## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LINCOLN-SUDBURY REGIONAL SCHOOL DISTRICT, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| MR. AND MRS. W., | ) ) ) |
| Defendants. | ) ) |

Civil Action
No.

### COMPLAINT FOR ATTORNEYS' FEES

1.      Plaintiff, Lincoln-Sudbury Regional School District (Lincoln-Sudbury) brings this action against Mr. and Mrs. W of Sudbury, Massachusetts, to recover reasonable attorneys' fees, costs, and expenses incurred in the administrative proceeding at the Massachusetts Bureau of Special Education Appeals (BSEA), BSEA #1501317, which ended in a decision for Lincoln-Sudbury on all issues, and included an express finding that Mr. and Mrs. W brought the administrative proceeding in bad faith and for an improper purpose.

2.      This Court has jurisdiction over this matter pursuant to 20 U.S.C. §1415(i)(3)(A).

3.      Lincoln-Sudbury is a regional school district created pursuant to M.G.L. c.71, §15 with all the powers and duties conferred by law upon school committees and by M.G.L. c.71, §16.  Lincoln Sudbury operates Lincoln-Sudbury Regional High School (LSRHS) and is responsible for educating students who reside in the towns of Lincoln and Sudbury beginning in the ninth grade.

4.      At all times pertinent hereto, the defendants, Mr. and Mrs. W. were and remain residents of Sudbury, Massachusetts.  They are the parents of Wallis, who was, at all pertinent times, a minor who resided with them in Sudbury, Massachusetts, and who attended LSRHS from ninth grade through the end of the 2012-2013 school year and the beginning of the 2013-2014 school year until September 6, 2013, when Mr. and Mrs. W. unilaterally

917669v1

placed her at Lawrence Academy, a non-special education, college preparatory private school, for her junior and senior years of high school.

5.       On or about September 30, 2012, Wallis was injured during a Lincoln-Sudbury field hockey practice.  Her physician diagnosed a concussion on October 3, and Wallis remained out of school for two weeks.  A doctor's note dated October 12, 2012, stated that Wallis was to miss gym and games until October 29 and further provided that she could "run but not yet play."  It also excused her "from make-up work and tests for two weeks" and provided that "[i]f homework causes a relapse of symptoms, she should be excused from homework for a week."

6.       The October 12, 2012, note provided the only doctor's instructions related to Wallis's return to school, and neither Wallis, nor Mr. and Mrs. W., presented Lincoln-Sudbury with any other doctor's instructions during the 2012-2013 school year until after Wallis's June 14, 2013, doctor visit at which parents asked the doctor for a note to excuse Wallis from taking a math make up test and the math final.

7.       Wallis never went to the Lincoln-Sudbury Health office for any reason during the 2012-2013 school year except for routine vision and hearing screenings, and she did not see any doctors for between October 12, 2012, and June 14, 2013.

8.       When Wallis returned to school on October 15, 2012, after missing nine (9) school days, Lincoln-Sudbury implemented regular education modifications and supports to assist her in making up the academic work she missed during her absence.  After her return, Wallis met with her guidance counselor and her teachers individually to discuss the work she needed to make up and the time-frame for making up the work.  Wallis, Mr. and Mrs. W., and LSRHS staff and teachers met together in November, 2012 to further refine the plan for

Wallis to complete the necessary make-up work. Wallis made up all the work her teachers required by the third quarter of the 2012-2013 school year.

9.      No one at the November, 2012 meeting discussed making a referral for special education or Section 504 evaluation, and no one made an oral or written request for an evaluation in the fall of 2012.

10.     Wallis maintained good grades in all her challenging academic and non-academic classes and successfully participated fully in school and extra-curricular activities during the 2012-2013 school year. She scored above average on the National Spanish Examination, earning a bronze medal; the United States History Advanced Placement Exam, scoring 4 out of a possible 5; and the United States History subject SAT, scoring 610. She also actively participated in Model UN and spring track. She passed all her classes for the year with the exception of intensive math, in whcih she received an incomplete because she refused to take one fourth-quarter test and the final exam. Her performance in intensive math demonstrated that she accessed the curriculum, showed competency in the subject, and placed her above the average tenth grade college prep math student.

11.     Lincoln-Sudbury staff did not notice that Wallis suffered from any post-concussion symptoms at any time after she returned to school.

12.     After November, 2012, neither Wallis, nor Mr. or Mrs. W., ever communicated to Lincoln-Sudbury any concerns stemming from Wallis's concussion such as lingering symptoms, make-up work, inability to do any activity or sports, or the need for concussion-related accommodations until May, 2013, when Wallis's math teacher declined to recommend her for the intensive math class in 11th grade, and recommended that she take the advanced honors class instead.

13.     Although Wallis could have taken intensive math in 11th grade pursuant to a parental override, a process Mr. and Mrs. W. had used in the past, Wallis was upset that the math teacher did not recommend her for intensive math.

14.     Lincoln-Sudbury developed and proposed a plan to provide Wallis extra help for the remainder of the quarter to achieve the grades she would need to earn to obtain the math teacher's recommendation to intensive math for 11th grade.

15.     On May 19, Mr. and Mrs. W. rejected the plan in a scathing e-mail demanding an "emergency meeting to put [Wallis] on a 504 plan to address deficiencies in math and any other area of subpar performance," that Wallis be removed from the math teacher's class, that the math teacher have no further contact with her, that Wallis be given an incomplete in the class, that a plan be developed to include tutoring over the summer to "position her well for intensive math next year," and that Wallis be evaluated to identify alleged unlearned curriculum, as well as for "cognitive issues due to her concussion."

16.     Lincoln-Sudbury responded by e-mail on May 20, offering a meeting to discuss the 504 process, providing a summary of the 504 process, explaining the need for additional medical documentation and consent for cognitive testing, and urging Wallis's prompt return to math class.

17.     On May 21, Mr. and Mrs. W. responded with another e-mail which was highly critical of Lincoln-Sudbury and its staff, and in which they claimed, among other things, that Alexandra had been "cognitively disabled for an extended period of time."

18.     Lincoln-Sudbury met with parents on May 24 to discuss, *inter alia*, Wallis's math placement for eleventh grade, parents' questions about math in particular, and, in general, about whether Lincoln-Sudbury appropriately accommodated Wallis after her

concussion, whether Wallis had a disability which required continued accommodations, and the additional steps and documentation required for consideration of a 504 plan.

19.     At the May 24, 2013, meeting Mr. and Mrs. W. confirmed that they had not taken Wallis back to the doctor because of her concussion, that they did not think she had post-concussion symptoms at that point, and even that they felt Alexandra had fully accessed the Intensive Algebra curriculum.

20.     On June 14, 2013, Mr. and Mrs. W. took Wallis to the doctor for a note advocating that she should receive an incomplete in math and be tutored over the summer because she had not learned the material she missed due to her concussion.  The doctor did not examine Alexandra during that visit, but wrote the requested note and recommended a neuropsychological evaluation.

21.     Wallis never made up the math test she missed in May and never took the final.

22.     On July 8, 2013, Mr. and Mrs. W. took Wallis to Boston Children's Hospital for "support to discuss with the school about [alleged] previous lack of accommodations," but the doctor declined because he had not been treating Alexandra when parents claim she should have had accommodations.

23.     Mr. and Mrs. W. did not produce any evidence to Lincoln-Sudbury during the 2012-2013 school year, or at hearing, to back up their claim that Alexandra was disabled.

24.     Although Mr. and Mrs. W. requested an "evaluation" for a 504 Plan in mid-May, 2013, they never signed a consent to evaluate.

25.     Mr. and Mrs. W. unilaterally placed Wallis at Lawrence Academy for the 2013-2014 and 2014-2015 school years.

26.     Mr. and Mrs. W. requested a hearing before the Bureau of Special Education Appeals (BSEA) on September 22, 2014.

27.     The issues presented in their hearing request were ultimately pared to eight (8), and after six (6) days of hearing, during which parents called seventeen (17) witnesses, all of whom were either current Lincoln-Sudbury administrators, teachers, and staff or were former Lincoln-Sudbury administrators, Mr. and Mrs. W. rested their case.  Neither of them testified, and they also chose not to call Wallis to testify.

28.     On April 1, 2016, the BSEA issued its decision in Lincoln-Sudbury's favor on all the issues.  The BSEA issued a corrected decision which corrected clerical errors on April 8, 2016.  A true and correct copy of the corrected BSEA decision is attached hereto as Exhibit A and is incorporated herein by reference.

29.     In addition to finding that Mr. and Mrs. W. failed to prove "by a preponderance of the evidence that Lincoln-Sudbury failed to meet its obligations under the IDEA, M.G.L. c.71B and/or Section 504," the hearing officer found that they failed to show that Wallis was disabled at any time during the 2012-2013 school year, failed to present any evidence "which could form a reasonable basis for a finding of eligibility for IDEA or Section 504 protections," and found "[t]here was no reasonable support for a 'suspicion' at any time during the 2012-2013 school year that Wallis might have a disability."  Exhibit A, p.22.

30.     Moreover, the hearing officer concluded that "Lincoln-Sudbury acted reasonably and responsibly when it followed the physician's instructions concerning Wallis' re-entry to school following her injury" and that "Lincoln-Sudbury teachers extended reasonable regular education supports to Wallis immediately on her return, and for as long as

she needed them, and that those supports permitted Wallis to maintain a high level of

achievement in rigorous honors level academic classes and in a demanding extracurricular

schedule." Exhibit A, p.22.

31.     The hearing officer expressly found that Mr. and Mrs. W. brought and

pursued the BSEA proceeding for an improper purpose, that "[t]he record clearly

demonstrates that the Parents' objections to Wallis' 10th grade experience at Lincoln-Sudbury

began only after the math department recommended a change from one honors section to

another honors section," that "[t]heir claim to special education eligibility is patently

frivolous, as is the claim to Section 504 protections," and that "the Parents' actions in

pursuing IDEA and Section 504 claims at the BSEA were a bad faith effort to punish

Lincoln-Sudbury's staff for the perceived 'disrespect' of their daughter's academic prowess

and to justify public funding for her private school education." Exhibit A, p.22.

32.     The hearing officer described Mr. and Mrs. W.'s behavior during the

administrative process as "vitriolic hyperbole," noting that they "offered insults, threats,

distortions, misleading and tautological arguments" which appeared designed "to intimidate,

shame or coerce Lincoln-Sudbury staff into actions not warranted by a reasonable view of

Wallis' educational experience at Lincoln-Sudbury." Exhibit A, p.22.

33.     20 U.S.C. §1415(i)(3)(B)(i)(III) allows the Court to award reasonable

attorneys' fees as part of costs "to a prevailing …local educational agency…against the

parent, if the parent's complaint or subsequent cause of action was presented for any

improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the

cost of litigation."

34.     Lincoln-Sudbury prevailed at the BSEA on every issue in a lengthy proceeding which began with the hearing request filed September 22, 2014, almost two full years after the accident which resulted in Wallis' concussion, involved significant discovery, and ended with a hearing which occurred on six (6) different days.

35.     The hearing officer expressly found that "[i]f ever a matter merited a finding that it was brought for an improper purpose it is this." Exhibit A, p.22.

36.     The attorneys' fees, costs, and expenses incurred in defending against Mr. and Mrs. W.'s frivolous claims were reasonable and are based upon the rate prevailing in the community in which the proceeding arose for the kind and quality of the services furnished.

37.     Lincoln-Sudbury is the prevailing party, parents' motives for initiating and pursuing the proceeding were improper, and Lincoln-Sudbury is entitled to an award of attorneys' fees, costs, and expenses.

WHEREFORE, Lincoln-Sudbury prays that the Court enter judgment in its favor as follows:

1.     awarding Lincoln-Sudbury reasonable attorneys' fees, costs, and expenses to defend against Mr. and Mrs. W.'s claims in the administrative proceeding below;

2.     awarding Lincoln-Sudbury reasonable attorneys' fees, costs, and expenses for the prosecution of this action; and

3.     for such other relief as the Court deems proper.

DATED at Quincy, Massachusetts this 14th day of April, 2016.

> LINCOLN-SUDBURY REGIONAL SCHOOL
> DISTRICT,
> By Its Attorney,
>
>
> Doris R. MacKenzie Ehrens
> BBO #544292
> Murphy, Hesse, Toomey & Lehane, LLP
> 300 Crown Colony Drive
> Quincy, MA 02169
> (617) 479-5000
> (617) 479-6469

# EXHIBIT A

DIVISION OF ADMINISTRATIVE LAW APPEALS
COMMONWEALTH OF MASSACHUSETTS
BUREAU OF SPECIAL EDUCATION APPEALS

APR 1 1 2016

## <u>CORRECTED DECISION</u>

To:     Interested Parties

From:  Lindsay Byrne, Hearing Officer

Re:     Decision:  BSEA #1502427 - Wallis & Lincoln-Sudbury Regional School District

Date :  April 8, 2016

This Corrected Decision is sent to correct errors on pages 1 and 14 in the Decision originally sent to the Parties on April 1, 2016.  The corrections result in the formatting and page sequence changes reflected in the Corrected Decision.  Other than the docket numbers and the paragraph substitutions on page 14, which do not alter the analysis or the outcome, the Decisions are identical.  Please discard the Decision sent to you on April 1, 2016 and substitute this one in your records.

# COMMONWEALTH OF MASSACHUSETTS

# DIVISION OF ADMINISTRATIVE LAW APPEALS

# BUREAU OF SPECIAL EDUCATION APPEALS

In re:  Wallis[1]

&                                                              BSEA #1502427

Lincoln-Sudbury Regional School District

## DECISION

     This Decision is issued pursuant to M.G.L.c 71B and 30A, 20 U.S.C. §1400 et seq., 29 U.S.C. § 794 and the regulations promulgated under the statutes. A Hearing was held in the above-entitled matter on April 7, November 17, 18 and 19, 2015 and January 6 and 7, 2016. Present for all or parts of the proceeding were:

| | |
|---|---|
| Mr. and Mrs. W | Parents |
| Nancy O'Neil | Athletic Director, retired, Lincoln-Sudbury Regional School District |
| Janette Cavallo | Nurse, Lincoln-Sudbury |
| Gail Nozik | Nurse, Lincoln-Sudbury |
| Joan Gaumitz | Nurse, Lincoln-Sudbury |
| Vicky Caburian | Coach, Wellness Teacher, Lincoln-Sudbury |
| Yoshitaka Ando | Athletic Trainer, Lincoln-Sudbury |
| Ann Kramer | English Teacher, Lincoln-Sudbury |
| Kim Schultz | Spanish Teacher, Lincoln-Sudbury |
| Joshua Gilman | History Teacher, Lincoln-Sudbury |
| Brandon Dorey | Math Teacher, Lincoln-Sudbury |
| Lisa Weiss | Math Department Coordinator, Lincoln-Sudbury |
| Virginia Blake | Curriculum Coordinator, Lincoln-Sudbury |
| Sandra Crawford | West Housemaster, Lincoln-Sudbury |
| John Kwan Park | Guidance Counselor, Lincoln-Sudbury |
| Scott Carpenter[2] | Former Superintendent, Lincoln-Sudbury |
| Rhonda Taft-Farrell[2] | Former Interim Director of Special Education, Lincoln-Sudbury |
| Aida Ramos | Director of Student Services, Lincoln-Sudbury |
| Doris McKenzie-Ehrens | Attorney for Lincoln-Sudbury |
| Anne Bohan | Court Reporter |
| Alexander Loos | Court Reporter |
| Lindsay Byrne | Hearing Officer |

---

[1] "Wallis" and "Mr. and Mrs. W". are pseudonyms assigned by the Hearing Officer to protect the family's privacy in documents available to the public.

[2] Mr. Carpenter and Dr. Taft-Farrell participated and testified by telephone as agreed by the Parties.

The official record of the Hearing consists of exhibits submitted by the Parents during the hearing marked P-1 through P-4; exhibits submitted in advance of the hearing by the School marked S-1 through S-45; and approximately 26 hours of recorded oral testimony and argument. The Parents represented themselves at all stages of the Hearing Process. The School was represented by an attorney. The Parties submitted written closing arguments by March 1, 2016 and the hearing record closed on that date.

## I. ISSUES

The issues were originally set out in an Order issued on January 14, 2015. The issues articulated in that Order were confirmed in a subsequent Order issued on April 17, 2015 and read into the Hearing Record on April 7, 2015 and November 17, 2015:

1.    Whether Lincoln-Sudbury complied with Student's physician's medical instructions regarding reentry to school following her concussion during the 2012-2013 school year?

2.    Whether Lincoln-Sudbury failed to comply with the requirements under the IDEA and/or Section 504 "child find" provisions (that is, whether Lincoln-Sudbury knew or should have known of Student's continuing medical issues, physical or mental impairment?

3.    Whether Student's medical issues substantially limited Student's ability to learn (a major life activity)?

4.    Whether Lincoln-Sudbury denied Student access to the curriculum of each of her classes during the 2012-2013 school year?

5.    Whether Student failed to make effective progress in her classes during the 2012-2013 school year?

6.    Whether Student was eligible to receive accommodations under a Section 504 plan as a result of a concussion suffered on or about September 30, 2012?

7.    Whether Parents are entitled to reimbursement for their unilateral placement of Student at Lawrence academy for her junior and senior year inclusive of transportation?

8.    Whether Parents are entitled to reimbursement for provision of the 2013 math summer tutoring for Student?

## II. PARENTS' POSITION

Wallis was disabled as a result of a concussion she sustained on September 29, 2012. The injury caused substantial limitations in her ability to learn throughout the remainder of the 2012-2013 school year. Wallis did not make effective progress commensurate with her potential with the minimal and inappropriate supports provided by Lincoln-Sudbury. Lincoln-Sudbury knew or should have known of her disability. Lincoln-Sudbury failed to carry out its child-find obligations, to evaluate Wallis for special education and to provide appropriate specialized instruction in violation of the IDEA and MGL 71B. Lincoln-Sudbury failed develop a Section 504 Plan to ensure equitable access to Lincoln-Sudbury classes, programs and services in violation of 29 USC § 794. As a result of these failures Wallis suffered

2

serious and long lasting physical and emotional harm. The Parents are therefore entitled to publicly funded reimbursement of expenses associated with their unilateral placement of Wallis at Lawrence Academy for the 2013-2014 and 2014-2015 school years and for math tutoring during the summer 2013.

III.  SCHOOL POSITION

There is no evidence that Wallis was disabled after her return from a two week absence due to a concussion. Lincoln-Sudbury complied with her physician's instructions which provided for a full return to activities by October 30, 2012. There are no other evaluations or directions from a health care provider, a parent, or any other source between October 2012 and June 2013. Wallis received regular education supports geared toward work completion which she both used and accomplished. No teacher recommended further evaluation or course/activity modification. Wallis had full access to her challenging regular education curriculum, participated in all aspects of high school life without limitation, and earned excellent course grades with and without grading modifications, passing the 10th grade without difficulty. Wallis achieved at the highest levels on national academic tests in History and Spanish. There was no reasonable suspicion of any disability and thus no obligation to evaluate or to provide special education services or 504 accommodations to Wallis during the 2012-2013 school year.

IV.  PROCEDURAL HISTORY

1.      The Parents requested a BSEA Hearing on September 22, 2014. The Hearing was scheduled to take place on October 27, 2014 before Hearing Officer Rosa Figueroa. During a conference call held on October 14, 2014 the Parties agreed to postpone the Hearing. On October 27, 2014 the BSEA issued an Order scheduling the Hearing for February 25, 26, and 27, 2015. (Administrative Record)

2.      On November 9, 2014 the Hearing Officer issued an Order outlining the issues to be decided at Hearing. The Parents withdrew three of those issues on November 20, 2014. On January 14, 2015 the Hearing Officer granted the Motion of Lincoln-Sudbury Regional School District to Dismiss an additional and overlapping four issues and set out the issues remaining for resolution at this Hearing. (Administrative Record)

3.      On February 18, 2015 the Hearing Officer granted the Parents' request to postpone the February 15 Hearing dates. By Order dated March 13, 2015 the Hearing was rescheduled to April 7, 8, and 9, 2015. (Administrative Record)

4.      On March 22, 2015 the Parents requested a postponement of the April Hearing dates. The School opposed further postponements. On April 3, 2015 the Hearing Officer denied the Parents' request to postpone the April 7 and 8 Hearing dates. The Hearing Officer granted the Parents' request to postpone the April 9th date due to the Parents' conflicting medical appointment. She directed the Parties to be available on any of the following alternate dates: April 10, 13 or 14, 2015, to conclude the Hearing. (Administrative Record)

5.      On March 25, 2015 the Parents filed a Motion to Recuse Hearing Officer Figueroa. The School opposed the Motion. On April 3, 2015 Hearing Officer Figueroa denied the Parents' Motion for Recusal but recommended administrative reassignment of the matter. In accordance with the Hearing Officer's recommendation BSEA #15-02427 was reassigned to Hearing Officer Lindsay Byrne on April 3, 2015. (Administrative Record)

6.     The School submitted its proposed exhibits and witness list on March 31, 2015 in accordance with 20 U.S.C.§1415(f)(2), 34 CFR § 300.512, and BSEA Rule IX. The Parents submitted a witness list on April 3, 2015, fewer than five days before the scheduled hearing. The Parents did not submit any proposed documentary evidence. (Administrative Record)

7.     The Hearing was scheduled to begin on April 7, 2015 at 10:00 am. That morning, at 7:56 am the BSEA received a fax from the Parents Requesting Postponement of the Hearing and indicating that they would not be attending the Hearing. The Parents' April 7, 2015 request offered no new or alternative grounds to those advanced in support of their previous, partially unsuccessful, postponement request. (Administrative Record)

8.     On April 7, 2015 at 10:00 am the School's attorney, the School's Special Education Director, and a witness subpoenaed by the Parents were present and ready to begin the Hearing. The Hearing Officer convened the Hearing at approximately 10:45 in order to give the Parents ample time to arrive. The Hearing Officer attempted to contact the Parents at two telephone numbers listed in the administrative record. Messages were left at each number. The Hearing Officer then addressed the outstanding Motions.. The Parents' Motion to Postpone was Denied. The School's Motion to Dismiss for Failure to Prosecute was taken under advisement. The Hearing Officer reviewed the Schools submissions for objectionable material and, finding none, added the School's documents to the official record of the Hearing, The Hearing Officer then suspended the Hearing until November 17, 2015. (Administrative Record) On April 17, 2015 the Hearing Officer denied the School's Motion to Dismiss and imposed a lesser sanction: barring introduction of documentary evidence by the Parents that did not conform to the IDEA's 5 day rule.  As the Parents had not submitted any conforming documents the Ruling functionally excluded direct presentation of documentary evidence by the Parents.

On November 4, 2015 the Parents requested the issuance of subpoenae to 20 individuals. The School's Motion to Quash two subpoenae and to reschedule one subpoena was granted. The remainder were issued. On November 9, 2015 the Parents requested the recusal of the Hearing Officer. The Parents' Motion to Recuse was denied on November 16, 2015. The Hearing resumed on November 17, 2015. At the outset the Parties presented arguments on the Parents' outstanding Motions: to Vacate the Hearing of April 7, 2015 and to Vacate the April 17, 2015 Ruling on the Parents' Motion for a Postponement and on the School's Motion to Dismiss.  Both were denied. The Parents' Motion to sequester witnesses was reserved for a case by case demonstration of need. The Hearing proceeded on the 3 previously scheduled days in November 2015. The Parents did not conclude presentation of their witnesses. An additional three days were scheduled for the first week of January 2016 (January 7, 8 and 9, 2016) to accommodate Wallis' college schedule. The School's January 5, 2016 Request to Postpone the Hearing due to the emergency hospitalization of the Special Education Director was opposed by the Parents and was denied. The Hearing resumed on January 6, 2016.  The Parents did not call Wallis to testify and she did not attend any part of the Hearing. The Parents declined to testify.  They completed presentation of their evidence on January 7, 2016. Their evidence included four exhibits taken in during the Hearing. The Hearing was continued to February 9, 10, 11 and 12, 2016 to begin the School's presentation. On January 22, 2016 the School alerted the Parents and the Hearing Officer by letter and through a conference call that it would not call any witnesses. Therefore the evidentiary record closed on January 22, 2016.  Closure was confirmed by Order issued on January 29, 2016. (Administrative Record; TR I, II, V, VI.)

## V.  SUMMARY OF THE EVIDENCE

1.      This matter concerns events that took place during the 2012-2013 school year. At that time Wallis was a 15 year old general education student enrolled in the 10th grade at Lincoln-Sudbury Regional High School. Her academic course of study was the most challenging available to a 10th grade student. It included accelerated honors level courses in English, Science, Math and Spanish as well as advanced placement (AP) American History. She also participated in varsity sports and on the School's Model United Nations Team. (S-22; Park; Kramer)

2.      Wallis was a member of the varsity field hockey team. On Saturday September 29, 2012 Wallis was injured during play on the Lincoln-Sudbury field. She lost a tooth, received immediate first aid, and was picked up by her Parents for further treatment. On Monday, October 1, 2012 Vicky Caburian, varsity field hockey coach, reported the incident on a state form "Report of Head Injury During Sports Season." (S-3; Caburian; O'Neil)

3.      Wallis was absent from school for two weeks following the injury. (S-21A) She was seen by her physician on October 3, 2012. Dr. Gaughan diagnosed a concussion and recommended "complete rest; no school or media or reading or physical activity." (S-4) On October 5, 2012, Ms. W sent electronic mail correspondence to Ms. Caburian stating:

> On Wednesday her physician diagnosed her with a concussion and said that [Wallis] should have complete physical and brain/mental rest including not attending school or doing any academic work… The doctor said that [Wallis] will be returning to school part time and should have a step by step gradual ramp up to get her caught up on homework projects and tasks she has missed. She will coordinate further with you to develop a plan when she returns. She is eager to get back to field hockey and at least see practices and games. Let me know if there is anything more specific we need to do related to the concussion.

(S-6). Ms. Caburian replied wishing Wallis well.

4.      On October 7, 2012 the Parents returned a "Student Health and Emergency Information Form" to Lincoln-Sudbury, giving permission for the administration of over-the-counter pain relief products. No health concerns were listed. (S-6) On October 9, 2012 Dr. Gaughan wrote a prescription stating:

> Please continue to excuse [Wallis] from school. She suffered concussion on
> The 30th and saw me on October 3 at which point I recommended complete
> rest.  Today I saw her for F/U and continue to recommend complete rest.

(S-6)  There is nothing indicating contemporaneous receipt of this document by Lincoln-Sudbury.

5.      On October 12, 2012 Dr. Gaughan wrote a prescription stating:

> Please allow [Wallis] to miss gym and games until the 29th. She may run but
> not yet play. In class, excuse her from make-up work and tests for two
> weeks. If homework causes a relapse of symptoms please excuse her from
> homework for a week.

(S-6) A handwritten note indicates Lincoln-Sudbury's receipt of this prescription on October 15, 2012.

6.      On October 15, 2012 Gail Nozik, a school nurse at Lincoln-Sudbury, entered a "concussion alert" into the Lincoln-Sudbury student record system. The alert, sent to Wallis' teachers as well as to guidance administration and nursing staff, stated:

> Field hockey September 29, 2012 – awaiting paperwork – knocked tooth out. October 12, 2012 No Wellness or Field Hockey until October 29, 2012 – may run, but no playing games. To be excused from make-up work and tests for two weeks. If homework causes a relapse of symptoms, she is to be excused from homework for one more week.
>
> October 15, 2012 – mother's note regarding wellness – will participate in wellness as tolerated.

(S-4)

Ms. Nozik testified that she also entered the medical alert in the school's "Ipass" system. This system places an icon in a column next to the student's name in school records. The icon alerts the reader that the student has a relevant health concern. The icon does not differentiate between concussions and other medical conditions but permits further inquiry by authorized users. (See eg. S-5)

Ms. Nozik further testified that the nursing staff regularly cares for students with concussions, is trained and experienced in recognizing and treating post-concussion symptoms such as headaches, nausea, dizziness and visual changes, and participates with guidance staff in developing 504 plans and IEPs for students with medical issues. Ms. Nozik stated that Wallis never came to the nursing office with any complaints of any kind during the 2012-2013 school year. She also stated that Wallis' parents never communicated directly with the nursing office about Wallis during the 2012-2013 school year. Other than Dr. Gaughan's October 2012 prescription, the nursing office received no medical information or instructions concerning Wallis. No concussion related problems were reported to the nursing office by Wallis, her parents, her doctor(s), or Lincoln-Sudbury staff. (Nozik; see also Cavallo)

7.      Janet Cavallo, a school nurse at Lincoln-Sudbury, testified that she has been extensively trained in concussion management and now trains Lincoln-Sudbury staff on the topic. (S-4, 5, 8) According to Ms. Cavallo, the Lincoln-Sudbury health office typically cares for 80-100 students a year with concussion related symptoms. She stated that during the 2012-2013 school year school responses to concussions were driven by the reports and instructions from the affected student's doctor and parents. The role of the school nurse was to implement the instructions. There were no "medical clearance" forms required at that time. A post-concussion gradual re-entry plan was limited to returning to participation in sports, was developed by the student's physician, and supervised by the athletic trainer.

Other than the October 2012 prescription neither Wallis' doctor nor her parents ever submitted instructions or other documents to the health office, or made any other requests for school action concerning Wallis that the health office was aware of. Wallis never came to or contacted the health office about any post-concussion symptom during the 2012-2013 school year. The health office did not assess or treat Wallis for any post-concussion symptoms. The only visit Wallis made to the health office during the 2012-2013 school year was on January 19, 2013 for a state mandated vision/hearing screening applicable to all 10th grade students. Wallis did not check off any symptoms that might have indicated post-concussion difficulties. She passed both the vision and hearing screen. (Cavallo; S-6; S-45; see also Nozik)

8.     The Athletic Trainer during the 2012-2013 school year, Yoshitako Ando, testified that in the fall of 2012 all school actions and policies regarding concussions and student-athletes were based on the individual student's physician's instructions. He was aware that Wallis had sustained a concussion at that time but received no information from any source that would have indicated continuing concern. Mr. Ando reported that Wallis never visited his office and that neither her parents nor Lincoln-Sudbury staff contacted him about Wallis. (Ando; see also testimony of O'Neil)

9.     Wallis returned to school on October 15, 2012 for a field trip to Sturbridge Village with her AP History class. She remained on the varsity field hockey roster and participated in Team events such as the end of season banquet, but did not play. (S-21A; Caburian)

10.     Jon Kwan Park was the guidance counselor assigned to Wallis during the 2012-2013 academic year (S-45N). He also saw Wallis as the faculty advisor for the Model UN program Wallis participated in throughout the year. He testified that while he has no specific recollection of receiving the Parents' email attaching the doctor's note with post-concussion instructions for Wallis, he was aware that she had been injured during field hockey and sustained a concussion. At some point he came into possession of the doctor's note. His usual practice when receiving a doctor's note is to keep a copy, give a copy to the school nurse, and inform the student's teachers of the content of the note.

Mr. Park met with Wallis on her return to school. They developed a plan covering what information to share with her teachers and sorting her assignments by priority. Mr. Park testified that Wallis appeared physically recovered from her injury with no observable post-concussion symptoms. Wallis appeared emotionally capable of resuming her normal, ambitious routine and expressed a desire to do so independently. Mr. Park assured her that support was available if needed. He sent an e-mail to Wallis' teachers advising them to work with Wallis to adjust assignments. (Park)

11.     Wallis missed two days of school in early November due to the death of a close family member. (S-21A)

12.     Mr. Park received an email from Wallis' parents in November 2012 indicating concerns with the concussion and Wallis' return to school. He set up a meeting with Wallis, her parents, her teachers, the responsible housemaster, Sandra Crawford, and himself to discuss those concerns. The meeting took place on November 29, 2012. It resulted in a plan for academic accommodations and modifications to be implemented in Wallis' existing general education courses, including: extra help from the teacher, waiver of some assignments and tests, and extension of deadlines for making up and/or turning in others, modifying the format or length of projects, extended time for tests and extension of the deadline for addressing grades of incomplete. Wallis and her Parents agreed to the Plan at the meeting. There was no discussion about referring Wallis for a disability evaluation. (Park; See also S-13; Crawford)

13.     Wallis actively managed her participation in winter track on her return to school (S-14). She also participated in Model UN where she was a natural leader, according to her faculty advisor Mr. Park. (Mr. Park; S-21A)

14.     Ann Kramer taught the mixed grade American Literature 1620-1900 class during the fall semester 2012 (S-45L). Ms. Kramer testified that the class is the highest level English class offered at Lincoln-Sudbury. She described Wallis as an outstanding student with a solid grade of A prior to the accident. Ms. Kramer was notified by Lincoln-Sudbury staff of Wallis' concussion. On her return after the two week absence Ms. Kramer met with Wallis, waived a few quizzes and discussed the parameters of a long paper. Ms. Kramer was prepared to give a significant extension. Instead Wallis turned in

7

"excellent, excellent work" within a few days. (TR III-46) Wallis completed tests at same rate as other students with excellent results.

Ms. Kramer is aware of post-concussion symptoms. She testified that Wallis displayed no post-concussion symptoms after she returned to school. Wallis never complained about the lights, never had trouble watching films, and never asked for any in-class or homework adjustments. Ms. Kramer did not observe any fatigue. She observed no changes in Wallis' behavior or academic performance after her concussion. Wallis appeared to be the same student behaviorally, emotionally and academically after the accident as she had been before the accident. Ms. Kramer reported that Wallis earned grades of: 1st quarter A; 2nd quarter A+; Final Exam A-; Final A. She was consistently one of the highest achieving students in the American Literature class. She never heard any complaints from Wallis or her parents. Ms. Kramer, who had participated in dozens of Section 504 meetings, testified that there was never any reason to refer Willis for an evaluation for Section 504 accommodations or for special education. (Kramer; S-15; S-22; S-12)

15.     Kim Schultz taught the full year 3rd year Advanced Spanish class in which Wallis was enrolled during the 2012-2013 school year. Ms. Schultz testified that she received emails from the Lincoln-Sudbury guidance department and from the Parents alerting her to the concussion sustained by Wallis. When Wallis returned to class she looked "overwhelmed" and was concerned about making up missed work. Ms. Schultz did not count missed homework and suggested that Wallis enlist a tutor from the school provided peer tutoring center or privately to help her catch up. Ms. Schultz attended a meeting in November 2012 between Wallis, her parents and her teachers to discuss ways to help Wallis catch up with her academic work. The group decided to reduce some homework and to extend deadlines to complete assignments. Ms. Schultz permitted all recommended accommodations. Wallis didn't use them. (Schultz; S-15)

Before the injury Wallis' grades in Spanish were inconsistent. After returning Wallis consistently earned B grades. During the second semester Wallis did not ask for or use any accommodations or modifications to the regular coursework and expectations. She earned a bronze medal on the National Spanish Examination administered in the spring of 2013. (S-27)

Ms. Shultz had no contact with Wallis' Parents after November 2012. She never observed any post-concussion symptoms and was not informed by anyone else that Wallis might have been experiencing any.  Nothing in Wallis' academic performance or classroom behavior prompted Ms. Shultz to refer her for a special education evaluation or for a Section 504 Plan. (Schultz)

16. .    Scott Gilman taught the Advanced Placement United States History course in which Wallis was enrolled for the full 2012-2013 school year. (S-45J) AP History is a college level course using college level text and primary source materials. It is fast paced and requires a lot of factual recall. Mr. Gilman was notified of the concussion and Wallis' extended absence by email. He developed a plan, in consultation with Mr. Park, to excuse Wallis from at least one test, to have an extended schedule for completion of 2 essays, and for carrying an incomplete grade ("I") until that work was finished. Wallis handed in the missing work during the 3rd Quarter and her 1st semester grade of I was converted to a B. Mr. Gilman does not recall meeting with other teachers to discuss these measures. He did not have any direct contact with Wallis' Parents. (Gilman; S-13; S-15; S-22)

Mr. Gilman testified that, due to his work as a softball/baseball coach, he has received training in concussion management. To assess whether a student is experiencing continuing difficulty as a result of a concussion he would look for: sleep disturbances, confusion, headaches, slurred speech, changes in

behavior and changes in comprehension. If any of these were observed he would contact the student's parents and other Lincoln-Sudbury staff. He did not observe any post-concussion symptoms in Wallis. She did not appear sleepy, irritable, sad, nervous or emotional. She had no difficulty concentrating or focusing. She kept up with the class. He did not observe any behavioral or academic changes between Wallis' pre-injury functioning and her post-injury functioning. At both times she was pleasant, participatory, engaged, friendly. She never complained of any difficulty and never requested accommodations or modifications to the course work or expectations. Wallis never requested teacher help, never came to before or after school history help hours, and never emailed any questions to Mr. Gilman. The fact that she could make up missed work while remaining current was very impressive. She earned B grades in each semester and a score of 4 on the Advanced Placement Exam administered in the spring. The score of 4 demonstrates that she was well qualified to do college level academic work. (S-25; see also S-26) Mr. Gilman did not observe any reason to refer Wallis for a special education evaluation or for Section 504 accommodations during the 2012-2013 school year. (Gilman)

17.    Brandon Dorey taught the Intensive Algebra II class Wallis was enrolled in during the 2012-2013 school year. (S-45G) Intensive Algebra II is taught in two discrete semesters. Success in one semester is not dependent on mastering the content of the other semester. He explained that Lincoln-Sudbury has 3 levels of math at the college prep level and above. Level II is college prep. Level I is a fast paced advanced course covering advanced concepts with teacher direction. Intensive is the course that is the fastest paced and most demanding. It is designed for students who learn independently and need little teacher instruction or direction. Math teachers make a recommendation for each Student's appropriate level placement for the next academic year. A final grade of "C" in one level is the minimum requirement for continuing in the same level. Should the student or parents want a different level placement than that recommended by the sending teacher they must complete an "override" form. Parental/student choice of level as indicated on the override form is then honored without exception. (Dorey; Crawford; Blake; Weiss)

Mr. Dorey was notified of Wallis' concussion and absence in the fall of 2012. He did not notice any change in her demeanor or academic performance after her return to school from the injury. She did not display, or complain of, any post-concussion symptoms. Mr. Dorey waived one test for the first quarter and Wallis chose to forgo an optional homework binder for the second quarter. At a meeting with Wallis, her Parents and her teachers to develop a work completion plan after her return to school Mr. Dorey recommended that Wallis see him for additional help during their mutual free block 6, that Wallis go to the math tutoring table available at lunch every day and that she take advantage of the on-line instructional videos he prepared to go along with each class lesson. Mr. Dorey also offered to waive assessments until she had caught up with the material and to place greater grading weight on the mid-term exam to be administered in January 2013. Mr. Dorey testified that he would have offered the same supports to any student who had missed two or more weeks of school for any reason. He did not require a finding of disability to put supports in place and none was warranted on the basis of Wallis' performance. Mr. Dorey did not recall any discussion of disability at the November 2012 meeting. (Dorey; S-134; S-15; S-44)

Wallis did not see Mr. Dorey for individual help. She did not complain to him about post-concussion symptoms or ask for additional or different supports. Her parents did not contact him about her grades or any other matter until May 2013. She earned a C grade for the 1st semester. (Dorey)

Mr. Dorey continued to offer supports during the 3rd Quarter including a modified homework binder and modified grades due to missing assignments. He testified that he reviewed her previous math grades and found that her Intensive Algebra II performance was consistent with her performance in earlier Intensive

courses. He found that Wallis mastered math concepts easily and quickly with direct instruction. He pointed to her achievement of 91% on the probability test after 45 minutes individual preparation with him.

As one of the lower performing students in the class Wallis still was mastering math concepts two levels above a regular college prep Algebra II course, well beyond what an average student would be learning. He concluded that the structure of the Intensive level, as it relied primary on independent learning, was not a good fit for her learning style. He recommended that she shift to Level I math, an honors level regular education course, for the 11th grade. He expected that with more teacher direction and repetition Wallis would achieve A grades in that honors course. Mr. Dorey also recommended that, based on their performance and learning style in the Intensive Algebra II class, 2 other students change levels for the 2013-2014 school year. (Dorey)

18.     Mr. Dorey explained his recommendation to Wallis and also explained that she could complete an override should she prefer to continue at the Intensive level. Shortly after that conversation the Parents called to express disagreement with his recommendation. Mr. Park met with Wallis, and with Mr. Dorey separately about the math level recommendation. Mr. Park testified that Wallis did not report that she was having difficulty with the content of the math course, but was disappointed with the teacher's course level recommendation for 2013-2014. (Park)  Mr. Park  proposed a plan to assist Wallis in bringing her 4th quarter grade to at least 70% by actively using the extra help offered by Mr. Dorey, using the available lunch-time math tutoring and the on-line instructional support and receiving concrete feedback. If Wallis demonstrated 4th quarter math achievement above 70% Mr. Dorey would reconsider his recommendation for placement in Advanced Honors Math. (S-30)

On May 19, 2013 the Parents objected to the plan proposed by Mr. Park and requested a Section 504 meeting. (S-31) The Parents wrote, in part:

> The school must take actions to immediately develop a 504 plan and has been remiss in not doing this.
>
> [Wallis] is to be removed from Mr. Dorey's classroom and is to be given an incomplete in math for this year. Mr. Dorey is not to conduct any further testing or grading of [Wallis'] work. It is obvious that she should not be tested until proper evaluation and remediation has been done.
>
> Mr. Dorey is not to have any further contact with [Wallis].
>
> The school is to properly evaluate [Wallis] to identify what parts of this year's curriculum she did not learn. The testing should include evaluations to identify any cognitive issues due to the concussion.
>
> A plan should be developed to position her well for intensive math next year. We expect that this will include tutoring over the summer.

(S-31)

19.     The Housemaster, Sandra Crawford, responded on May 20, 2013 explaining the School's plan to extend the time in which to make a math course level recommendation for Wallis to permit consideration of her performance for the entire 2012-2013 school year. Ms. Crawford also explained the process of developing a Section 504 plan:

JK and I are available to meet with you to discuss the 504 process. In brief, a
504 plan is created to provide students with disabilities accommodations which
allow them to access curriculum in a manner commensurate with their
non-disabled peers. When parents request a 504, they provide medical
results and/or cognitive testing which documents that their child has a
disability, the house team gets feedback from teachers about the student's
level of academic performance, and then we meet to discuss potential
eligibility and accommodations. 504 plans are created out of such meetings.

In terms of [Wallis'] concussion, and post-concussion symptoms, the last doctor's
note we have in the nurses office is dated 10/12/12. It excuses [Wallis] from tests
and homework for two weeks. We have no additional medical documentation for
[Wallis] after the date. Do you have additional medical documentation that you
have not shared with us concerning her condition? (JK was under the impression
that you said on the phone last week that [Wallis] is symptom free. Is this not the
case?) Also in your email you request cognitive testing. If you would like us to
provide this testing, you must sign a consent to test. We can send you these forms,
or you could come to Student Services to sign.

(S-32)

20.     At no time during the 2012-2013 school year did any of Wallis' teachers report to Mr. Park that
Wallis was exhibiting symptoms associated with post-concussion syndrome or that she evidenced any
other kind of disability, that she was unable to access the curriculum or that she required specialized
instruction. (Park)

21.     The Parents did not offer any contemporaneous physician notes, health assessments or learning
evaluations to support their request for a finding of eligibility for a Section 504 Plan. The only doctor's
notes available to Lincoln-Sudbury were the two authored by Dr. Gaughan in October 2012 (See
Paragraph 3, infra )

22.     Wallis did not visit her physician between October 2012 and June 2013. (S-7)

23.     Ms. Crawford arranged a 504 meeting for May 24, 2013. The meeting was attended by the
Parents, Mr. Crawford, Mr. Park, Mr. Dorey, Ms. Blake, the math department coordinator at the time
and Ms. Weiss slated to become the math department coordinator in September 2013.

At the meeting the Parents continued to reject the school plan to provide Wallis additional math supports
and the opportunity to make up missed tests and assignments. The Parents also rejected the School's
proposal to extend the time to make math course level recommendations. (Crawford; Blake)

Ms. Crawford explained the 504 process: the first step is a parent-teacher meeting to discuss a student
who is struggling in an academic subject and to set up regular appropriate education supports; for
students with health related issues documentation and instructions from the student's medical provider
guides the discussion and planning; parental requests for testing are honored when there is a reasonable
suspicion of the existence of a disability and some showing of its affect on learning from the teachers
and/or the appropriate health care professional; and parents must provide written consent for any school
provided testing. (Crawford).

24.     At the May 2013 meeting the Parents stated that although Wallis had been disabled by her injury during the 2012-2013 school year, by May 24, 2013 she no longer was. Therefore, they asserted, testing was not necessary. (Crawford; Blake; Admission TR. 2-250-51; S-33) The School did not receive a signed consent to evaluate form from the Parents. (Crawford)

25.     Wallis attended most math classes for the remainder of the 2012-2013 year. She did not participate in assessments. On June 14, 2013 Dr. Gaughan wrote a note to excuse Wallis from the final exam in math. The note did not cover the final exam in any other subject. It stated that Wallis had incurred a concussion and did not have an opportunity to learn the missed work. The note did not refer to any post-concussion symptoms. The recommendation was not based on a physical examination of Wallis. (S-8C. Crawford. Compare S-6, June 14, 2013 visit note.) Wallis did not participate in the final exam in math. She received a grade of incomplete for the semester. (Dorey; Park; Blake; S-22)

26.     Mr. Dorey testified that at the end of the 2012-2013 school year the tests Wallis had not taken were left in the administrative office for Wallis to complete during the summer 2013. Had the tests been completed they would have been graded. Her I grade would then have been cleared and replaced with a letter grade. Wallis did not clear the I grade during the summer 2013. Instructional materials were accessible through the School's website during the summer. Mr. Dorey also offered to work with Wallis during the teacher prep week before the start of the 2013-2014 school year. (Dorey; Crawford; S-44)

27.     On July 8, 2013 Wallis was seen in the Boston Children's Hospital Sports Medicine Clinic. (S-6; S-9) There were no significant clinical findings or recommendations.

27.     Ms. Blake testified that the Parents had previously disputed a March 2011 recommendation for placement in a Level 1 Honors math class. Wallis' Algebra I teacher recommended that she be placed in Level I Geometry during the 2011-2012 school year. The Parents filed an override and Wallis was placed in Intensive Geometry instead. Wallis earned a B and a B- in that class. (Blake; S-22)

28.     The Parents filed an override of Mr. Dorey's recommendation that Wallis be placed Level I Calculus for 2013-2014. Despite a grade of I in Intensive Algebra II, Wallis was therefore scheduled into the Intensive Trigonometry class. (Blake)

29.     The Report Cards reflecting grades earned before and after Wallis' September 2012 injury show:

|              | Spring 2012 | Fall 2012 | Spring 2013 |
| ------------ | ----------- | --------- | ----------- |
| English      | A-          | A         | A-          |
| AP History   | A-          | B         | B           |
| Spanish      | A-          | B-        | B           |
| Math         | B-          | C         | I           |
| Science      | B-          | C--       | B-          |
| Art          | A           |           |             |
| Coaching     | A           |           |             |
| Wellness     | A           |           |             |
| Ceramics     |             | A         |             |
| Fitness      |             | A         |             |
| CPR          |             | A         |             |
| Architecture |             |           | A           |
| Dance        |             |           | A           |
| Outdoor      |             |           | A           |

30.     On September 3, 2013 the Parents notified Lincoln-Sudbury that Wallis had been enrolled in Lawrence Academy. They asserted that Lincoln-Sudbury had not provided Wallis with a free appropriate public education. They requested public funding for the private high school placement. In response Lincoln-Sudbury sent the Parents a proposed special education evaluation consent form. Wallis began attending Lawrence Academy on September 6, 2013.. There is no information about Lawrence Academy in the record. (S-16)

31.     By letter dated September 24, 2012, the Parents withdrew Wallis from Lincoln-Sudbury and noted their lack of consent to an IDEA Eligibility Evaluation. (S-17; S-18)

## VI.  LEGAL FRAMEWORK

The issue underlying all of the Parents' claims is eligibility. To reach their desired outcome: a publicly funded private school education and reimbursement for privately obtained individual math tutoring, the Parents must prove by a preponderance of the credible evidence that Lincoln-Sudbury failed to provide a free appropriate public education to Wallis as required by 20 U.S.C. § 1400 et. seq. and/or failed to provide the educational accommodations Wallis needed to have equitable access to the regular education course of studies and other Lincoln-Sudbury activities on the same basis as her non-disabled peers in accordance with 29 U.S.C. § 794. *Schaffer v. Weast* 546 U.S. 49 (2005). To sustain either of those claims the Parents must show at the outset that, at the time of the events complained of, Wallis was entitled to the protections afforded by the IDEA, by the Rehabilitation Act of 1973, and/or by conforming Massachusetts law. M.G.L.c. 71B. As those statutes are designed to promote the education of individuals with disabilities that showing requires a foundational finding of disability. The statutes have slightly different approaches to defining and determining disability.

## A.  IDEA.

The IDEA determines disability based on categories. To qualify for special education and related services under Part B of the IDEA, a student must be between the ages of 3 and 21 and:

> 1.     Meet the definition of one or more of the categories of disabilities which include: intellectual disability, a hearing impairment (including deafness), a speech or language impairment, a visual impairment (including blindness), a serious emotional disturbance (referred to in this part as "emotional disturbance"), an orthopedic impairment, autism, traumatic brain injury, other health impairment, a specific learning disability, deaf-blindness, or multiple disabilities; and

> 2.     Need special education and related services as a result of the disability or disabilities.

20 U.S.C. § 1401(3) 34 CFR 300.8(a)(1)

Special Education is defined as: "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability". 20 U.S.C. § 1401(29); 34 CFR 300.39

Specially designed instruction means:

> adapting, as appropriate to the needs of an eligible child…
> the content, methodology or delivery of instruction:

13

(i) to address the needs of the child that result from the child's disability; and

*(ii) to ensure access of the child to the general curriculum so that the children meet the educational standards within the jurisdiction of the public agency that apply to all children.*

34 CFR 300.39(3) (emphasis added)

In this matter the Parents did not offer any evidence of an objective finding of, or the existence of, a categorical disability. The Parents did refer to Wallis as "brain-damaged" during some conversations with Lincoln-Sudbury personnel in the spring 2013 and in some arguments in the administrative record. As the Parents pointed to the concussion incurred in September 2012 as the beginning of her disability, the IDEA categories of "traumatic brain injury" and "other health impaired" are the categories most likely to offer a potential eligibility niche for Wallis.

"Other health impairment" means "having limited strength, vitality, or alertness, including a heightened alertness of environmental stimuli, that results in limited alertness with respect to the educational environment," that:
(i) is due to the chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and
(ii) Adversely affects a child's educational performance

34 CFR 300.8(c).

"Traumatic brain injury" is defined in the IDEA's implementing regulations as:
Traumatic brain injury means an acquired injury to the brain caused by an external physical force, resulting in total or partial functional disability or psychosocial impairment, or both, that adversely affects a child's educational performance. Traumatic brain injury applies to open or closed head injuries resulting in impairments in one or more areas, such as cognition; language; memory; attention; reasoning, abstract thinking; judgment; problem-solving; sensory, perceptual, and motor abilities; psychosocial behavior; physical functions; information processing; and speech.

34 CFR §300.8 (12)

There is, however, no evidence in the record from which I could conclude that Wallis displayed any symptoms such as "limited vitality, strength or alertness" or a "functional disability or psychosocial impairment" associated with traumatic brain injury or other health impairment during the 2012-2013 school year. There are no physician evaluations, nor any psychological, physical, rehabilitation, vision, or other assessments that present or diagnose any such symptoms. There are no observations by teachers, school nurses, coaches or other interested adults to support a finding of the existence of such symptoms. There are no complaints of such symptoms by Wallis or her parents. On the contrary Wallis successfully maintained a demanding academic, sports and extracurricular schedule throughout the school year. Furthermore, there is no showing of adverse effect on educational performance, the second element of a disability finding.[3] Instead Wallis' teachers uniformly reported that Wallis returned to

---

[3] The mere existence of a diagnosis does not render a student eligible for special education under the IDEA. A showing that the condition both produced symptoms at school as contemplated by the IDEA and that the student needed specialized instruction to access the regular curriculum is necessary for IDEA eligibility. *San Francisco Unified Sch. Dist.* 65 IDELR 217 (SEA CA 2015) See also: *District of Columbia Public Schools*, 116 LRP 16786 (SEA DC 2/2/15).

school after her injury without difficulty and that her positive, productive engagement in academics, sports and extracurricular activities continued for the remainder of the school year at a significantly high level and rapid pace. There is no evidence to the contrary in the record.

## B.  M.G.L.c. 71B – THE MASSACHUSETTS SPECIAL EDUCATION STATUTE

The Massachusetts special education statute and regulations mirror and expand upon the federal IDEA in small but important ways. For example the statute includes additional covered disability categories and additional responsible state agencies. M.G.L.c 71B.[4] The Massachusetts statute also provides:

> Until proven otherwise, every child shall be presumed to be appropriately assigned to a regular education program and presumed not to be a school age child with a disability or a school age child requiring special education.

M.G.L.c 71B Section 3 pp 1.

The Massachusetts statute continues to express a preference for maintaining a student in regular education when possible:

> Prior to referral of a school age child for evaluation under the provisions of this chapter, the principal of the child's school shall ensure that all efforts have been made to meet such child's needs within the regular education program. Such efforts may include, but not be limited to: modifying the regular education program, the curriculum, teaching strategies, reading instruction, environments or materials, the use of support services, the use of consultative services and building-based student and teacher support and assistance teams to meet child's needs in regular education classroom.[5]

M.G.L.c. 71B, Section 2:

---

[4] M.G.L.c. 71B Section 1 provides in pertinent part:
   **School age child with a disability:** a school age child in a public or non-public school setting who, because of a disability consisting of a developmental delay or any intellectual, sensory, neurological, emotional, communication, physical, specific learning or health impairment or combination thereof, is unable to progress effectively in regular education and requires special education services, including a school age child who requires only a related service or related services if said service or services are required to ensure access of the child with a disability to the general education curriculum.
   and
   **Special education:** educational programs and assignments, including special classes, programs or services designed to develop the educational potential of children with disabilities including, but not limited to, educational placements of children by school committees, the departments of public health, mental health, mental retardation, youth services and social services in accordance with the provisions of this chapter.
   See also 603 CMR 28.02(7)
   *Eligible student* shall mean a person aged three through 21 who has not attained a high school diploma or its equivalent, who has been determined by a Team to have a disability(ies), and as a consequence is unable to progress effectively in the general education program without specially designed instruction or is unable to access the general curriculum without a related service. An eligible student shall have the right to receive special education and any related services that are necessary for the student to benefit from special education or that are necessary for the student to access the general curriculum. In determining eligibility, the school district must thoroughly evaluate and provide a narrative description of the student's educational and developmental potential.
[5] See also: 34 CFR 104.35 which provides that under the ADA students must be assigned to regular education unless their learning needs cannot be met with supplementary regular education aids and services.

Eligibility for special education services in Massachusetts is determined by a Team which includes parents and professional educators and is based on an evaluation(s). An eligibility determination has 2 prongs:

1.)   a finding of a disability
        and
2.)   a finding that the student is unable to make effective progress in regular education without specialized instruction or services.

In this record there is no evidence that Wallis had a disability. Nor is there any credible evidence that Wallis failed to progress in her regular education academic coursework at any time during the 2012-2013 school year.[6] (See discussion at A., *supra,* which is incorporated here by reference) Instead, the substantial weight of the credible evidence supports the conclusion that Lincoln-Sudbury took all appropriate measures to successfully meet Wallis' demonstrated learning needs throughout the 2012-2013 school year as contemplated by M.G.L.c. 71B, Section 2.

C. SECTION 504 OF THE REHABILITATION ACT OF 1973.

"Section 504" is an anti-discrimination statute. Its purpose is to ensure that individuals with disabilities have access to publicly funded programs, services, activities and places equivalent to the access enjoyed by individuals without disabilities. To be eligible for Section 504 protection in an educational setting a student must have been determined, as a result of an evaluation, to have a physical or mental impairment that substantially limits one or more major life activities. 34 CFR 104.3.

A physical or mental impairment for Section 504 purposes is:

> Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory; including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin and endocrine; or
>
> A mental or psychological disorder, such as, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

34 CFR 104.3(j)(2)(i).

Section 504 defines "major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 34 CFR 104.3(j)(2)(ii) [7]

The term "substantially limits" is not defined by Section 504 and must be evaluated on a case-by-case basis.  In educational settings a determination of substantiality is based on:

---

[6] See discussion of the necessity of showing failure to progress in regular education as a required element of a disability determination in *J.D. v. Pawlet Sch. Dist.,* 224 F3d 60 (2nd Cir. 2000).
[7] The sister statute ADAAA provides that the term disability means:
        (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. 12102(1).
The ADAAA states that the major life activities include, but are not limited to: caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. 42 USC 12102(2)(B).

1.) the nature and severity of the impairment;

2.) the duration or expected duration of the impairment; and

3.) the permanent, long term impact, or expected impact of the impairment.

An impairment is not, in and of itself a disability. The impairment must be shown to substantially limit at least one major life activity.[8]

Therefore to determine whether a student is "covered" by Section 504, an evaluation must indicate the existence of an "impairment" and the impairment must impose a substantial limitation on a major life activity. To reach that determination a school district must consider information from a variety of sources and perspectives, rather than relying solely on test scores. *Tustin Unified School District*, 114 LRP 23543 (SEA CA 1/14); *J.D.v.. Pawlet School District, 224 F3d 60 (2nd Cir. 2000)*.

In this matter there is no evidence that Wallis had an "impairment" after she returned to school in October 2012. The doctor's notes recommending a gradual return to full academic homework load and to physical activity expired by the end of October of 2012. There is no other documentation from a health care professional attesting to an impairment. There were no observations by academic, sports, guidance, extracurricular or health services providers at Lincoln-Sudbury to support a finding of an impairment. The Parents did not secure or offer to Lincoln-Sudbury any contemporaneous evaluation establishing an "impairment." (See Paragraph V 21.)

Even if the doctor's notes confirming the concussion were construed to establish an "impairment," the notes explicitly limited the effect of the "impairment" in scope and time. The time was two weeks after Wallis' return to school. The scope was homework and participation in field hockey games. (S-4; S-6)) Nevertheless, even if Wallis were perceived as having an impairment in October 2012 that could be characterized as a disability for the purposes of eligibility analysis under Section 504, a two week limitation on homework production and varsity sports participation does not rise to the level of a "substantial limitation" of the school activities in which she was expected to, or chose to, participate: learning, walking, seeing, hearing, speaking. Nor was there any credible showing of an adverse impact on Wallis' educational performance during the 2012-2013 school year that could reasonably be linked to an "impairment."[9]

This record shows that while there was never a formal determination that Wallis was not eligible for 504 accommodation, there was also no evidence to support, no reasonable suspicion to believe, nor parental consent to evaluate, a finding of a qualifying impairment.[10]

---

[8] *Snowflake Unified School District*, 102 LRP 38678 ((SEA AZ 3/98) (An impairment is not, in and of itself a disability. The impairment must be shown to substantially limit at least one major life activity.) See also Dear Colleague Letter, 58 IDELR 79 (OCR 2012) See also; *Saginaw City School District*, 352 IDELR 413 (SEA MI 1987) which states: "by definition, a person who is succeeding in regular education does not have a disability which substantially limits the ability to learn."

[9] See: *Perrin v. Warrior Run School District*, 64 IDELR 260 (SEA PA 3/2014), aff'd 66 IDELR 225 (M.D. PA 9/15) and 66 IDELR 254 (M.D. PA 11/15) (a medical condition alone is insufficient to qualify a student for services under the IDEA or for Section 504 accommodations); *Ripple v. Marble Falls Ind. Scho. Dist.*, 99 F. Supp. 3d 662 (W.D.Tx 2015); *Wenger v. Conastota Central Sch. Dist.*, 979 F. Supp. 147 (2nd Civ. 2000).

[10] For a helpful discussion of Section 504 standards and procedures see: www2.ed.gov/about/offices/list/OCR/504faq.html See also: Letter to Mentink, 19 IDELR 1127 (OCR 1993).

17

VII.   FINDINGS OF FACT                                                                                                  1/

Within the applicable statutory and regulatory framework discussed above, the facts pertinent to the resolution of the issues brought to the BSEA by the Parents are limited. Undergirding these findings I note that I found each of the seventeen witnesses called by the Parents to be thoughtful, candid, non-defensive and sympathetic to Wallis.  I found their testimony to be supported by and echoed in the contemporaneous written record.  I credit the testimony of each of these professionals in full.  .Drawing on the Summary of the Evidence at Part V. of the Decision, the distilled findings of fact are:

1.      Wallis incurred an injury in September 2012. As a result of that injury Wallis was absent from school for two weeks. When Wallis returned she had two doctor's notes. The notes excused her absence, requested homework modifications, alerted teachers to the possibility that she could need additional modifications to academic work production, and excused Wallis from participation in varsity games. The notes expired on October 29, 2012. No other physician instructions or evaluations were presented to Lincoln-Sudbury during the 2012-2013 school year.

2.      Lincoln-Sudbury staff did not notice any post-concussion symptoms at any time after Wallis returned to school. Lincoln-Sudbury staff did not notice any change in Wallis' academic functioning after Wallis returned to school. Wallis maintained good grades in all academic and nonacademic courses. Wallis remained an active participant in varsity sports, in the Model UN program and in other extracurricular activities throughout the 2012-2013 school year.

3.      Lincoln-Sudbury implemented regular education modifications and supports to assist Wallis to make-up academic work missed during her absence. Wallis made up all work required by her teachers by the third quarter of 2012-2013.

4.      No one at the November 2012 meeting attended by the Lincoln-Sudbury staff and teachers and the family discussed making a referral for a special education or Section 504 evaluation.  No written request for a special education or Section 504 evaluation was made during the fall 2012.

5.      In the spring 2013 Mr. Dorey recommended that Wallis shift levels from Intensive to Advanced Honors math class in September 2013. This recommendation was consistent with math department policy and with a level change recommendation made during a 2010-2011 algebra class. Until that point Wallis had been an active participant in math class and had achieved passing grades. After she was advised of the level change recommendations Wallis refused to take most assessments and the final exam in the Intensive math class. (Dorey; Blake; S-24)

6.      Wallis was able to access and master the content of the Intensive math class throughout the 2012-2013 school year. She achieved better than passing grades on the assessments she chose to take. (Dorey)

7.      The Parents requested an "evaluation" for a 504 Plan in mid-May 2013. There is no signed consent to evaluate form in the record. (S-31, 32, 33; Crawford)

8.      Wallis passed all but one of her challenging regular academic and non-academic courses during the 2012-2013 school year. She received a grade of incomplete in math because she refused to take the 4th quarter assessment test and the final exam, not because she had failed to master the content of the course. When Wallis took the math tests she earned above average marks. (Dorey) Wallis earned above average marks in all other 10th grade courses. She earned above average marks on outside honor

assessments such as the AP History Examination and the National Spanish Exam without modifications to the form or content. (S-22; S-26; S-27)

9.      Wallis made effective progress in her regular education courses during the 2012-2013 school year. There is no evidence to the contrary.

10.     Wallis had access to the regular education academic program, services and/or activities on the same basis as other 10th grade Lincoln-Sudbury students throughout the 2012-2013 school year. There is no evidence to the contrary.

11.     There is no evidence to support a determination that Wallis had a disability as defined by 20 U.S.C. § 1401; 29 U.S.C. 794; M.G.L.c. 71B; or any time during the 2012-2013 academic year.

## VIII.   FINDINGS ON PARENTS' ISSUES

Based on the facts recited above I address each of the Parents' discrete issues:

1.      Whether Lincoln-Sudbury complied with Student's physician's medical instructions regarding reentry to school following her concussion during the 2012-2013 school year?

Yes. The record convincingly demonstrates that Dr. Gaughan's notes of October 9, 2012 and October 12, 2012 were accepted by Lincoln-Sudbury. The doctor's instructions about Wallis' re-entry to school after her concussion were communicated to all relevant staff members. Sports, guidance, academic and non-academic teachers followed the instructions for the time period specified by the doctor (October 29, 2012). They continued to offer appropriate supports and modifications to their regular course expectations as needed by Wallis beyond the time covered by Dr. Gaughan's notes. There is no contrary evidence in the record.[11]

2.      Whether Lincoln-Sudbury failed to comply with the requirements under the IDEA and/or Section 504 "child find" provisions (that is, whether Lincoln-Sudbury knew or should have known of Student's continuing medical issues, physical or mental impairment?

No. There is no credible evidence in this record that Wallis had a "continuing" medical issue or physical or mental impairment during the 2012-2013 school year, beyond the time frame set out by Dr. Gaughan in her note of October 12, 2012. There are no other physician notes in the record. Indeed Wallis did not visit a physician, or the school health staff, between the time of her return to school in October 2012 and her brief consultation with Dr. Gaughan on June 14, 2013. (S-6; S-7; Cavallo)

Wallis did not display any symptoms of a medical, physical or mental impairment during the course of the 2012-2013 school year that were observed by an Lincoln-Sudbury staff. Wallis did not complain of any such impairment. Neither did her parents.

"Child Find" regulations under both the IDEA and Section 504 require school districts to have procedures in place to identify children who are "suspected" of having a disability but are not yet

---

[11] Decisions about the effects of and appropriate responses to concussions are always made by a physician. (Cavallo , Paragraph 5)

receiving special education. 34 CFR 300.111; 34 CFR 104.32. Lincoln-Sudbury's activities in response to notice of Wallis' concussion: adherence to her physician's instructions; monitoring her re-entry; providing regular education supports, evaluating the effectiveness of these supports, meeting with the family in November 2012 and May 2013 to discuss Wallis' academic functioning, and advising the parents of the procedure to request formal evaluations for eligibility for IDEA and/or Section 504 services, are sufficient to meet the district's child find obligations in this instance. Furthermore the record here amply demonstrates that there was no reason to "suspect" that Wallis had a disability that was impeding her progress in regular education or preventing her from accessing the regular education content on the same basis as her Lincoln-Sudbury 10th grade peers.

3.     Whether Student's medical issues substantially limited Student's ability to learn (a major life activity)?

No. There is no evidence in this record that, after her return to school on October 15, 2012, Wallis had any "medical issues." Nor is there any evidence in this record that Wallis' ability to learn during the remainder of the 2012-2013 school year was limited in any way for any reason. The conclusions and supporting reasoning set out above at Paragraphs VIII. 1 and 2 are incorporated by reference.

4.     Whether Lincoln-Sudbury denied Student access to the curriculum of each of her classes during the 2012-2013 school year?

No. The evidence presented in this hearing clearly and convincingly demonstrates that Wallis returned from her injury to full participation in the same full set of highly challenging regular academic courses and non-academic classes that she had participated in prior to her injury. There is no evidence that Lincoln-Sudbury, at any time after her return to school, denied Wallis access to any class, activity or program at Lincoln-Sudbury. Her schedule was not altered. Her teachers made appropriate workload accommodations to ensure Wallis learned the material covered in her absence and received credit for her work. They did not alter the curriculum content. Wallis' teachers uniformly reported that Wallis learned the challenging content and produced excellent academic work throughout the 2012-2013 school year, as reflected in her better than passing grades. Wallis therefore had access to the same curriculum as her peers in each class.[12]

In particular, the Parents' argument that Mr. Dorey's recommendation that Wallis change levels from Intensive to Advanced Honors math for the 2013-2014 school year indicates that Lincoln-Sudbury did not afford Wallis the support she needed to succeed in the Intensive Algebra II class and therefore denied her access to regular curriculum is based on a misunderstanding of Section 504. Contrary to their assertions, the evidence shows clearly that Wallis had the on-going capacity to learn the material, and did learn the material when she took advantage of the regular education instruction available to her. There were no recommendations from any source during the 2012 – 2013 school year for specialized instruction in math, for modifications to a regular honors level curriculum in math, or for accommodations to the workload, format, presentation or assessment instruments during the second semester. The uncontroverted evidence demonstrates that the level change recommendation was based on teacher assessments of Wallis' consistent, high level learning style as well as Mr Dorey's knowledge of the instructional structure available

---

[12] See: *Saginaw City School District*, 352 IDELR 413 (SEA MI 1987); *J.D. v. Pawlet Sch. Dist.*, 224 F3d 60 (2nd Cir. 2000).

at each class level and not on any indication of disability.[13] His recommendation was consistent with a previous, pre-morbid, math level recommendation. It is equally clear that the incomplete grade earned by Wallis in the 2nd semester was due to her refusal to participate in learning assessments, rather than a fundamental lack of access to, or learning of, the Intensive Algebra II curriculum. I find that Mr. Dorey's recommendation that Wallis be placed in an Advanced Honors level math class consistent with her math performance and learning style throughout her tenure as a Lincoln-Sudbury student does not indicate that she did not have access to the regular math curriculum on the same basis as her 10th grade peers during the 2012-2013 school year.

5.    Whether Student failed to make effective progress in her classes during the 2012-2013 school year?

No. There is no evidence that Wallis failed to make effective progress in her classes during the 2012-2013 school year. The record shows that Wallis was an engaged participant in all classes, throughout the school year, produced all required academic work at a consistently high level, earned above passing grades, and was promoted to the next grade without any recommendation for special education services or Section 504 accommodations. The only exception was math class when her behavior changed, not after her injury in September 2012, but after the 2013-2014 math level recommendation was made by Mr. Dorey in the spring 2013. (See discussion at Item 4 above) Wallis' behavior change, limited as it was to math, did not constitute a lack of effective progress in general education due to a disability.

6.      Whether Student was eligible to receive accommodations under a Section 504 plan as a result of a concussion suffered on or about September 30, 2012?

No. The record is devoid of any evidence that would support a finding of an "impairment" that "substantially" limited Wallis' ability to learn during the 2012-2013. See discussion at VI.C, *supra*, which is incorporated by reference here.

7.    Whether Parents are entitled to reimbursement for their unilateral placement of Student at Lawrence Academy for her junior and senior years inclusive of transportation?

No. Public funding of private special education schooling is an equitable remedy available to a student with a disability who proves at a hearing that the responsible school district failed to provide a free, appropriate public education to her and that the unilateral placement made by her family meets her demonstrated special education needs.[14] No such showing was made here. The Parents are neither legally nor equitably entitled to the relief they seek. I therefore do not consider the lack of evidence about Lawrence Academy.

8.    Whether Parents are entitled to reimbursement for provision of the 2013 math summer tutoring for Student?

No. There is no evidence that specialized math tutoring was needed by Wallis, or recommended for her, at any time during the 2012-2013 school year or during the summer 2013. Instead, as discussed *infra*, the Parents failed to show at hearing that Wallis had any special education needs

---

[13] See 34 CFR 306(b)(ii).
[14] *Town of Burlington v. Massachusetts Dept. of Education*, 471 U.S. 359,373 (1985).(Parents who unilaterally place a child in a private school do so at their financial peril)

during the 2012-2013 school year.  Consequently, they failed to show that Lincoln-Sudbury had any obligation to provide a free appropriate public education to Wallis under the IDEA or M.G.L.c.71B.  Further, they failed to show that Wallis was entitled to educational accommodations under Section 504 during the 2012-2013 school year.  The Parents are, therefore, not entitled to any relief under those statutes.  As a result of these findings I do not consider the lack of evidence for, and the equities of, the Parents' claims for reimbursement.[15]

## IX.  CONCLUSION

Based on the facts and the applicable law recited above I find that the Parents have not proven by a preponderance of the evidence that Lincoln-Sudbury failed in any respect to meet its obligations under the IDEA, M.G.L.c. 71B and/or Section 504. *Schaffer v. Weast*, 546 U.S. 49 (2005). They have not shown that Wallis was disabled at any time during the 2012-2013 school year. They have not presented any evidence which could form a reasonable basis for a finding of eligibility for IDEA or Section 504 protections. Without that foundational finding their remaining claims fail.

I further find the Lincoln-Sudbury acted reasonably and responsibly when it followed the physician's instructions concerning Wallis' re-entry to school following her injury. I find that the Lincoln-Sudbury teachers extended reasonable regular education supports to Wallis immediately on her return, and for as long as she needed them, and that those supports permitted Wallis to maintain a high level of achievement in rigorous honors level academic classes and in a demanding extracurricular schedule. There was no reasonable support for a "suspicion" at any time during the 2012-2013 school year that Wallis might have a disability. Therefore Lincoln-Sudbury acted properly when it did not refer Wallis for an evaluation for IDEA services or Section 504 accommodations.

The lack of support for the Parents' claims is as startlingly clear now as it was when they were first raised in May 2013. Indeed, the Parents' vitriolic hyperbole does little to disguise the absence of factual and legal support for their position.[16] Instead of facts the Parents have, in correspondence to and meetings with Lincoln-Sudbury personnel, and throughout this administrative process, offered insults, threats, distortions, misleading and tautological arguments, designed, apparently, to intimidate, shame or coerce Lincoln-Sudbury staff into actions not warranted by a reasonable view of Wallis' educational experience at Lincoln-Sudbury.  I have no doubt that the Parents' unwelcome behavior has had an unfortunate, outsized negative effect on the time, attention and morale of Lincoln-Sudbury staff, and the corresponding interests of the students and taxpayers of the Lincoln-Sudbury Regional School District.

If ever a matter merited a finding that it was brought for an improper purpose it is this. The record clearly demonstrates that the Parents' objections to Wallis' 10th grade experience at Lincoln-Sudbury began only after the math department recommended a change from one honors section to another honors section. Their claim to special education eligibility is patently frivolous, as is the claim to Section 504 protections. I find, based on the totality of the administrative record, that the Parents' actions in pursuing IDEA and Section 504 claims at the BSEA were a bad faith effort to punish Lincoln-Sudbury's staff for the perceived "disrespect" of their daughter's academic prowess and to justify public funding for her private school education.

---

[15] 20 U.S.C. § 1412(a)(10)(C)(iii). See also:  *C.G. v. Five Town Comty Sch.Dist.*, 513 F3d 278,288 (1st. Cir. 2008).(barring reimbursement if parents actions are unreasonable)

[16] See eg. Parents' opening argument at TR Vol II; Parents' Closing Argument, Admin. Record.

X.  ORDER

The Parents' claims under 20 U.S.C. 1400 et seq., 29 U.S.C. 794 and M.G.L.c. 71B are not supported by the evidence in the record and are Dismissed with Prejudice.

By the Hearing Officer

_Lindsay Byrne_

_____
Lindsay Byrne
Dated:     _April 1, 2016_ : Decision originally issued

_April 8, 2016_  : Corrected Decision issued

23

COMMONWEALTH OF MASSACHUSETTS
BUREAU OF SPECIAL EDUCATION APPEALS

EFFECT OF BUREAU DECISION AND RIGHTS OF APPEAL

## Effect of the Decision

20 U.S.C. s. 1415(i)(1)(B) requires that a decision of the Bureau of Special Education Appeals be final and subject to no further agency review. Accordingly, the Bureau cannot permit motions to reconsider or to re-open a Bureau decision once it is issued. Bureau decisions are final decisions subject only to judicial review.

Except as set forth below, the final decision of the Bureau must be implemented immediately. Pursuant to M.G.L. c. 30A, s. 14(3), appeal of the decision does not operate as a stay. Rather, a party seeking to stay the decision of the Bureau must obtain such stay from the court having jurisdiction over the party's appeal.

Under the provisions of 20 U.S.C. s. 1415(j), "unless the State or local education agency and the parents otherwise agree, the child shall remain in the then-current educational placement," during the pendency of any judicial appeal of the Bureau decision, unless the child is seeking initial admission to a public school, in which case "with the consent of the parents, the child shall be placed in the public school program". Therefore, where the Bureau has ordered the public school to place the child in a new placement, and the parents or guardian agree with that order, the public school shall immediately implement the placement ordered by the Bureau. *School Committee of Burlington, v. Massachusetts Department of Education*, 471 U.S. 359 (1985). Otherwise, a party seeking to change the child's placement during the pendency of judicial proceedings must seek a preliminary injunction ordering such a change in placement from the court having jurisdiction over the appeal. *Honig v. Doe*, 484 U.S. 305 (1988); *Doe v. Brookline*, 722 F.2d 910 (1st Cir. 1983).

## Compliance

A party contending that a Bureau of Special Education Appeals decision is not being implemented may file a motion with the Bureau of Special Education Appeals alleging that the decision is not being implemented and setting out the areas of non-compliance. The Hearing Officer may convene a hearing at which the scope of the inquiry shall be limited to facts bearing on the issue of compliance, facts of such a nature as to excuse performance, and facts bearing on a remedy. Upon a finding of non-compliance, the Hearing Officer may fashion appropriate relief, including referral of the matter to the Legal Office of the Department of Education or other office for appropriate enforcement action. 603 CMR 28.08(6)(b).

Rights of Appeal

Any party aggrieved by a decision of the Bureau of Special Education Appeals may file a complaint in state superior court or in the District Court of the United States for Massachusetts, for review of the Bureau decision. 20 U.S.C. s. 1415(i)(2).

An appeal of a Bureau decision to state superior court or to federal district court must be filed within ninety (90) days from the date of the decision. 20 U.S.C. s. 1415(i)(2)(B).

Confidentiality

In order to preserve the confidentiality of the student involved in these proceedings, when an appeal is taken to superior court or to federal district court, the parties are strongly urged to file the complaint without identifying the true name of the parents or the child, and to move that all exhibits, including the transcript of the hearing before the Bureau of Special Education Appeals, be impounded by the court. See *Webster Grove School District v. Pulitzer Publishing Company*, 898 F.2d 1371 (8th Cir. 1990). If the appealing party does not seek to impound the documents, the Bureau of Special Education Appeals, through the Attorney General's Office, may move to impound the documents.

Record of the Hearing

The Bureau of Special Education Appeals will provide an electronic verbatim record of the hearing to any party, free of charge, upon receipt of a written request. Pursuant to federal law, upon receipt of a written request from any party, the Bureau of Special Education Appeals will arrange for and provide a certified written transcription of the entire proceedings by a certified court reporter, free of charge.