UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LINCOLN-SUDBURY REGIONAL SCHOOL DISTRICT, | ) ) ) ) | Civil Action No. 1:16-CV-10724-FDS |
| Plaintiff, | ) ) |  |
| v. | ) ) |  |
| MR. AND MRS. W., | ) ) |  |
| Defendants | ) ) |  |
| WALLIS and MR. and MRS. W., | ) ) ) |  |
| Plaintiffs-in-Counterclaim | ) ) |  |
| v. | ) ) |  |
| LINCOLN-SUDBURY REGIONAL SCHOOL DISTRICT and | ) ) ) |  |
| BUREAU OF SPECIAL EDUCATION APPEALS, | ) ) ) |  |
| Defendants-in-Counterclaim. | ) ) |  |

**MEMORANDUM OF REASONS IN SUPPORT OF DEFENDANTS'/PLAINTIFFS' IN COUNTERCLAIM MOTION TO SUPPLEMENT AND CORRECT THE ADMINISTRATIVE RECORD**

**I.  INTRODUCTION**

This action was initiated by Lincoln Sudbury Regional School District ("District"). In its complaint the District seeks to recover its attorney's fees, costs and expenses incurred in the administrative proceeding before the Massachusetts Bureau of Special Education Appeals ("BSEA). After a multiple day hearing the BSEA issued a decision in favor of the District on all remaining issues and included findings that Mr. and Mrs. W.'s claim was frivolous, in bad faith, and brought for improper purposes. The W.s answered denying the foregoing findings and

counterclaimed asserting, among other matters, that Wallis was categorically disabled due to a concussion she had suffered during a high school varsity field hockey practice and that the District had failed to comply with the Child Find mandate that she be evaluated for special education services due to her categorical disability, failed to develop an Individual Education Plan or 504 plan and are entitled to reimbursement for tuition and related expenses incurred from their unilateral placement of Wallis at Lawrence Academy.

Wallis and her parents now move to submit additional evidence to supplement the Administrative Record and, additionally, to correct that record.

## II.     ARGUMENT

The purpose of the Individuals with Disabilities Education Act ("IDEA") is to ensure that all disabled children have access to a free and appropriate public education with an emphasis on special education services designed to meet the unique needs of the disabled child. 20 U.S.C. § 1400(d)(1)(A). IDEA provides for procedural safeguards to the student and her parents including the right to a due process hearing before an impartial hearing officer and the right to review of the hearing officer's decision in federal court. *See* 20 U.S.C. § 1415(f)-(g). On judicial review, the IDEA provides that the court "shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

In the First Circuit, the provision regarding evidence in addition to that within the administrative record has been construed to mean supplemental evidence. The additional evidence should supplement the record, not merely embellish or duplicate evidence already in

2

the administrative record. *Burlington v. Dept. of Educ. for Comm. of Mass.*, 736 F.2d 773, 790 (1st. Cir. 1984).

*Burlington* provided some examples of situations where supplementation would be appropriate such as gaps in transcripts, the unavailability of a witness, the improper exclusion of evidence and evidence of relevant events occurring after the administrative hearing. *Id.* The First Circuit further expounded upon the issue in *Roland v. Concord School Comm.*, 910 F.2d 983 (1st. Cir. 1990). There, the district court had precluded the parent appellants from introducing additional evidence in the form of the testimony of three medical expert witnesses who had treated their child. *Id.* at 996. The district court had excluded the proffered testimony on the ground that the parents' attorney had deliberately withheld the testimony of the experts at the administrative hearing despite the exhortations of the hearing officer to produce the witnesses. *Id.* The Town attempted to subpoena the witnesses to appear but only one testified, and over the parents' objection. *Id.* The Court held that in these circumstances the trial court was well within its discretion to exclude the testimony of the proffered witnesses. *Id.* A party that seeks to supplement the administrative record with additional evidence must present some "solid justification for doing so." *Id.* The appellants had every opportunity to have the proffered evidence heard at the administrative level but their lawyer "had deliberately withheld the testimony . . . .", *id.* (quoting district court findings), and was in fact admonished to produce the witnesses by the hearing officer but refused to do so . *Id.* at 996, n. 6. In conclusion, the Court stated:

> To be sure, district courts are empowered to hear testimony not presented before the state agency. Yet, that power is a hedge against injustice. Injustice cannot credibly be claimed when, as here, parties willfully elect to leapfrog the agency proceedings. While "the legislative history of the Act reflects the understanding that exhaustion is not a rigid requirement ... litigants are discouraged from weakening the position of the agency by flouting its processes." Counsel's

3

unfounded disdain for the administrative process, without more, cannot persuade us to ignore both our own precedents and the elaborate protocol mandated by Congress. We discern no abuse of the lower court's sound discretion in this situation.

*Id.* at 997 (internal citations omitted).

As set forth below, there are solid justifications for this Court to exercise its authority to receive the additional evidence offered by Wallis and her parents.

**A.     The BSEA Improperly Narrowed The Issues To Preclude Consideration Of The District's Non-Compliance With The Head Injury Regulation**

The primary issue of this case was aptly framed by HO Figueroa in her January 14, 2015 Ruling On Lincoln-Sudbury Regional School District's Motion To Dismiss/Motion For Summary Decision, to wit: "Whether Student is or was disabled as a result of the concussion she sustained in September 2012 and, as a result, should have been identified by the District and provided services pursuant to an IEP or a Section 504 plan, is the central question in this case." (R. Vol. I, 528). However, the same Ruling effectively eliminated from consideration the District's alleged non-compliance with the state regulation entitled Head Injuries and Concussions in Extracurricular Athletic Activities, 105 C.M.R. 201, on the basis that the regulation was beyond the purview of the BSEA.[1]  *See* (R. Vol. I, 527).

By narrowing the issues such that any consideration of the Head Injury Regulation ("HI regulation"), its definition of Traumatic Brain Injury to expressly include students diagnosed

---

[1] As framed, the issue was whether the parents were entitled to compensation for the District's violations of 105 C.M.R. 201.  (R. Vol. I, 527).  However, while acknowledging that compensation for violations of the regulation were beyond the jurisdiction of the BSEA, the parents asserted that the issue of the District's compliance or non-compliance with the regulation should be considered as integral to the central issue of the case. (R. Vol. I, 132).  And in their Opposition to the District's Motion to Dismiss, the parents argue that consideration of the HI regulation and related materials would demonstrate that the District knew or had reason to suspect Wallis was disabled due to the concussion but failed her in its Child Find obligations. (R. Vol. I, 227, ¶ 3).

4

with concussion, its training requirements and its mandate to initiate a graduated reentry plan for resumption of a concussed student's studies, the BSEA failed to consider relevant law within its purview. As a result, evidence was excluded that would have shown that Wallis was in fact categorically disabled with Traumatic Brain Injury and had the District complied with the training and concussion mitigation aspects of the law, which it had not, it would have gone a long way towards fulfillment of its Child Find obligations.

1. Categorical Disability under Special Education Law

Under the Massachusetts Special Education Regulation, 603 CMR 28.02, generally for a student to be eligible for special education services she must be under 21 years old, categorically disabled and as a consequence of the disability is unable to progress effectively in the general education program without special education services. *See* 603 C.M.R. 28.02.

Special education law sets forth categorical areas of disability. Under the IDEA Traumatic Brain Injury ("TBI") is one such category. 20 U.S.C. § 1401(3)(i); 34 C.F.R. 300.8(a)(1). The state regulation also sets forth TBI as a categorical disability within the broader category of Neurological Impairment and provides:

> The capacity of the nervous system is limited or impaired with difficulties
> exhibited in one or more of the following areas: the use of memory, the control
> and use of cognitive functioning, sensory and motor skills, speech, language,
> organizational skills, information processing, affect, social skills, or basic life
> functions. The term includes students who have received a traumatic brain injury.

603 C.M.R. 28.02.

1. Child Find

Child find places an affirmative duty on the District to identify students suspected of disability, regardless of the severity of their disability, and to evaluate them to determine if they are eligible for special education services. 20 U.S.C. 1412(a)(3)(A); 34 C.F.R. 111. Here, the

District knew or should have suspected that Wallis was disabled due to her concussion but failed to conduct any evaluations consistent with the requirements of Child Find to determine if she was in need of special education services. Child Find regulations make clear that the burden for identifying disabled students and evaluating them for special education services lies with the school. Under federal law, where disability is suspected, an initial evaluation of the child must occur within 60 days unless the state establishes a shorter time frame. 34 C.F.R. § 300.301. Massachusetts has established a shorter time frame and requires an initial evaluation within 30 days. 630 C.M.R. 28.04(2). The only exceptions from the mandate to conduct a timely initial evaluation are where a parent repeatedly refuses to produce the child for evaluation or if, within the mandated time period, the child has been enrolled in another public school, 34 C.F.R. § 300.301(d), neither of which are applicable here.

Consistent with federal law, state regulations set forth detailed formal requirements for persons conducting the evaluation together with the nature of the assessments of the child including a narrative description of the child's educational and developmental potential. 603 C.M.R. 28.04(2)(a). The regulation further requires: "Each person conducting an assessment shall summarize in writing the procedures employed, the results, and the diagnostic impression, and shall define in detail and in educationally relevant and common terms, the student's needs, offering explicit means of meeting them." 603 C.M.R. § 28.04(2)(c).

In sum, and as developed further below, under the pertinent regulations, when the District had reason to suspect that Wallis had suffered a concussion it was required to conduct an initial evaluation within 30 days to determine if she was a disabled student in need of special education services. The District had reason to suspect Wallis' disability, in fact had direct knowledge on September 30, 2012, the day she suffered the head injury during varsity field hockey practice. It

6

is undisputed that the District failed to conduct the required evaluation and as a result failed in its Child Find obligations.

2.  The HI regulation and related evidence should have been considered by the HO

As follows, it should have been readily apparent to the District and its attorney that the HI regulation and related evidence were highly relevant to the BSEA proceedings. Yet the District and its attorney succeeded in having consideration of the District's non-compliance with the regulation excluded. Under state special education law the HI regulation is relevant to the circumstances of this case and within the purview of the BSEA. The state special education statute provides:

> There shall be a bureau of special education appeals which shall provide adjudicatory hearings . . . for resolution of disputes between and among parents, school districts, private schools and state agencies **concerning: (i) any matter relating to the identification, evaluation, education program or educational placement of a child with a disability or the provision of a free and appropriate public education to the child** arising under this chapter and regulations promulgated hereunder or under the Individuals with Disabilities Education Act, 20 U.S.C. section 1400 et seq., and its regulations; or (ii) a student's rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. section 794, and its regulations.

M.G.L. c. 71B, § 2A(a)(emphasis added). And Section three of the statute, which addresses the identification and evaluation of disabled students, contemplates that in order for a school district to meet its mandate under the statute it must consider not only the "regulations, guidelines and directives" of the Department of Education, but should also consider those regulations, directives and guidelines promulgated by the Department of Public Health ("DPH"), among other departments, that are relevant to the mandate of the statute. *See* M.G.L. c. 71B, § 3.

The DPH issued such a regulation, the HI regulation, in effect prior to the 2012-2013 school year, pursuant to the mandate of M.G.L. c. 111, § 222. The regulation sets forth the minimum standardized policies and procedures to be implemented by public school districts, *see* 105

C.M.R. 200.001 *et seq*., for the "prevention, training, management and return to activity decisions regarding students who incur head injuries while involved in extracurricular athletic activities," 105 C.M.R. 201.001.

In accordance with the regulation, school districts were required to initiate a written graduated reentry plan for a student's return to full academics where the student has been diagnosed with concussion. 105 C.M.R. 201.010(E). The development of the reentry plan requires the participation of the student's doctor, parents, teachers, guidance counselor, school nurse, and other relevant school staff, and of particular relevance here, contemplates the involvement of the school's special education team. 105 C.M.R. 201.010(E)(1). The regulation provides:

> Each student who is removed from practice or competition and subsequently diagnosed with a concussion shall have a written graduated reentry plan for return to full academic and extracurricular athletic activities.
> (1) The plan shall be developed by the student's teachers, the student's guidance counselor, school nurse, certified athletic trainer if on staff, neuropsychologist if available or involved, parent, members of the building-based student support and assistance team or individualized education program team as appropriate and in consultation with the student's primary care provider or the physician who made the diagnosis or who is managing the student's recovery.
> (2) The written plan shall include instructions for students, parents and school personnel, addressing but not be limited to:
> (a) Physical and cognitive rest as appropriate;
> (b) Graduated return to extracurricular athletic activities and classroom studies as appropriate, including accommodations or modifications as needed;
> (c) Estimated time intervals for resumption of activities;
> (d) Frequency of assessments, as appropriate, by the school nurse, school physician, team physician, certified athletic trainer if on staff, or neuropsychologist if available until full return to classroom activities and extracurricular athletic activities are authorized; and
> (e) A plan for communication and coordination between and among school personnel and between the school, the parent, and the student's primary care provider or the physician who made the diagnosis or who is managing the student's recovery.

105 C.M.R. 201.010(E).

In addition, the HI regulation provides the necessary and undeniable link between concussion and the categorical disability TBI.

> Traumatic Brain Injury (TBI) means a complex pathophysiological process affecting the brain, induced by traumatic biomechanical forces. TBI may be caused either by a direct blow to the head, face, neck or elsewhere on the body with an impulsive force transmitted to the head. **TBI includes, but is not limited to, a concussion**.

105 C.M.R. 201.005 (emphasis supplied)[2].

Despite the clear mandate requiring the District to implement a written reentry plan for Wallis consistent with 105 C.M.R. 201.010(E), together with the regulation's express classification of concussion as a form of TBI, a categorical disability under both state and federal special education law, which should have triggered the District's Child Find obligation to evaluate Wallis, the summary of the evidence demonstrates that the District utterly failed in the duty owed Wallis: Gail Nozik, a school nurse, testified that the nursing staff is trained and has experience treating students diagnosed with concussion.[3] She further testified that the nursing staff is involved in developing 504 plans and IEPs for students with medical issues. That while the nursing staff was aware that Wallis had suffered a concussion and that fact had been entered in the District's student record system with an alert sent to Wallis' teachers and guidance counselor, her testimony also reveals that, in derogation of the standard of care set forth in 105

---

[2] The regulation also defines concussion as "a complex disturbance in brain function, due to direct or indirect trauma to the head, related to neurometabolic dysfunction, rather than structural injury." 105 C.M.R. 201.005. Here, it is not disputed that Wallis was diagnosed with a concussion.

[3] M.G.L. c. 111, § 222(a) provides: "In developing the [training] program, the division may use any of the materials readily available from the Centers for Disease Control and Prevention." Excerpts of these training materials are included in (Supp. P-8, Vol. IV, 1976-2015). Heads Up to Schools; Know Your Concussion ABCs poses the question "What is a concussion?" and answers that "[a] concussion is a type of traumatic brain injury (TBI) that results from a bump, blow or jolt to the head . . .." (Supp. P-8, Vol. IV, 1977).

9

C.M.R. 201.000 *et seq*. and particularly 105 C.M.R. 201.010(E), the nursing staff took a hands off approach with respect to Wallis' concussion. (R. Vol. II, 1367, ¶ 6). Another school nurse, Janet Cavallo, also "extensively trained in concussion management," testified that during the 2012-2013 school year the District's response to students with concussions was "driven by the reports and instructions from the affected student's doctor and parents" and that "[t]he role of the school nurse was to implement the instructions." As for the medical clearances and reentry plans contemplated by the HI regulations her testimony also reveals the District's non-compliance with the HI regulations: during the 2012-2013 school year there were no medical clearance forms and the "post concussion gradual reentry plan was limited to returning to participation in sports . . .." (R. Vol. II, 1367, ¶ 7). And, as with nurse Nozik, Cavallo's testimony also reveals that the District improperly placed the onus on Wallis and her parents to take the initiative in Wallis' post-concussion recovery and return to academics. (R. Vol. II, 1367, ¶ 7). In stark contrast to the District's policy as revealed by its nurses, the HI regulation explicitly requires that the District's response to students with concussion be "driven" by the school nurses and other school staff. The summary of evidence continues with further examples of the District's non-compliance with the HI regulation demonstrating its disregard for the duty it owed to Wallis and her parents. *See e.g.* (R. Vol. II, 1368, ¶¶ 8, 10, 12). Thus, the District not only failed to implement an appropriate written plan for Wallis' reentry to academics consistent with the regulation, in shirking its own duties under the HI regulation and Child Find it inappropriately placed the burden on Wallis and her parents to take the initiative and, presumably, only then would the District be required to take action to comply with the relevant law. Because of the framing of issues, the District's compliance or non-compliance with the standards of the HI regulation was converted to whether or not the District complied with Wallis' doctor's note, (R.

VII, 1380, ¶ 1), which in the context of this case should have been a non-issue or at most a part of the larger issue respecting the fulfillment of the District's obligations under Child Find and the HI regulation. Thus framed and without consideration of the duties owed Wallis and her parents under the HI regulation, the HO decided that the District's efforts in complying with Wallis' doctor's note and by its uncoordinated and makeshift overall response to Wallis' resumption of academics, albeit without any appropriate evaluations, were "sufficient to meet [its] child find obligations in this instance." *See* (R. VII, 1380-81, ¶¶ 1 & 2).

Again, for a student to be eligible for special education services under state law the student must be categorically disabled and, as a result of her disability, is unable to progress effectively in the general education program. *See* 603 C.M.R. 28.02 (Eligible Student). In determining whether the student is progressing effectively, the individual learning potential of the student must be considered. 603 C.M.R. 28.02 (Progress Effectively in the General Education Program). In conducting an initial evaluation for special education services, a school district must thoroughly evaluate the student's educational potential. 603 C.M.R. 28.04(2)(a)2. The District introduced Wallis' report cards for the Spring of 2012, before her concussion, and for the Fall and Spring of 2012 and 2013. Despite the reported grades demonstrating a fall-off in Wallis' achievement in Spanish, Science and Math, (Dec. 12, ¶ 29), the HO nevertheless found that Wallis had made effective progress during the 2012-2013 school year.[4] (Dec. 19, ¶ 9). Clearly this fall-off could have been attributed to her TBI. In addition to establishing that concussion is a

---

[4] In fact, at the hearing the HO interjected while Mrs. W. was questioning the head of special education services, Ramos, she asked if Ramos thought Wallis was disabled at the time the witness sent she had sent a consent for evaluation form in 2013. Ramos answered no. Mrs. W. followed up asking what the basis of here determination was that Wallis was not disabled and Ramos referred to the school nurses' testimony and that "[Wallis] was performing in school. She was getting good grades." Ramos was the asked how she knew they were good grades which elicited an objection at which time the HO interjected that "the legal standard is passing." (R. Trans. 2-176 to 177).

11

form of TBI, (Supp. Ex. A 3, ¶ 9), the affidavit of Dr. Beasley establishes that a student recovering from a concussion may be capable of functioning academically at their pre-concussion level in one subject while struggling in others. And that this dichotomy would be more apparent in subjects such as math and foreign languages and, further, that a focus in such studies may worsen concussion symptoms. *See* (Supp. Ex. A 4, ¶14; Ex. a;), (R. Vol. IV 2075-77 (P-18)) and compare (Supp. Ex. B).

3.   Had the HI regulation and related evidence been considered it would have established that Wallis was categorically disabled.

The threshold issue of the BSEA hearing was whether or not Wallis was categorically disabled. However, while recognizing that Wallis was in fact diagnosed with a concussion, the HO failed to make the link between concussion and traumatic brain injury or neurological impairment. In her ultimate findings of fact the HO states: "there is no evidence to support a determination that Wallis had a disability as defined by 20 U.S.C. § 1401; 29 U.S.C. 794; M.G.L. c. 71B; or any time during the 2012-2013 academic year." (R. VII, 1380, ¶ 11). This is clear error. Had the W.s been allowed to introduce evidence relating to the HI regulation and/or the HO had reviewed the regulation, the link would have been established, or should have been, as a matter of law.[5] Based on the definitions contained in the HI regulation and its training requirements, at all relevant times the District knew or should have known that the HI regulation establishes that a student diagnosed with concussion is categorically disabled and as such the District had the affirmative duty to evaluate her for special education services pursuant to its

---

[5] The BSEA Hearing Rules provide: "The parties may offer as evidence documents that they have exchanged prior to the hearing in accordance with these rules. At the hearing, the Hearing Officer may permit or request the introduction of additional documentary evidence where no prejudice would result to either party." BSEA R. X.C.1. Subpart 3 provides: "Regulations and statutes may be put into evidence by reference to the citation or by submitting a copy of the pertinent regulation or statute." BSEA R. X.C.3.

12

Child Find obligations. The record is devoid of any indication that the District met its obligations.

**B.     This Court Should Accept Additional Evidence As A Hedge Against Injustice**

Unlike the parents in *Roland*, here the parents were self-represented. To be sure, they made procedural mistakes along the way in the BSEA proceeding ultimately resulting in an order precluding them from offering exhibits. (R. Vol. II, 983). Perhaps this and other missteps would not have occurred had they been represented by an attorney. To now prohibit the proffered additional evidence would be particularly harsh to the parents and Wallis.

Unlike in *Roland*, where the town had attempted, over the parents' attorney's objection, to have relevant evidence introduced by way of the parents' experts, 910 F.2d at 996-97, here it was the District that fought and succeeded to have excluded relevant issues, law and evidence which would have assisted the HO, and will assist this Court, in answering the questions of whether Wallis was categorically disabled; whether she was making effective academic progress in relation to her unique abilities; whether the District met its obligations under Child Find; and whether the District failed to provide Wallis with a free and appropriated public education.

As the affidavit of Mrs. W. demonstrates, the parents had good faith, and in part altruistic, motivations for initiating the BSEA proceedings. (Supp. Ex. D, 1-4). They attempted to diligently present their claims through what can only be characterized as contentious proceedings. (Supp. Ex. D, 4-5). They were frustrated by the HOs' inaction on their motions to compel production of documents, particularly with respect to the District's failure to produce Wallis' full academic record. (R. Vol. I, 643-49; Vol. II, 702-03, ¶¶ 8-9). They were further frustrated by the HO's late order requiring them to produce transcripts of audio recordings of

13

meetings they and Wallis had had with the District's staff.[6] (R. Vol. II, 702, ¶ 7; 739). They were confused by the HO's Clarification Order of March 4, 2015, providing that "no document that has not been exchanged in response to discovery shall be included in the exhibit book unless said document is received post March 9, 2015. (R. Vol. II, 691 ¶ 1). The parents took this to mean that they would be prohibited from introducing documents that they had not received directly from the District in response to formal discovery and, consequently, that they could not use relevant documents they had in their possession, such as email exchanges with District staff, or that they obtained through informal discovery or pre-hearing public records requests. (Supp. Ex. D, 4-5). The parents attempted to have this clarified by their letter dated March 10, 2015, (R. Vol. II, 698-700 ¶¶ 2,3). The clarification they sought was not helpful. The HO simply referred the parties back to the Order that caused the confusion and ordered that exhibits and witness list must be exchanged by March 31, 2015. (R. Vol. II, 739). Consequently, other than three exhibits allowed into evidence during the hearing, the parents were precluded from introducing documentary evidence.

Nevertheless, and despite the impossible position they thought they were in, the parents decided to continue with the process hoping that they would be able to submit some relevant evidence when the hearing continued and make progress through testimonial evidence. (Supp. Ex. D, 4-5 ¶ 16). However, from the beginning, the HO made it apparent that she would hold Mrs. W. to the rules of direct examination,[7] *e.g.* (R. Trans. 2-72 to 81), a skill that many attorneys have difficulty mastering. As the hearing progressed Mrs. W. was prepared to submit

---

[6] These transcripts are submitted herewith as Exhibits I, J, and K.
[7] The BSEA Hearing Rules provide: The Hearing Officer shall not be bound by the rules of evidence applicable to courts, but shall observe the rules of privilege recognized by law. Evidence shall be admitted only if it is the kind of evidence upon which reasonable persons are accustomed to rely in the conduct of serious affairs. Hearing Rules for Special Ed. App. R. X.C.

documents and the recordings of the meetings with District staff in order to refresh and counter various witnesses' lapses in memory, but she was largely prohibited from doing so. In the end, believing it to be a lost cause the parents decided against offering their testimony or that of Wallis and their experts. They nonetheless attempted to make a final effort at stating their case and to express their frustrations with the process in their closing argument. (Supp. Ex. D, 7 ¶¶ 22-23); (R. Vol. IV, 1789-1865 (closing argument)).

**C.     Summary Of Supplementary Evidence**

As set forth in the Tables Of Supplemental Evidence, Documents Filed With But Missing From The Administrative Record, And Corrections To The Table Of Contents Of The Administrative Record Filed In Support Of Defendants'/Plaintiffs' In Counterclaim Motion To Supplement And Correct The Administrative Record submitted herewith, the majority of the additional evidence requested to be considered by this Court was submitted by the W.s as exhibits to their closing argument, and is included in the Administrative Record, but not considered by the HO in her Decision. This material is identified as P-1, P-2 and etcetera in the Tables. Additional material is being submitted with the Motion and identified in the Tables as Exhibits A-K and Exhibit a (submitted with but omitted from the Administrative Record). Much of this material is relevant to the issue of whether a concussion is a TBI and is therefore a categorical disability under special education law, what the District knew or should have known respecting concussion and TBI, and/or the Districts policies relating to Child Find. (Ex. A, C, D, P-1, P-3, P-8, P-9, P-14, P-16, P-21). Other material is relevant to the issue of Wallis' educational potential and whether she was effectively progressing academically. (Ex. B, C, D). Other exhibits, whether part of parents exhibits submitted with their closing argument or submitted herewith, would tend to establish that the District's staff observed symptoms of post-concussion in their interactions with Wallis, and that, at a minimum, the parents had constructively requested that Wallis be evaluated for special education services. In addition, documents identified in the tables as BSEA-30.5, 51.5 and 78.5, and submitted herewith, are documents that were filed with the BSEA but are missing from the Administrative Record filed by the BSEA. Lastly, the Tables set forth corrections to the Administrative Record Table of Contents.

### III. CONCLUSION

For the reasons stated, there is solid justification for this Court to exercise its authority and discretion and allow Wallis and her parents to submit additional evidence to supplement the Administrative Record.

Dated: December 30, 2016

Respectfully submitted,
Defendants and
Plaintiffs-in-Counterclaim,
By their attorney,

/s/ John N. Morrissey
John N. Morrissey
1 Mary's Way
Lincoln, MA 01773
BBO No. 664579
(508) 358-2027
johnmrrssy@yahoo.com

### CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(2)

I certify that in an effort to narrow the issues presented by this motion, I conferred with counsel for Lincoln-Sudbury Regional School District and counsel for the BSEA, prior to the filing of this motion.

/s/ John N. Morrissey
John N. Morrissey

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on December 30, 2016.

/s/ John N. Morrissey
John N. Morrissey