**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| LINCOLN-SUDBURY REGIONAL SCHOOL DISTRICT, ) ) ) ) Plaintiff, ) v. ) ) MR. AND MRS. W., ) ) Defendants ) WALLIS and ) MR. and MRS. W., ) ) Plaintiffs-in-Counterclaim ) v. ) ) LINCOLN-SUDBURY REGIONAL ) SCHOOL DISTRICT and ) ) BUREAU OF SPECIAL EDUCATION ) APPEALS, ) Defendants-in-Counterclaim. ) | Civil Action No. 1:16-CV-10724-FDS |

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF MRS. AND MRS. W'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR ATTORNEY'S FEES AND WALLIS AND MRS. AND MRS. W'S MOTION FOR SUMMARY JUDGMENT ON THEIR COUNTERCLAIMS**

1. On Sunday September 30, 2012, Wallis suffered a head injury while participating in a varsity field hockey practice when she was struck in the head with a field hockey stick. The blow to here head resulted in facial and dental injuries including a knocked out tooth. (R.III 1474, 1483; Tr.III 82-85).

2. Vicky Caburian, the team's head coach, supervised the practice. (Tr.III 80, 82).

3. Caburian had received certification in the annual concussion-training program. (Tr.III 91).

4. As a result of the head injury, her primary care physician diagnosed Wallis with a concussion on October 3, 2012. On October 5, 2012, Mrs. W informed the District of Wallis' concussion by email:

> On Wednesday her physician diagnosed her with a concussion and said that [Wallis] should have complete physical and brain/mental rest including not attending school or doing any academic work… The doctor said that [Wallis] will be returning to school part time and should have a step by step gradual ramp up to get her caught up on homework projects and tasks she has missed. She will coordinate further with you to develop a plan when she returns. She is eager to get back to field hockey and at least see practices and games. Let me know if there is anything more specific we need to do related to the concussion.

(R.II 1366).

5. Wallis returned to school on Monday October 15, 2012. (R.II 1368). On Sunday, October 14, 2012 Mrs. W. again emailed the District: "below I have typed the instructions on October 12th from [Wallis'] physician, Dr. Aisling Gaughan. Dr. Gaughan offered to speak with any of [Wallis'] teachers who would like further explanation of the treatment of traumatic head injury and concussion. . . . [Wallis] is really looking forward to returning to her classes. Based upon your communications, she is expecting to speak with you individually about a plan that allows her to fully access the class curriculum as soon as possible. Given her two week absence and her heavy workload of accelerated courses we know that you will assist her in developing a reasonable plan." (R.III 1523).

6. The Centers for Disease Control and Prevention ("CDC") describes a concussion as:[1]

---

[1] Pursuant to Federal Rules of Evidence 201(c)(2) (2015), the movants respectfully request that the Court take judicial notice of the facts set forth in this paragraph. Under the Federal Rules of Evidence 201(b)(2) (2015), judicial notice may be taken of facts relevant to this dispute contained on a government website. *Gent v. CUNA Mut. Ins. Society*, 611 F.3d 79, 84 n.5 (2010) (taking judicial notice of causes, symptoms and diagnosis of Lyme disease from information primarily obtained from the CDC website on the topic). Judicial notice of facts may be taken at any stage of the proceedings, Fed. R. Evid. 201(d), including on appeal, *see* Advisory Committee Notes to Fed. R. Evid. 201; *Gent*, 611 F.3d at 84 n.5.

2

> [A] type of traumatic brain injury—or TBI—caused by a bump, blow, or jolt to the head or by a hit to the body that causes the head and brain to move rapidly back and forth. This sudden movement can cause the brain to bounce around or twist in the skull, creating chemical changes in the brain and sometimes stretching and damaging brain cells. . . .
>
> Medical providers may describe a concussion as a "mild" brain injury because concussions are usually not life-threatening. Even so, the effects of a concussion can be serious.

<http://www.mass.gov/eohhs/gov/departments/dph/programs/community-health/dvip/injury-prevention/cdc-sports-concussions.html> (last accessed 5/29/2017).

The CDC's Returning to School After a Concussion: A Fact Sheet for School Professionals advises:

> The effects of concussion on a student's return-to-school experience are unique to each student. In most cases, a concussion will not significantly limit a student's participation in school; however, in some cases, a concussion can affect multiple aspects of a student's ability to participate, learn, and perform well in school. In turn, the experience of learning and engaging in academic activities that require concentration can actually cause a student's concussion symptoms to reappear or worsen. Given this inter-relationship, and the way concussion effects can vary across students, academic adjustments need to be tailored to each student's specific circumstances.

Centers for Disease Control and Prevention, *Returning to School After a Concussion: Fact Sheet for School Professionals* < https://www.cdc.gov/headsup/pdfs/schools /tbi_returning_to_school-a.pdf> p. 2 (last accessed 5/25/2017).

Some of the symptoms of concussion are relatively obvious such as fatigue, headache, nausea and sensitivity to light. *Id*. But others are not. A student may experience: difficulty with concentration; remembering and learning new information; the need for more time to complete assignments; trouble with organization and prioritizing tasks; be more emotional than typical; irritability and impulsive or inappropriate behavior; and difficulty in coping with stress. *See id*. pp. 2, 5.

3

> In the classroom, concussion symptoms may translate into a variety of challenges with learning. Cognitive symptoms may result in problems with speed of reading, difficulties doing multi-step math problems, problems maintaining consistent attention throughout the class, and/or distractibility . . . Problems with emotional control can also be evident. The student can become more easily irritated or agitated or may feel overwhelmed and frustrated by their learning challenges. These different symptoms can impact the student's overall school performance.

*Id.* p. 6. For a student recovering from a concussion, the very act of attempting to catch up on missed assignments, especially when coupled with learning new material, may delay recovery and compound symptoms. *See id.* at 6-7 (cognitive-exertional effects).

> "Many students find limiting or completely avoiding cognitive activities difficult, because these activities are a routine part of their lives. Therefore, it is important to explain to students that ignoring concussion symptoms and trying to "tough it out" often makes symptoms worse and can make recovery take longer, sometimes for months.

*Id.* at 7. Because concussions are unique to each student, it is critical to regularly monitor their recovery. *Id.* at 7. While most students require only temporary and informal accommodations for their recovery others will require formal services and these students may be candidates for a 504 Plan or an IEP. *Id.* at 11.

7. Traumatic Brain Injury is a category of disability under the IDEA. 20 U.S.C. § 1401(3)(A); 34 CFR 300.8(c)(12).

8. Traumatic Brain Injury is expressly included in the categorical disability of Neurological Impairment under state law. 603 CMR 28.02.

9. The District did not made any plans for Wallis' return to school and resumption of her studies after her concussion, (Tr.III 143; IV 11-12), until Wallis took the initiative to attempt to coordinate her reentry to academics. In early November, she met with her guidance counselor, Park, and expressed that she still felt fatigued when involved with academic work and did not feel she was back to her baseline level of mental output. (Tr.III 143-44). Wallis and Park came

4

up with a plan to prioritize the assignments she had missed in her courses and how to communicate the plan with her teachers. (Tr.III 143-44).

10. Park sent an email to Wallis' teachers in which he began by stating, "It's been a month since [Wallis'] concussion." He indicated that Wallis had informed him that she still felt fatigued and did not feel as if she was back to her baseline level of mental output. (Tr.III 146-47).

11. Later in November, Mr. and Mrs. W emailed Park in which they expressed their concerns with Wallis' concussion and her return to school. (Tr.III 147-48; R.II 1368). Park arranged a meeting that took place on November 29, 2012. (R.II 1368). The meeting was attended by Wallis and her parents, Park, Wallis' housemaster, Sandra Crawford, (R. II 1368), and some, but not all of Wallis' teachers, (Tr.III 149).

12. The only documentary evidence of a written plan of any sort are the handwritten notes of the meeting taken by Crawford. (R.III 1526-29).

13. Crawford testified that as part of her duties she would "sit in on many, although not all, parent meetings, IEP meetings, 504 meetings. So I'm part of the student team in that way" (Tr.IV 6).

14. There were no school nurses, school's certified athletic trainer, or neuropsychologist present at the November 29, 2012 meeting nor were any of the foregoing personnel otherwise consulted by the District in developing a plan for Wallis's reentry to academics. (Tr. IV 15; R.II 1368 ¶12).

15. The District did not consult with Wallis's primary care physician with regards to any reentry plan for Wallis's return to full academic or extracurricular athletic activities before, at or subsequent to the November 29, 2012 meeting, nor were the school nurses consulted. (Tr.IV 15).

16. After the November 29, 2012 meeting Crawford did not follow-up with Wallis or her parents, her teachers or the school nurses. (Tr.IV 20-21).

17. Mrs. W asserted that at the November 29, 2012 meeting Crawford "represented that the school staff was familiar with the impacts of concussion on learning when a student returns to school including: memory and attention issues . . . tiredness and other cognitive impairments." She goes on to state:

> [Wallis'] doctor offered to provide further guidance to anyone who wanted it. Given the school's public pronouncements on their expertise with concussions and your own assurances we certainly expected competence and compassion in implementing a plan for [Wallis] to make up work and be successful in her subjects.
>
> Your November [29]th plan was clearly a failure in math as well as other subjects. Your provided no oversight and coordination and never checked in with [Wallis], us her parents or her teachers as to how she felt, how she was doing and her status in catching up. It was easy to see that [Wallis] was working through both her Christmas and February school vacation weeks as well as during her school free blocks and lunches and doing make-up work and tests with teachers before and after school."

(R.III 1781).

18. During the relevant period, the District's nursing staff was trained and experienced in treating students diagnosed with concussion and the nursing staff participated with guidance staff in developing 504 plans and IEP's for students with medical issues. (R. II 1367 ¶ 6).

19. During the relevant period the District did not employ medical clearance forms for students returning to academics and extracurricular athletics after having suffered a concussion while participating in extracurricular athletics. (R.II 1367 ¶ 7).

20. During the relevant period the District's response to concussions suffered by students while participating in extra curricular athletics was "driven by the reports and instructions from the

affected student's doctor and parents." The District's nurses' role was to implement the instructions of the student's doctor. (R.II 1367 ¶ 7).

21. Nether the school nurses, Wallis' primary care physician, nor any other medical professional were consulted at any time regarding Wallis' recovery from her concussion and in particular with respect to any plan for her resumption of academics and the impact concussion may have on a concussed student's return to school. *See* (R. II 1367 ¶ 6, 7).

22. The school nurses did not monitor Wallis' recovery from her concussion. *See* (R. II 1367 ¶ 6, 7).

23. On May 19, 2013, Mrs. W emailed Sandy Crawford demanding, "The school is to properly evaluate [Wallis] to identify what parts of this year's curriculum she did not learn. The testing should include evaluations to identify any cognitive issues due to the concussion." (R.III 1603).

24. On June 5, 2013, the District's Superintendent/Principal, Scott Carpenter, emailed Mrs. W indicating that the school would be forwarding Wallis for a 504/IEP pre-referral. (R.III 1785).

25. The first and only consent to evaluate form and notice of procedural safeguards was sent by the District by letter dated September 9, 2013. (R.III 1540). This letter was in response to Mr. and Mrs. W's letter to the District dated September 3, 2013, informing the district of their intent to enroll Wallis at Lawrence Academy. *Id.* at 1537. By letter dated September 24, 2012, Mr. and Mrs. W informed the District that they were withdrawing Wallis from the school. *Id.* at 1559.

26. The District did not evaluate Wallis for eligibility for special education services or a Section 504 Plan. (R.II 1378 last ¶).

27. During the 2012-2013 academic year Wallis was enrolled in the most demanding and difficult academic classes that the District offered for tenth grade. (Tr.IV 12).

28. Wallis' academic performance declined after her concussion.  (R.I 312, 314); (R.III 1633).

29. Wallis' math teacher altered the standards he used in assessing Wallis' performance in his class and used the altered standards to inflate her grade. (R.III 1430, 1633); (Tr.IV 118-19, 129-31, 135-36,).

30. With one-on-one instruction Wallis was able to perform at an optimal level in math and achieved a 91% score on a probability test.  (Tr.IV 188, 190); (R.II 1371).


Dated: June 6, 2017 

Respectfully submitted,
For Wallis and Mr. and Mrs. W.,

/s/ John N. Morrissey
John N. Morrissey, BBO # 664579
1 Mary's Way
Lincoln, MA 01773
(508) 358-2027
johnmrrssy@yahoo.com


**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 6, 2017.

/s/ John N. Morrissey
John N. Morrissey