**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

| | | |
|---|---|---|
| | ) | |
| LINCOLN-SUDBURY REGIONAL | ) | Civil Action |
| SCHOOL DISTRICT, | ) | No. 16-10724-FDS |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MR. AND MRS. W, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**MEMORANDUM IN SUPPORT OF**
**LINCOLN-SUDBURY REGIONAL SCHOOL DISTRICT'S**
**MOTION FOR SUMMARY JUDGMENT FOR ATTORNEYS' FEES**

**I.**     **The Standard for an Award of Attorneys' Fees from Parents to a School District.**

Under the IDEA, a court "may award reasonable attorneys' fees as part of the costs" to a "prevailing …local educational agency against… the parent, if the parent's complaint or subsequent cause of action was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation." 20 U.S.C. § 1415(i)(3)(B)(i)(III). The Supreme Court has defined a prevailing party as "one who has been awarded some relief by the court [or administrative agency]" or succeeded on an issue and has received a final judgment on the merits or obtained a settlement that is enforceable through a consent decree. Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Human Res., 532 U.S. 598, 603-604 (2001); _see also_ Doe v. Boston Public Schools, 358 F.3d 20 (1st Cir. 2004) (the definition of prevailing party announced in Buckhannon applies to claims for attorneys' fees brought under the IDEA). The success achieved "cannot be a hollow victory; it must materially alter the litigants' legal relationship by modifying one party's behavior in a way

that directly benefits the other." <u>Maine Sch. Admin. Dist. No. 35 v. Mr. R.</u>, 321 F.3d 9, 14-15 (1st Cir. 2003). *See also* <u>Mary G-N v. City of Northampton</u>, No. CV 14-30113-MGM, 2015 WL 9462080, at *2 (D. Mass. Dec. 28, 2015).

Attorneys' fees awards against parents are rare, however, since school districts must show more than prevailing party status to be entitled to an award. Although 20 U.S.C. §1415(i)(3)(B)(i)(III) requires only that "the parent's complaint or subsequent cause of action was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation," courts that have considered the standard have required that the school district show both that parents' claims were frivolous and that it was brought for any improper purpose." In <u>Doe ex rel. Doe v. Attleboro Pub. Sch.</u>, 960 F. Supp. 2d 286, 303 (D. Mass. 2013), *citing* <u>R.P. v. Prescott Unified Sch. Dist.</u>, 631 F.3d 1117, 1126 (9th Cir.2011); <u>L.P. v. Longmeadow Pub. Sch.</u>, No. 10–40190–FDS, 2012 WL 3542581, at *20–21, 1012 U.S. Dist. LEXIS 115277, at *60 (D. Mass. Feb. 24, 2012) <u>Oakstone Cmty. Sch. v. Williams,</u> No. 2:11–cv–1109, 2012 WL 4051322, at *4, 2012 U.S. Dist. LEXIS 130449, at *10 (S.D.Ohio Sept. 13, 2012) ( "[f]or a claim to have an 'improper purpose' the claim must be both frivolous (without merit) and result from an improper motive" and "if a claim is not frivolous, it necessarily does not have an improper purpose, even if resulting from an improper motive"); <u>I.S. v. Town of Munster</u>, No. 2:11–cv–160–JD, 2012 WL 928880, at *4, 2012 U.S. Dist. LEXIS 36766, at *8, 11–12 (N.D.Ind. March 19, 2012).

A claim is not frivolous, and therefore not improper if the parent has made plausible arguments and "presented *plausible* evidence that created a *material* fact dispute," as long as the evidence is not "completely false or nonsensical." <u>G.M. v. Saddleback Valley Sch. Dist.</u>, No. SACV 11–1449 DOC, 2012 WL 5947213, at *5, 2012 U.S. Dist. LEXIS 169411, at *15

(C.D.Cal. Nov. 26, 2012) (emphasis in original). In Bureau of Special Education Appeals (BSEA) Docket No. 1502427, however, Mr. and Mrs. W failed to present any evidence or make any plausible arguments to support their side of any of the issues at hearing or raise a material dispute of fact. After seven (7) days of hearing, including the one (1) day Mr. and Mrs. W. refused to attend, the second hearing officer found for Lincoln-Sudbury Regional School District (Lincoln-Sudbury) on all the issues and concluded emphatically that parents' "claim to special education eligibility is patently frivolous, as is the claim to Section 504 protections." Administrative Record, Volume II, 1357 1383; [1] *See also* Complaint, ¶31 and Exhibit A, p.22. She also concluded unequivocally that "[i]f ever a matter merited a finding that it was brought for an improper purpose it is this." R.II, 1383; Complaint, ¶35 and Exhibit A, p.22.

## II.    Lincoln-Sudbury Prevailed at Hearing on All Issues.

The hearing officer found that Mr. and Mrs. W. did not show that Wallis was disabled within the meaning of the IDEA or Section 504 of the Rehabilitation Act of 1973 at any time during the 2012-2013 school year at issue (R.II, 1380, ¶11, 1383) and did not present "***any*** evidence which could form a reasonable basis for a finding of eligibility for IDEA or Section 504 protections." R.1383 (emphasis added). Parents' 23-page single-spaced hearing request, filed September 22, 2014 (R.I, 1-26) contained numerous allegations which the first hearing officer[2] assigned to the case distilled into thirteen (13) issues by her order of November 9, 2014. R.I,

---

[1] The Administrative Record, volume, and page(s) will hereafter be cited R. followed by the volume of the record and page number(s).

[2] The first hearing officer assigned to the case was Rosa Figueroa. Parents moved to recuse her in a twenty-three page motion, accompanied by some eighty-five (85) pages of exhibits. R.II, 767-939. Although the hearing officer denied the motion (R.II, 965-968), the case was administratively reassigned to hearing officer Lindsay Byrne on April 3, 2015. R.II, 968. Mr. &. Mrs. W. also moved to recuse hearing officer Byrne on November 9, 2015, in a fourteen (14)-page letter with four (4) exhibits attached, which also sought to vacate the first day of hearing on April 7, 2015 (at which they failed to appear), and to vacate or revise the April 17 ruling on parents' motion for postponement and on Lincoln-Sudbury's motion to dismiss for the Ws' failure to prosecute when they did not show up for the hearing on April 7. R.II, 1041-1058. On November 16, 2015, the hearing officer denied the motion for recusal and scheduled the Ws' remaining motions for argument/consideration at the beginning of the hearing on November 17, 2015. R.II. 1092.

126-127.  On November 20, 2015, Mr. and Mrs. W "moved" to dismiss three (3) issues (their

claim for 300 hours of compensatory services or the financial equivalent; their claim for

attorneys' fees or to compensate them for their own time "pursuing the BSEA hearing request

and *other complaints*" (R.I, 136)(emphasis added),[3] and their claim based upon Lincoln-

Sudbury's implementation of student  records and privacy policies and procedures).  Id.

Lincoln-Sudbury filed its motion to dismiss/for summary judgment on all issues on December 5,

2015.  R.I, 144-165.  On January 14, 2015, the hearing officer granted Lincoln-Sudbury's

motion with respect to four (4) issues, denied its motion as to eight (8), and dismissed the issue

parents withdrew, leaving eight (8) issues for hearing.  R.I, 521-529.  The hearing on the

remaining eight (8) took place on April 7, November 17, 18, 19, 2015, and January 6 and 7,

2016.  R.I, 1362 and Transcript Volumes I-VI (hereinafter TRI, TRII,...,TRVI).  The BSEA

issued its decision on April 1, 2016, finding in Lincoln-Sudbury's favor on all issues.  R.II,

1335-1360; 1362-1386.[4]

 Lincoln-Sudbury is unquestionably the prevailing party within the meaning of that term

because it prevailed on all the issues raised by the hearing request.  With respect to the issues

which were the subject of the hearing, the hearing officer found at R.1380-1383 that:

 1. Lincoln-Sudbury complied with Wallis' doctor's medical instructions concerning

her reentry to school after her concussion;

 2. Lincoln-Sudbury did not fail to comply with IDEA and/or Section 504 child find

provisions because there was no evidence Wallis had any continuing medical issues or

---

[3] *See* references to complaints filed against Lincoln-Sudbury's athletic director and three school nurses and about records requests in Exhibit B to the Affidavit of Counsel for Lincoln-Sudbury Regional School District in Support of Its Motion for Summary Judgment for Attorneys' Fees.  *See also* note 10, *infra*, and R.I, 401.
[4] The BSEA issued a corrected decision on April 8, 2016 (R.II, 1362-1386), to correct errors on pages 1 and 14. According to the hearing officer, the corrections "do not alter the analysis or the outcome."  R.I, 1361.  Lincoln-Sudbury will hereinafter cite to the corrected decision only.

impairment and there was no reason for Lincoln-Sudbury to suspect she had a disability impeding her progress in regular education or preventing her from accessing the regular education curriculum;

3.     there was no evidence that medical issues substantially limited Wallis' ability to learn (or any other major life activity);

4.     Lincoln-Sudbury did not deny Wallis access to the curriculum of each of her classes during the 2012-2013 school year because the evidence "clearly and convincingly demonstrates that Wallis returned from her injury to full participation in the same full set of highly challenging regular academic courses and non-academic classes that she participated in prior to her injury."  R.II, 1381;

5.     Wallis did not fail to make effective progress in her classes during the 2012-2013 school year;

6.     Wallis was not eligible for accommodations under a Section 504 plan because of the concussion she sustained on September 30, 2012;

7.     Mr. and Mrs. W. are not entitled to reimbursement for their unilateral placement of Wallis at Lawrence Academy for her junior and senior years, including transportation; and

8.     Mr. and Mrs. W. are not entitled to reimbursement for providing Wallis a math tutor for the summer of 2013.

The BSEA decision is not a hollow victory; it has materially altered the litigants' legal relationship by terminating the BSEA proceeding with findings on the merits denying Mr. and Mrs. W any of the relief they sought and finding that Lincoln-Sudbury acted properly and reasonably.  As the prevailing party, Lincoln-Sudbury is entitled to an award of attorneys' fees against Mr. and Mrs. W because their hearing request was frivolous (Doe ex rel. Doe v.

Attleboro Pub. Sch., 960 F. Supp. 2d at 303) and "was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation." 20 U.S.C. § 1415(i)(3)(B)(i)(III).

**III.     The Hearing Officer Expressly Found that the Ws' Claims in the BSEA Proceeding Were Frivolous and were Brought for An Improper Purpose.**

The hearing officer expressly concluded that the Ws' "claim to special education eligibility is patently frivolous, as is the claim to Section 504 protections." R.II, 1383. She also found that Mr. and Mrs. W filed the hearing request for an improper purpose, concluding that "[t]he record clearly demonstrates that the Parents' objections to Wallis' 10th grade experience at Lincoln-Sudbury began only after the math department recommended a change from one honors section to another honors section," and that "the Parents' actions in pursuing IDEA and Section 504 claims at the BSEA were a bad faith effort to punish Lincoln-Sudbury's staff for the perceived 'disrespect' of their daughter's academic prowess and to justify public funding for her private school education." Id. The evidence supports these findings and also that the Ws' intended to harass Lincoln-Sudbury, its administrators and staff, cause unnecessary delay, and needlessly increase the cost of litigation.

The court "is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir.1993) (citing Town of Burlington v. Dep't of Educ. for Com. of Mass., 736 F.2d 773 (1st Cir. 1984), aff'd sub nom. Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 105 S. Ct. 1996 (1985). A hearing officer's findings of fact are entitled to deference unless impaired by an error of law or the Court "determines that [they] are unreliable or incorrect in light of the totality of the record." Ross v. Framingham Sch. Comm., 44 F. Supp. 2d 104, 112 (D. Mass. 1999), aff'd, 229 F.3d 1133 (1st Cir. 2000).

**A.** **Substantial, Clear and Convincing Evidence in the Record Supports the Finding that the Ws Claims Are Patently Frivolous.**

The hearing officer found that the evidence presented at hearing provided no factual support whatsoever for the extensive allegations in the Ws' lengthy, single-spaced hearing request or for a single finding in their favor on the issues. The totality of the record demonstrates that the BSEA proceeding was a vendetta against Lincoln-Sudbury and its administrators and staff and supports the hearing officer's finding that the proceeding was frivolous from its inception. R.II, 1353.

By calling only seventeen (17) Lincoln-Sudbury witnesses, Mr. and Mrs. W presented evidence which proved only that Lincoln-Sudbury had no reason to suspect Wallis was disabled and required specialized instruction and related services or accommodations beyond the regular education accommodations she was given and that Lincoln-Sudbury acted "reasonably and responsibly" (R.II, 1383) in following Wallis' doctor's instructions concerning her re-entry to school. The conclusion is inescapable that Mr. and Mrs. W deliberately chose not to testify themselves or to call Wallis or any doctor to testify because they knew Wallis was not disabled within the meaning of the IDEA or section 504 as a result of the concussion. They knew they could not prove that she was disabled or that Lincoln-Sudbury knew or should have known she was disabled and should have referred her for an evaluation to determine her eligibility for an IEP or 504 plan.

The Ws' witness list contained thirty-one (31) names. Supplemental Record (hereinafter SR), 44-45. Of those named, twenty (20) were current or former Lincoln-Sudbury staff, administrators, and a school committee member, and eleven (11) were witnesses not associated with Lincoln-Sudbury. In addition to Mr. and Mrs. W. and Wallis, the non-Lincoln-Sudbury

witnesses included two dentists (Leonard Carapezza and Joyce Johnston-Neeser), Michael

Beasley, the doctor Wallis saw at Children's Hospital in July, 2013 (R.III, 1515), Kim

Hildebrandt, believed to be Wallis's math tutor during the summer of 2013, and Frank

Mastrangelo, Krista Collins, and Brian Feigenbaum, staff at Lawrence Academy.  Notably

missing from the list was Dr. Aisling Gaughan, the doctor who diagnosed Wallis' concussion

and wrote the notes concerning her two-week absence due to the concussion and the instructions

for her return to school.  R.III, 1512-1513.  Dr. Gaughan also wrote the June 14, 2013, note

asking Lincoln-Sudbury to excuse Wallis from a make up test in math and the math final.  R.III,

1514.

Dr. Gaughan's records document that on October 12, 2012, Wallis felt much better and

complained of "mild fatigue only."  Dr. Gaughan also reported that "[Wallis'] mother is very

pleased and says she is back to herself."  R.III, 1461; 1504.  The doctor provided "written

instructions for school" about postponing make up work and excusing Wallis from gym and

games, specifically adding that "She will contact me if she has problems."  Id.  Since the next

entry documenting a visit to Dr. Gaughan is the June 14, 2013, visit (R.III, 1466-1467; 1510-

1511), Dr. Gaughan's records are evidence that Wallis did not have any further problems related

to the concussion.  Neither Wallis, nor her parents contacted the doctor between October, 2012,

and June 14, 2013.

The doctor's record of the June 14 visit notes that Wallis' subjective complaints were of

"[c]oncentration difficulties" which were "[p]er patient related to stress."  R.III, 1466; 1510.  Dr.

Gaughan also noted in the history that Mr. W reported that Wallis "recovered physically has no

headaches but has difficulty with anxiety because school did not accommodate her and she has

not been supported her in math."  Id.  Under "Plan," she noted that "[n]o exam performed at this

apt which lasted 30 mins" (id.) and the "Procedure Code" listed was for counseling.  R.III, 1467, 1511.

According to Dr. Gaughan's record, the Ws brought Wallis to see her because they wanted "the school to provide tutoring and remediation over the summer and postpone tests and exams" until after summer tutoring (R.III, 1466; 1510), not because of any recurring symptoms. The June 14, 2013, note states only that Wallis "suffered a concussion in 10/2012 and did not have the opportunity to learn the work that she had missed."[5]  R.III, 1514.  It does not say she still suffered from concussion symptoms.  It does not say she was disabled or that postponing the tests and math remediation over the summer was medically necessary.

The Boston Children's Hospital Record (R.III, 1515-1519 and 1506-1509) does not prove that Wallis was disabled during the 2012-2013 school year.  An ImPACT Clinical Report from a July 8, 2013, visit reports only one concussion symptom, "feeling slowed down."  R.III, 1519.[6] Dr. Michael Beasley's "Assessment and Plan" based upon that one visit stated that "Overall it seems that clinically [Wallis] is resolved" (R.III, 1508) and "I think the family is looking for some support to discuss with the school about previous lack of accommodations which is difficult for me to do since she wasn't a part of my care at this point."  R.III, 1509.  Dr. Beasley does not diagnose a disability and would not speculate about whether she ever had one.

In addition to the medical records in evidence showing that Wallis did not see a doctor between October 12, 2012, and June 14, 2013, Wallis' Student Health Record, and the testimony of the school nurses are evidence that Wallis never went to the school's health office during the 2012-2013 school year, for any reason, whether related to concussion symptoms or not, except

---

[5]  The note asks Lincoln-Sudbury to excuse Wallis from the math make-up and math final even though those exams did not cover material from the first quarter or first semester when she missed time from school because of the concussion.  Dorey, TRIV, p.134, ll.18-20; p.137, ll.1-6; p.189, ll.5-13; Crawford, TRIV, p.51, ll.10-19.
[6]  This finding is in contrast to Wallis's report to Dr. Gaughan three weeks earlier that she did not feel tired.  R.III, 1466; 1510.

for routine vision and hearing screenings.  Cavallo, TRII, p.80, *ll*.18-23; p.85, *ll*.1-2; Nozik, TRIII, p.21, *ll*.2-3; p.35, *ll*.19-21; Gaumnitz, TRIII, p.40, *l*.23 – p.41, *l*.1.  *See also* parents' admission at TRIII, p.41, *ll*.2-4.

Mr. and Mrs. W. knew that Wallis was not disabled within the meaning of the IDEA or Section 504 in May and June, 2013.  Notes of the May 24, 2013, meeting to discuss the math teacher's decision not to recommend Wallis for intensive math in eleventh grade indicate that the Ws admitted they had not taken Wallis back to the doctor because of her concussion and they did not think she had post-concussion symptoms at that point.  R.III, 1613.  They even said they felt Wallis had fully accessed the Intensive Algebra curriculum.  R.III, 1615.  The meeting notes also reflect that Lincoln-Sudbury reminded the Ws it does not deny requests to override teacher recommendations for class placement.  R.III, 1614.  The Ws were well aware of the override process, however, because they had already exercised that option to place Wallis in intensive geometry for 9th grade against the recommendation of her eighth grade teacher.  R.III, 1585; TRIV, p.244, *l*.13 – p.246, *l*.24.  In fact, they ultimately also overrode Mr. Dorey's recommendation, and Wallis was placed in the 11th grade intensive math class.  Crawford, TRIV, p.54, *ll*.5-13.

Mr. and Mrs. W chose not to testify themselves and they chose not to call Wallis or any non-Lincoln-Sudbury witness.[7]  The Ws are well-educated.[8]  They knew the doctors would not

---

[7] Dr. Gaughan was not on the Ws' witness list.  S.R.44-45.

[8] The Court can take judicial notice of the fact that according to LinkedIn, Mrs. W., who took the lead role in filing and arguing at the BSEA, has Bachelor of Science degrees in Chemistry and Chemical Engineering from the Massachusetts Institute of Technology (MIT) and a Master of Science in Chemical Engineering from the University of California at Berkeley.  She has been employed as a consultant to chemical, pharmaceutical, and biotechnology clients, as well as in the health care plan industry.  Mr. W. has a Bachelor of Science degree in Mechanical Engineering from MIT and a Master of Science in Engineering from the University of California at Berkeley.  He has been employed as a consultant/software developer and as a product manager for a suite of portfolio management software.  Affidavit of Counsel, ¶5.  They are also familiar with the BSEA and the special education process because they have been to a due process hearing with a different school district in 2005 concerning Wallis's dyslexic brother.  TRII, p.57, *ll*.11-15.  R.III, 1508.

provide evidence that Wallis was disabled throughout the 2012-2013 school year since Dr. Gaughan did not see her after October 12, 2012, until June 14, 2013, and Dr. Beasley never saw her until July 8, 2013. They also knew that Wallis' teachers at Lawrence Academy could not provide testimony relevant to whether Wallis was disabled during the 2012-2013 school year because they did not know her then. Nevertheless, they proceeded to hearing, calling seventeen (17) of the twenty (20) Lincoln-Sudbury witnesses on the list. One after another, those witnesses testified that Wallis did not complain about concussion symptoms after the fall of 2012, did not display symptoms, and fully participated in her classes and extra-curricular activities. They testified that Wallis not only accessed the curriculum, but succeeded in challenging advanced level classes.

Mr. and Mrs. W also failed to present any evidence whatsoever of any communications between themselves and/or Wallis and Lincoln-Sudbury about Wallis's concussion, concerns over lingering symptoms, make-up work, inability to do any activity or sports, or the need for concussion-related accommodations after November, 2012, until May, 2013, when Brandon Dorey, declined to recommend Wallis for intensive math for the next year. R.III, 1612. The school nurses, Wallis' guidance counselor, the athletic trainer, and Wallis' teachers all testified to the lack of communication from Wallis' doctor, Wallis, or anyone. *See e.g.* Cavallo, TRII, p.80, *ll*.18-23; p.85, *ll*.4-8; p.87, *ll*.13-17; p.108, *ll*.8-11; p.125, *ll*.6-17; Park (guidance counselor), TRIII, p.158, *l*.19 - p.159, *l*.1; Ando (athletic trainer), TRIII, p.79, *ll*.6-14; Kramer (English teacher), TRIII, p.116, *ll*.15-21; Schultz (Spanish teacher), TRIII, p.127, *ll*.9-17; p.128, *l*.18 – p.129, *l*.10; Gilman (U.S. History teacher), TRIV, p.83, *l*.19 – p.84, *l*.11; p.87, *l*.22 – p. 88, *l*.11; p.96, *l*.21 – p.97, *l*.4; Dorey, TRIV, p.172, *l*.15 – p.173, *l*.16. *See also* R.1613.

Lincoln-Sudbury implemented regular education modifications and supports to assist Wallis in making up the academic work she missed during her absence. R.II, 1368-1371, ¶¶14-17; 1379, ¶3; R.III, 1400-1402 (Answer 3); 1404 (Answer 5); 1411 (Answer 17); 1413-1414 (Answer 17); 1415 (Answer 18; 1420-1422 (Answer 24); 1423-1424 (Answers 25, 26); 1428-1431 (Answers 23, 24). She made up all work required by her teachers by the third quarter of the 2012-2013 school year. R.II, 1379, ¶3. *See also* R.III, 1420 (Answer 24);1535-1536; 1615. Wallis accessed the curriculum and made effective progress as evidenced by her grades (As, Bs, and two Cs [R.III, 1577]) in the most rigorous classes offered to tenth grade students at LSRHS (R.III, 1577), and the testimony of her teachers. *See e.g.* Kramer, TRIII, p.63, *ll*.13-16; Schultz, TRIII, p.128, *ll*.3-9; Crawford TRIV, p.34, *ll*.19-24; p.55, *ll*.8-16; Gilman, TRIV; p.90, *ll*.18-22; Weiss, TRIV, p.113, *ll*.14-22; Dorey, TRIV, p.167, *ll*.11-23. She passed all her classes for the year with the exception of Intensive Math (id.) in which she received an Incomplete. Despite the incomplete, Wallis' performance in that class demonstrated that she accessed the curriculum and showed competency in the subject at a level well beyond what an average student would be learning. She received the Incomplete only because she refused to take one fourth-quarter test and the final, not because she was unable to access and master the content of the Algebra II curriculum. R.II, 1370-1371, ¶17; 1379, ¶¶5, 8; R.III, 1398; TRIV, p.160, *ll*.1-13; p.167, *l*.2-23.[9]

Wallis participated fully in her classes and in activities.[10] She did not complain about physical symptoms, her workload, or that she was unable to understand. *See e.g.* Kramer, TRIII, p.65, *l*.21 – p.66, *l*.3; Schultz, TRIII, p.127, *ll*.9-17 (complained about headaches when she first returned to school, but never again); Gilman, TRIV, p.85, *l*.24 – p.86, *l*.6; Dorey, TRIV, p.172,

---

[9] Wallis never complained about her math grades and parents never contacted Mr. Dorey during the school year until after he made his recommendation. TRIV, p.172, *l*.15 – p.173, *l*.16.

[10] Although incompletes the first quarter kept her from being on the winter track team, she was ready to, wanted to, and did participate in practices during the winter track season. R.III, 1530-1534.

*l*.19 – p.173, *ll*.13-16.  She was fully able to do the work.  *See e.g.* Kramer, TRIII, p.45, *ll*.1-12; Schultz, TRIII, p.127, *l*.18 – p.128, *l*.20; Gilman, TRIV, p.81, *ll*.3-24; p.83, *ll*.19-22; Dorey, TRIV, p.167. *ll*.3-10; p.166, *l*.21 – p.167, *l*.23; p.176, *ll*.5-16.

Thus, the uncontroverted evidence at hearing was that teachers had no reason to believe Wallis was disabled and required special education and related services or accommodations under the IDEA or section 504.  No one at Lincoln-Sudbury noticed any change in Wallis' academic functioning after she returned to school or observed any symptoms associated with post-concussion syndrome or any other kind of disability, and no one observed that Wallis was unable to access the curriculum or thought she required specialized instruction at any time during the 2012-2013 school year.  RII, 1372, ¶20; 1379, ¶2.

The absence of even a shred of evidence that Wallis was disabled and/or that Lincoln-Sudbury had any reason to suspect she was disabled supports the hearing officer's conclusion that the Ws' claim for special education or section 504 eligibility was frivolous from the outset. R.II, 1383.

**B.**     **Substantial, Clear and Convincing Evidence in the Record Supports the Finding of Improper Purpose.**

**1.**     **The Ws were motivated to harass and punish Lincoln-Sudbury administrators and staff.**

The hearing officer's conclusion that "[i]f ever a matter merited a finding that it was brought for an improper purpose it is this" is entitled to deference.  Lenn, 998 F.2d at 1087; Ross, 44 F. Supp. 2d at 112.  She had a rational basis for opining about the Ws' bad faith, improper motives and the "unfortunate, outsized negative effect on the time, attention and morale of Lincoln-Sudbury staff" because, in addition to reviewing the totality of the record, the hearing officer had the opportunity to observe Mr. and Mrs. W first hand, to interact with them,

and assess their behavior and demeanor. The Ws harassed Lincoln-Sudbury administrators and staff from May, 2013 throughout the administrative hearing because Wallis was angry that Mr. Dorey believed she should be placed in the Level I advanced math class, rather than in the intensive class,[11] and Mr. and Mrs. W were angry that Mr. Dorey and other Lincoln-Sudbury staff and administrators disrespected Wallis' academic prowess.

The Ws' e-mail communications after Mr. Dorey's recommendation (see e.g. R.III, 1602-1603; 1622-1631) highlight the Ws' anger and the improper motivation behind their relentless pursuit of a frivolous claim to an IEP or 504 plan for their nondisabled, capable daughter. The lengthy e-mails are caustic, scathing, and insulting to Lincoln-Sudbury administrators and staff. They accuse Lincoln-Sudbury administrators and staff of being unyielding and unproductive, uncooperative and insensitive, disgraceful, "negligent in oversight and communications and ineffectual in math instruction," and distracting to Wallis, causing her stress, and "negatively affecting her performance in all areas." R.III, 1605.

Wallis met with Mr. Dorey and Ms. Weiss, another math teacher (TRIV, p.112, *ll*.13-17; (TRIV, p.152, *l*.7 – p.154, *l*.8; p.155, *l*.4 – p.156, *l*.2; p.173, *l*.17 – p.174, *l*.7), and with her guidance counselor, J.K. Park, about Mr. Dorey's math recommendation. Mr. Park met with Mr. Dorey. R.III, 1660 (J.K. Park's notes of his meetings with Wallis and Brandon Dorey). Mr. Park then spoke with Mr. and Mrs. W and proposed a plan to provide Wallis extra help for the remainder of the quarter to achieve the grades she would need in order to earn Mr. Dorey's recommendation to intensive math for 11th grade. R.III, 1601. He e-mailed the plan to Wallis. Id.

---

[11] Mr. Dorey testified to the structure of math classes available. The highest level is Intensive. Just below that is Level I, an advanced course above college prep, and Level 2, which is college prep. Dorey, TRIV, p.118, *l*.20 – p.119, *l*.6. Below those is a non-college prep class. All are regular education courses. Crawford, p.60, *l*.2 – p.62, *l*.3.

The Ws were so angry with the plan that they rejected it in a scathing e-mail on May 19, 2013 (R.III, 1602-1603), demanding: (1) an "emergency meeting to put [Wallis] on a 504 plan to address deficiencies in math and any other area of subpar performance," (2) that Wallis be removed from Mr. Dorey's class, (3) that Mr. Dorey have no further contact with her, (4) that Wallis be given an incomplete in the class, (5) that a plan be developed to include tutoring over the summer to "position her well for intensive math next year" (id.), and (6) that Wallis be evaluated to identify alleged unlearned curriculum, as well as for "cognitive issues due to her concussion." R.III, 1602, 1603. The West House Housemaster, Sandy Crawford, responded by e-mail on May 20, offering a meeting to discuss the 504 process, providing a summary of the 504 process, explaining the need for additional medical documentation and consent for cognitive testing, and urging Alexandra's prompt return to math class. R.III, 1604.

On May 21, the Ws responded in another e-mail which was highly critical of and insulting to Lincoln-Sudbury and its staff. R.III, 1605-1606. They launched their unjustifiable attack against Mr. Dorey and Lincoln-Sudbury despite being fully aware that they could override Mr. Dorey's recommendation so that Wallis could still take the Intensive level math class in eleventh grade. *See* p.10., supra; R.III, 1585; 1614; TRII, p.244, *l*.13 – p.246, *l*.14. In fact, they exercised their option to override Mr. Dorey's recommendation and Wallis would have been in Intensive math if she had remained at Lincoln-Sudbury Regional High School. TRIV, p.54, *ll*.5-13.

Mrs. Ws' opening statement at the hearing (TRII, p.44, *l*.12 – p.68, *l*.21) continued the Ws' rant against the perceived injustice to Wallis of the recommendation that she take a math class other than the most advanced offered. It escalated the vitriolic hyperbole to a new level. Mrs. W railed against Lincoln-Sudbury administrators, staff, counsel, and both BSEA hearing

officers involved in the BSEA proceeding with accusations of, among other things, lying, misrepresentation, fabrication, stalling, twisting, sabotaging, acting in bad faith (TRII, 45, *ll.*9-16; 55, *ll.*1-6), being "woefully unaware, excessively ignorant, unsatisfactorily untrained" (TRII, 66, *ll.*9-10), disrespectful and arrogant (id., 61, *ll.*9-11), "unacceptably negligent" or "malicious in their woeful neglect" (id., 65, *ll.*3-5), and shameful. Id., 68, *l.*20. She made clear the reason for the vicious insults when she stated:

> We object to having to argue against the School's position and portrayal that [Wallis] was just not a good math student and not up to the rigors of high school math particularly in the context of her long-standing excellence in academics, math in particular, sports and extracurricular activities

(id., 53, *ll.*2-7) and when she asked:

> What kind of high school [sabotages] an ambitious, smart and talented student in math and science, one who received awards in middle school for straight As in all subjects all three years in the most rigorous classes there, and the Class Spirit Award, Science Olympiad and other awards, and instead of encouraging her portrays her as not up to the rigors of high school when she certainly was?

Id., 67, *ll.*11-19.

Other examples of the Ws' behavior which support the hearing officer's conclusion that the Ws' pursuit of the BSEA proceeding was "a bad faith effort to punish Lincoln-Sudbury's staff for the perceived 'disrespect' of their daughter's academic prowess and to justify public funding for her private school education" follow. They include, but are not limited to, the Ws' objection (TRII, 1103) to the hearing officer's allowing a motion to quash the subpoena of Lincoln-Sudbury's retired former athletic director whose mother was critically ill, even though the order was clear that the subpoena could be reissued for different dates, if necessary. R.II, 1084-1085, 1088. They complained that the hearing officer accepted Lincoln-Sudbury's reason

for quashing the subpoena and demanded proof. The Ws accused the former athletic director of being "disrespectful of the [concussion] regulations and arrogant" (TRII, 61, *ll.*9-11), and of shamefully expressing sympathy for the player that hit Wallis during the infamous field hockey practice in September, 2012. Id., 68, *ll.*16-20.

The Ws also objected continuously to the hearing officer's willingness to accommodate the medical needs of Dr. Aida Ramos, Lincoln-Sudbury's director of special education, and its representative throughout the pre-hearing proceedings and during the hearing. *See e.g.* R.I, 613; 894; 1122; 1124; *e.g.* TRVI, p.135, *l.*21 – p.140, *l.*2, Dr. Ramos, underwent a kidney transplant on April 28, 2015. *See e.g.* R.II, 977; R.I, 599; 617; 627; 686-687; R.II, 977; 1007, ¶8. When she suffered complications at the beginning of January, 2016, just days before the hearing was to resume (R.II, 1120-1121) the Ws objected to any postponement because of her medical issues. R.II, 1122-23; 1124. They would have had the hearing moved to Dr. Ramos' hospital room or would have had Dr. Ramos call in by phone as if whatever medical issue necessitated the hospitalization would have no effect on her functioning. TRVI, p.138, *ll.*8-24. The hearing went forward on January 6 and 7 without Dr. Ramos, and parents completed presenting their evidence. Given that the Ws' request for relief was entirely retroactive and financial in nature, the hearing officer postponed the January 8 hearing date so that Dr. Ramos could be present for the presentation of Lincoln-Sudbury's case. R.II, 1128; TRVI, p.136, *l.*1 – p.139, *l.*7. The hearing never actually continued. After consultation with Dr. Ramos, counsel rested Lincoln-Sudbury's case on the documentary evidence and the testimony and cross-examination of the witnesses who already testified. R.1133.

In Galanis v. Szulik, 841 F. Supp. 2d 456, 461 (D. Mass. 2011), *adhered to on reconsideration,* 863 F. Supp. 2d 123 (D. Mass. 2012), the Court found that the failure to come

forward with any evidence to support the allegations in the complaint, the plaintiff's attorney's failure to investigate the factual basis for the complaint, and the fact that the case was filed to extort a settlement from the defendant and intimidate him into waiving potential claims is other litigation constituted bad faith which justified an award of reasonable attorneys' fees and expenses under Federal Rules of Civil Procedure, Rule 11. In this case, the hearing officer found that the evidence presented at hearing provided no factual support whatsoever for the extensive allegations in parents' 23-page single-spaced hearing request or for a single finding in parents' favor on the issues at hearing and that Mr. and Mrs. W's "vitriolic hyperbole [did] little to disguise the absence of factual and legal support for their positon." R.II, 1383.

In addition, she found that "in correspondence to and meeting with Lincoln-Sudbury personnel, and throughout this administrative process, offered insults, threats, distortions, misleading and tautological arguments, designed, apparently, to intimidate, shame or coerce Lincoln-Sudbury staff into actions not warranted by a reasonable view of Wallis' educational experience at Lincoln-Sudbury." R.II, 1383. She further found that "[t]he record clearly demonstrates that the Parents' objections to Wallis' 10th grade experience at Lincoln-Sudbury began only after the math department recommended a change from one honors section to another honors section" and that "[t]heir claim to special education eligibility is patently frivolous, as is the claim to Section 504 protections." Id. The hearing officer concluded that, "based on the totality of the administrative record...Parents' actions in pursuing IDEA and Section 504 claims at the BSEA were a bad faith effort to punish Lincoln-Sudbury's staff for the perceived 'disrespect' of their daughter's academic prowess and to justify public funding for her private school education." Id. As in Galanis, the bad faith demonstrated in this case justifies an award of attorneys' fees.

### 2.     The Ws caused unnecessary delay.

Mr. and Mrs. W. delayed the hearing by moving to postpone the February 25-27, 2015, dates and, again, by moving to postpone the April 7-10, 2015, dates and then failing to show up on April 7 after the postponement was denied.  R.II, 581-585; 761-765.  By ignoring the BSEA order which denied the postponement, the Ws showed a complete lack of respect for the BSEA, the hearing officer, Lincoln-Sudbury administrators and staff, and a witness they had subpoenaed.  The witness, counsel, and Dr. Ramos, appeared at the BSEA for the scheduled hearing.  R.II, ¶¶7, 8.

The hearing was opened to address Lincoln-Sudbury's oral motion to dismiss for failure to prosecute and other procedural matters.  It was then suspended until November 17, 2015.  TRI, p.23, *ll.*6-13.[12]  The hearing proceeded with Ws' case on November 17, 18, and 19.  On November 19, the Ws asked to defer the November 20 hearing date until January.  TRIV, p.208, *l.*11 – p.209, *l.*14.  The hearing was further continued to January 6, 7, and 8.  R.II, 1115.  R.II, 979-984.

### 3.     The Ws increased the cost of the litigation.

Mr. and Mrs. W. also needlessly increased the cost of litigation for the district with their rambling, repetitive motions, memoranda, and letters, arguing about even the most insignificant points, and necessitating response from Lincoln-Sudbury. They argued about such things as the language in the N1 (a Department of Elementary and Secondary Education form school districts in Massachusetts use whenever they propose to take any action with respect to a student) that Dr. Ramos sent out with a consent to evaluate form.  R.III, 1560-1561.  This Court may take judicial notice of the form found online at http://www.doe.mass.edu/sped/iep/forms/pdf/N1.pdf.  Dr. Ramos sent the Ws an N1 with a consent to evaluate form to the Ws on September 9, 2013, in

---

[12] A scheduling order set the continued dates for November 17, 18, 19, and 20.  R.II, 983, ¶1.

response to the Ws' September 3 letter to the Superintendent complaining, among other things, that Lincoln-Sudbury had not evaluated Wallis. Mr. and Mrs. W never consented to an evaluation and Wallis was already attending Lawrence Academy. R.III, 1537-1539; 1540; TRII, p.217, *ll*.2-20.

The lengthy hearing request with its numerous allegations against so many Lincoln-Sudbury administrators and staff increased the cost of the litigation from the outset. Counsel was required to conduct extensive interviews and conversations to learn the facts in order to prepare a response. The Ws' unwieldy discovery, seeking many documents they already had (*see e.g.* R.II, 863-884; 911-917; R.III, 1562 – 1563) and documents which were irrelevant to issues within the BSEA's jurisdiction also involved time consuming discussion and investigations in order to prepare responses. The Ws' motions to compel and to recuse two hearing officers, required more time to oppose, and the inclusion of twenty (20) Lincoln-Sudbury employees on their witness list required significant time at Lincoln-Sudbury for preparation.

Throughout the pre-hearing stages of the process, the Ws sought documents which could not possibly have led to the discovery of any evidence tending to prove that Wallis was a child with a disability who required specialized instruction or accommodations and should have been referred for evaluation. They submitted three requests for production (R.I, 48-59; 72-80; 492-506) and two sets of interrogatories. R.I, 60-69; 78-80.

The first request for production (R.I, 48-59) contained 42 document requests, some with multiple parts, seeking, among a vast array of other things, copies of ***all*** Lincoln-Sudbury "policies, procedures, practices, guidelines, advisories, criteria or any such guidance documents, and revisions of any such documents" for the 2011-2012, 2012-2013, 2013-2014 and 2014-2015 school years related to, among other things, head injuries/concussions, emergency medical

treatment and first aid, absences and extended absences, incompletes, warnings, grading modifications, curriculum modifications, participation in sports, school clubs and other extracurricular activities, return-to-play for injured athletes, maintenance and destruction of students' midterm and final examinations, student records, placement in Intensive/Accelerated math classes (Intensive Geometry, Intensive Algebra II and Intensive Advanced Math), placement in Accelerated science classes (Accelerated Earth Science freshman year, Accelerated Biology sophomore year, Accelerated Chemistry junior year), the provision of an LSRHS staff escort of students, and appeals processes. They also sought copies of School Committee open session and executive session meeting minutes concerning those policies and procedures, practices, guidelines, advisories, or criteria, as well as Wellness Committee agenda and meeting minutes from 2010.

In addition to the document requests, the Ws sent their first set of thirty-four (34) interrogatories (R.I, 61-69), many of which included subparts and exceeded the maximum twenty-five (25) allowable without hearing officer approval. BSEA Rule VI.B.2. Nevertheless, Lincoln-Sudbury provided detailed answers to the interrogatories, including answers to interrogatories to which it objected. *See, e.g.* Lincoln-Sudbury's answers notwithstanding its objections, to interrogatories 9, 11, 16, 17, 18, 19, 20, 23, 24, 27, 29, 30, 31, 32, 33, 34, 35 [sic]. R.I, 308-345

The Ws' second document request R.I, 74-76, sent seven (7) days later, sought information about and from, *inter alia*, the Lincoln-Sudbury Concussion Committee, documenting its formation and the reason for it, its schedule, agendas and minutes, the identity and qualifications of its members, the identity of all school physicians and the agenda and meeting minutes during which they were hired, copies of their contracts

and job responsibilities, and documents "showing any and all services...provided by each and every school physician" from "2010 to present," documents describing The Beacon Program, a program started in the 2014-2015 school year, the process for determining eligibility for the program, and the redacted 504 plans, IEPs, doctor's notes and instructions, and re-entry plans of the students in the program. R.I, 74-176.

Any information about the Beacon program is irrelevant since it did not exist in the 2012-2013 school year (R.I, 305, Objection) when Wallis sustained her concussion (R.II, 1366, ¶2; 1474) and documentation related to other students in that program is not probative on any of the issues which remained for hearing. The hiring of school physicians and their contracts from 2010 to the present was not remotely or tangentially probative of any issue and is yet another example of the Ws' harassment.

The second request was also accompanied by a second set of interrogatories. R.I, 492-506. Plaintiffs' third request for production (R.I, 492-506), was prefaced by a diatribe and argument in all caps and bold type about documents they claimed they did not have. This request also sought policies related to identifying disabled students, performing eligibility evaluations, and head injuries/ concussions from the 2012-2013 school year through the date of the request in January, 2015. The first item requested had been already requested because it was included in request 7.e of the first request for production, the second was included in request 7.f. of the first request, and the third was included in request 7.b. of the first request.

Parents' document requests were excessive, unnecessary, and unduly burdensome in terms of volume and irrelevant subject matter, especially in light of the thousands of pages already provided to them in response to their student record, public records, and open

meeting law requests and complaints.[13]  They needlessly required Lincoln-Sudbury to prepare objections, as well as answers and to gather and provide more documents.

Mr. and Mrs. W also filed multiple motions to compel, including one claiming Lincoln-Sudbury failed to comply with BSEA discovery rules and engaged in inappropriate, prohibited ex parte communications with the hearing officer because it "sent complete copies of their responses" to the hearing officer.[14]  R.I, 293-295.  The Ws claimed that doing so was inappropriate and "may be viewed as ex parte communications with the hearing officer that is prohibited."  R.I, 293.  Again, Lincoln-Sudbury was forced to respond.  R.I, 375-376; 380-390; 513-520.[15]  Ultimately, the hearing officer scheduled a conference call with the Ws and counsel for Lincoln-Sudbury for February 17, 2015, to address discovery and the Ws' requests for subpoenas.  This marathon conference call lasted a highly unusual, if not unprecedented, two hours, thirty-four minutes, and 18 seconds.  R.I, 624; 635; 636-637.  No rule prohibits parties from filing requests or responses, and the hearing officer found no fault with what Lincoln-Sudbury filed.

In addition, the Ws filed lengthy, baseless motions to recuse both hearing officers assigned to the case.  R.II, 767-938; 1042-1058.[16]  Both motions were denied.  R.II, 966-967; 1092.  The BSEA administratively re-assigned the case from Hearing Officer Rosa Figueroa to Hearing Officer Lindsay Byrne on April 3, 2015.  R.II, 968.

---

[13] Mr. and Mrs. W. acknowledge Open Meeting Law and Public Records Requests. R.I, 401.  *See also* Affidavit of Counsel in Support of Lincoln-Sudbury Regional Schools District's Motion for Summary Judgment for Fees, Exhibit B.
[14] Lincoln-Sudbury did not file the documents responsive to any production request. R,I, 297-345; 415-438; 375-377.
[15] They also complained that counsel for Lincoln-Sudbury contacted the unknown individuals on the Ws' witness list to inquire into whether any were willing to talk about the substance of their anticipated testimony. The hearing officer properly ruled in her Clarification Order of March 4, 2015, that there was no prohibition to communications between counsel for Lincoln-Sudbury and the Ws' witnesses.  R.I, 691, ¶2.
[16] *See* Lincoln-Sudbury's opposition at R.II, 950-954.

The Ws also increased the cost of the litigation and harassed Lincoln-Sudbury administrators and staff by listing and calling witnesses whose testimony was duplicative and/or could not have been expected to generate evidence to prove that the Ws were entitled to any relief.  Instead of calling one school nurse to testify, Mr. and Mrs. W. called all three, although only one had ever met Wallis, and that was for routine vision and hearing screening.  They called the former athletic director and the athletic trainer, neither of whom were present when Wallis was injured and neither of whom had anything to do with Wallis' return to school after her injury.  They called the field hockey coach who was present the day of Wallis' accident, but was not involved in her return to school.

They called Wallis' English teacher who testified that Wallis's post-concussion school performance was outstanding.  They called her Spanish and History teachers who testified that Wallis appeared to be the same student after the concussion as she was before it.  They called the math teacher who had the audacity to recommend Wallis for the second highest level math class rather than the top class.  They called the administrator who was the math department coordinator when Wallis was in 10th grade, as well as the math department coordinator at the time of the hearing.  They called the individual who had been the interim director of special education while Wallis was in 10th grade, but who had no knowledge of Wallis.  They called the former principal/superintendent director.  They called Wallis' housemaster whose primary involvement began in May, 2013, months after Wallis' concussion.  None of these witnesses provided any evidence to support the Ws' entitlement to any relief.  Each of the twenty (20) Lincoln-Sudbury witnesses had to prepare to testify and be prepared by counsel.

The Ws never called any of the witnesses on their list who were not affiliated with Lincoln-Sudbury.[17] They did not call either dentist on their witness list or the Children's Hospital concussion specialist. They did not have the doctor who diagnosed Wallis' concussion and provided the return to school instructions on their witness list and did not ask to call her. They did not call the summer math tutor or any teacher from Lawrence Academy. In fact, comments made during the hearing suggest that these witnesses may not have even known they were on parents' witness list and/or were never contacted to arrange a time to testify. *See e.g.* TRII, p.26, *l* 1 – p.28, *l*.1; p. 207, *l*.22 – p.208, *l*.20; 209, *ll*.10-20. Although Mr. and Mrs. W. never called any of their non-Lincoln-Sudbury witnesses, Lincoln-Sudbury's counsel had to determine who they were and prepare to cross-examine each of them as well.

All the foregoing unnecessarily increased the cost of this litigation.

## C.     <u>The Hearing Officer's Findings Are Entitled to Weight</u>

The Ws' acted in bad faith motivated by the desire to harass and punish Lincoln-Sudbury, its administrators, and staff for insulting Wallis by recommending that she take the second highest level math class, and to cause unnecessary delay and needlessly increase the costs of litigation. The hearing officer's findings with respect to Mr. and Mrs. W's behavior and motives are supported by substantial evidence and should be afforded deference. <u>Lenn</u>, 998 F.2d at 1087; <u>Ross</u>, 44 F.Supp.2d R 112. It is highly unusual for a BSEA hearing officer to render the kind of findings made in the decision in this case because they understand the stress and emotional toll associated with being a parent of a disabled child and appreciate that parental advocacy may be aggressive, stubborn, and even unreasonable. Accordingly, even in cases decided in a school district's favor and against the parent, hearing officers either say nothing at all about the parents

---

[17] They did not even call their "key witnesses," whose unavailability was one of their reasons for seeking to postpone the hearing when it was scheduled for February 25-27.

beyond what they attempted to prove or were unable to prove, or they find a way to compliment

and commend the parents' dedication and commitment to the student.  For example, in In Re:

Sharon Public Schools, BSEA No.1600749 (December 8, 2015), the hearing officer  wrote:

> I was impressed with Sharon staff's commitment to Zoe.  They
> obviously care about her, enjoy her and view her as a talented and
> creative young woman.  I was similarly impressed with Zoe's
> mother who is a strong and loving advocate for her daughter.  I
> would encourage the school district continue to monitor Zoe's
> emotional status and to work with Zoe and her mother to address
> any changes in Zoe's needs by providing additional services and
> supports if necessary.

In In Re: Hudson Public Schools, BSEA #1600764 (December 14, 2015), the hearing

officer  found that the parent did not meet her burden of proving that Hudson either violated the

student's "stay put" rights or denied her a free appropriate public education by changing her

summer transportation drop-off/pick-up location or by refusing to provide Student with door-to-

door transportation, but noted that "[p]arent's concern for the safety of her vulnerable three-year-

old child during transportation to and from school is fully understandable" before it advised her

to consent to a suggested functional behavior assessment as a step toward addressing her

concern.

The hearing officer in In Re: Ludlow Public Schools v. Student, BSEA # 1603589

(November 25, 2014), bent over backwards to find something positive to say about a parent who

was difficult to deal with, had moved to recuse her, and failed to appear for the entire hearing:

> While Parent appears to be a loving, caring and devoted parent, the
> record shows that her need to control every aspect of Student's
> education has interfered with his ability to receive a FAPE.  As
> described by the documents from the May Center, she has been
> micromanaging every aspect of Student's education.  The record
> lacks evidence that she possesses the necessary educational
> background, expertise or licensure in autism, occupational therapy,
> ABA, speech and language, physical therapy, alternative
> augmentative communication, or as a teacher of special education

children to dictate the methodology or approaches effective in educating Student. She has often raised health and/ or safety concerns prior to interrupting Student's educational services. It would appear that her concern for Student makes it difficult for her to trust that the individuals responsible for delivering Student's services will be able to do so effectively and in a safe manner. It is therefore, imperative that the lines of communication between Parent and Ludlow's staff be effective and reasonable.

In this case, Wallis was neither disabled, nor vulnerable. Mr. and Mrs. W's case was so frivolous and so obviously brought for an improper purpose that the hearing officer did not simply remain silent, but made explicit findings to support that conclusion. Lincoln-Sudbury is aware of no other case where a hearing officer so decidedly condemned parents' conduct and motives.

## IV. Lincoln-Sudbury is Entitled to Recover The Attorneys' Fees and Costs Requested.

Because the Ws' claims before the BSEA were both frivolous and brought for an improper purpose, Lincoln-Sudbury is entitled to recover the costs and fees it incurred in preparing for and defending itself at the BSEA. 20 U.S.C. §1415(i)(3)(B)(i)(III). The Affidavit of Counsel for Lincoln-Sudbury in Support of Lincoln-Sudbury's Motion for Attorneys' Fees (Affidavit of Counsel) and Exhibit A thereto, summarize the billing information which forms the basis for Lincoln-Sudbury's claim for fees. With the exception of a small number of hours billed at $235.00 and $240.00 per hour, attorneys' fees for legal services spent on the BSEA matter and in pursuing Lincoln-Sudbury's claim for attorneys' fees and defending the counterclaim have been billed at $225.00 per hour. The hourly rates are fair and reasonable and within the range of fees customarily charged by attorneys in the special education area. Affidavit of Jeffrey M. Sankey, filed in support of this motion, ¶6; Affidavit of Michael J. Joyce, Esq., in Support of

Lincoln-Sudbury's Motion for Summary Judgment for Fees, ¶¶5, 7; *see also* Affidavit of Mary Ellen Sowyrda in Support of Lincoln-Sudbury's Motion for Summary Judgment for Fees, ¶8.

All time spent and fees incurred in defending the Ws' complaints against the school nurses and the athletic trainer, and to respond to Mr. and Mrs. W's repeated and duplicative student records, public records, and open meeting law requests and complaints ($8,505.00 in legal fees and $25.03 in expenses), have been excluded from the amounts sought. Affidavit of Counsel, ¶¶7-9 and Exhibits A (p.3, Part III) and B thereto. Any time for other unrelated matters or duplicative time is also excluded. Affidavit of Counsel, ¶10. Lincoln-Sudbury has also reduced the rate for travel time from $225.00 per hour to $175.00 per hour for purposes of this motion. Affidavit of Counsel, ¶13. In addition, counsel has already reduced the fees billed through "professional courtesy" discounts. Affidavit of Counsel, ¶11 and Exhibits A and C thereto.

Lincoln-Sudbury seeks to recover the $109,279.00 in attorneys' fees and $2,006.84 in costs in has incurred and paid to defend the Ws' BSEA proceeding. Affidavit of Counsel, ¶14 and Exhibit A. This amount reflects professional courtesy discounts totaling $4,524.50. Affidavit of Counsel, ¶14; Exhibit A, p.1, I.A. In addition, Lincoln-Sudbury has also paid an additional $46,327.00 in attorneys' fees through April 30, 2017, and $2,334.90 in costs incurred through March 31, 2017, related to its claim for attorneys' fees and its defense of the Ws' counterclaim appealing from the BSEA decision (up to and including part of the time spent on the Ws' motion to supplement the record, decided in Lincoln-Sudbury's favor). This amount reflects a professional courtesy discount of $1,575.00. Affidavit of Counsel, ¶15 and Exhibit A, pp.1-2, I.B. In addition to an award of fees in the total amount of $155,606.50 through April 30, 2017, and costs in the total amount of $4,341.74 through March 31, 2017, (Affidavit of Counsel,

¶16.  Lincoln-Sudbury should also be allowed to update the fees incurred in this litigation after April 30, 2017, and the costs incurred after March 31, 2017.

The number of hours spent on the BSEA case and this litigation is reasonable considering the complex nature of special education litigation in general and the additional complexities involved in this case in light of the parents' pro se status, their rancor toward Lincoln-Sudbury, its teachers and administrators, and the number of issues and Lincoln-Sudbury staff involved. Affidavit of Counsel in Support of Lincoln-Sudbury Regional School District's Motion for Summary Judgment for Attorneys' Fees, ¶19.  *See also* Affidavit Of Attorney Mary Ellen Sowyrda in Support of Lincoln-Sudbury Regional School District's Motion for Summary Judgment for Attorneys' Fees, ¶¶5-7.

## V.    CONCLUSION

This case is the rare circumstance where the prevailing school district should recover attorney's fees against parents.  As the hearing officer found, and the record supports, Mr. and Mrs. W. brought and pursued their frivolous BSEA proceeding in the way they did to harass Lincoln-Sudbury, its administrators, former administrators, teachers, and staff, cause unnecessary delay, and increase Lincoln-Sudbury's costs to punish them for slighting their daughter's academic prowess.

Lincoln-Sudbury's motion should be allowed.  The Court should award Lincoln-Sudbury attorneys' fees in the $155,606.50 through April 30, 2017, and costs in the total amount of $4,341.74 through March 31, 2017, and should allow Lincoln-Sudbury to supplement its motion to add fees incurred from May 1, 2017, and costs from April 1, 2017, through the end of this litigation.

DATED at Quincy, Massachusetts this 6th day of June, 2016.

Lincoln-Sudbury Regional School District,
By its attorney


/s/ Doris R. MacKenzie Ehrens
  Doris R. MacKenzie Ehrens, Attorney at Law
  BBO #544252
  300 Crown Colony Drive, Suite 410
  Quincy, MA 02269-1923
  (617) 479-5000


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 6th day of June, 2017, I served a copy of the foregoing electronically through the CM/ECF system on all counsel of record for the parties.


/s/ Doris R. MacKenzie Ehrens
  Doris R. MacKenzie Ehrens