# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LINCOLN-SUDBURY REGIONAL SCHOOL DISTRICT, | Civil Action |
| Plaintiff, | No. 1:16-CV-10724-FDS |
| v. | |
| MR. AND MRS. W., | |
| Defendants | |
| WALLIS and MR. and MRS. W., | |
| Plaintiffs-in-Counterclaim | |
| v. | |
| LINCOLN-SUDBURY REGIONAL SCHOOL DISTRICT and | |
| BUREAU OF SPECIAL EDUCATION APPEALS, | |
| Defendants-in-Counterclaim. | |

## CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF LINCOLN-SUDBURY REGIONAL SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT FOR ATTORNEYS' FEES

1. Lincoln-Sudbury is a regional school district created pursuant to M.G.L. c.71, §15 with all the powers and duties conferred by law upon school committees and by M.G.L. c.71, §16.

2. Lincoln Sudbury operates Lincoln-Sudbury Regional High School (LSRHS) and is responsible for educating students who reside in the towns of Lincoln and Sudbury beginning in the ninth grade.

3. Mr. and Mrs. W are residents of Sudbury, Massachusetts.

4. Mr. and Mrs. W are the parents of Wallis, who was, at all times pertinent to this matter, a minor who resided with them in Sudbury, Massachusetts.

5. The Bureau of Special Education Appeals proceeding out of which this action arises concerns events that took place when Wallis was a 15-year-old general education student enrolled in the tenth grade at LSRHS. R.II, 1366, ¶1.[1]

6. Wallis's academic courses were the most challenging available to a tenth grade student and included accelerated honors level classes in English, Science, Math and Spanish, as well as advanced placement (AP) American History. Id. She participated in varsity sports and LSRHS's Model United Nations team. Id.

7. On or about September 30, 2012, Wallis was injured during a Lincoln-Sudbury field hockey practice. She sustained a dental injury, and on October 3, her physician diagnosed a concussion and recommended complete rest. R.II, 1366, ¶¶2, 3, 4.

8. Pursuant to her doctor's instructions, Wallis remained out of school for two weeks. R.II, 1366, ¶5; R.III, 1492; 1512. The only doctor's instructions related to Wallis's return to school are in the note from Dr. Gaughan (R.III, 1493; 1513); Cavallo, TRII, p.85, *ll*.4-8; Nozik, TRIII, p.16, *ll*.20-24;[2] R.II, 1367, ¶¶6, 7.

9. The doctor's instructions, written on a prescription paper, read:

> Please allow [Wallis] to miss gym and games until 29th
> She may run but not yet play
> In class excuse her from make-up work and tests for two weeks
> If homework causes a relapse of symptoms please excuse her from homework for a week.

---

[1] The Administrative Record is cited as R followed by the volume number, page(s), and paragraph number(s), if applicable. Transcript references are cited TR followed by the volume number, page(s) and line(s).
[2] The first doctor's note (R.III, 1493' 1512) justified her absence from school after the concussion and the third (R, III, 1514) sought to excuse her from a math make-up test and the final. Id.; TRIV, p.47, *l*.21 – p.49, *l*.5.

R.III, 1493, 1513.

10. Wallis returned to school on October 15, 2012, and went on a field trip to Sturbridge Village with her AP History class. R.II, 1368, ¶9. That same day, a school nurse entered a "concussion alert" into the LSRHS student on-line record system. The alert was sent to Wallis' teachers as well as to guidance, administration, and nursing staff. It provided notice of the doctor's instructions, ie. that Wallis "may run, but no playing games. To be excused from make-up work and tests for two weeks. If homework causes a relapse of symptoms, she is to be excused from homework for one more week." The alert also noted that mother sent a note that Wallis would "participate in wellness as tolerated." R.II, 1367, ¶6; R.III, 1475-76.

11. The LSRHS health office did not receive any other instructions from Wallis' doctor or her parents, and was not aware of any other concussion-related problems or requests for school action concerning Wallis from Wallis, her doctor, her parents, or any member of LSRHS staff. Wallis' guidance counselor, the athletic trainer, and Wallis' teachers also all testified to the lack of communication from Wallis' doctor, Wallis, or anyone. RII, 1367¶¶6, 7. *See e.g.* Cavallo, TRII, p.80, *ll*.18-23; p.85, *ll*.4-8; p.87, *ll*.13-17; p.108, *ll*.8-11; p.125, *ll*.6-17; Park (guidance counselor), TRIII, p.158, *l*.19 - p.159, *l*.1; Ando (athletic trainer), TRIII, p.79, *ll*.6-14; Kramer (English teacher), TRIII, p.116, *ll*.15-21; Schultz (Spanish teacher), TRIII, p.127, *ll*.9-17; p.128, *l*.18 – p.129, *l*.10; Gilman (U.S. History teacher), TRIV, p.83, *l*.19 – p.84, *l*.11; p.87, *l*.22 – p. 88, *l*.11; p.96, *l*.21 – p.97, *l*.4; Dorey, TRIV, p.172, *l*.15 – p.173, *l*.16. *See also* R.1613.

12. Wallis did not visit any physician from October 12, 2012, until June 14, 2013. TRII, 1374, ¶22; TRIII, 1500-1519.

13. Wallis did not visit the LSRHS health office during the 2012-2013 school year except for state-mandated vision and hearing screening on January 19, 2013. Wallis did not check off any symptoms that might have indicated post-concussion difficulties and she passed both screens. RII, 1367, ¶7; R.III, 1479-1499; 1498-1499. Cavallo, TRII, p.80, *ll*.18-23; p.85, *ll*.1-2; Nozik, TRIII, p.21, *ll*.2-3; p.35, *ll*.19-21; Gaumnitz, TRIII, p.40, *l*.23 – p.41, *l*.1. *See also* parents' admission at TRIII, p.41, *ll*.2-4.

14. Wallis met with her guidance counselor when she returned to school to develop a plan covering information to share with teachers and addressing her assignments by priority. According to her guidance counselor, Wallis appeared physically recovered from her injury, with no observable post-concussion symptoms, and emotionally capable of resuming her normal ambitious routine. She expressed her desire to resume her routine independently, and the guidance counselor assured her that support was available if she needed it. He also sent an e-mail to Wallis' teachers asking them to work with Wallis to adjust assignments. R.II, 1368, ¶10. TRIII, p.144, *l*.22 – p.146, *l*.6.

15. In early November, 2012, Wallis missed two more days of school due to the death of a family member, and later in November, Mr. and Mrs. W e-mailed the guidance counselor with concerns about Wallis' concussion and return to school. R.II, 1368, ¶¶11, 12. TRIII, p.147, *l*.24 – p.148, *l*.14.

16. The guidance counselor set up a meeting with Wallis, her parents, teachers, the housemaster, and himself to discuss Mr. and Mrs. W.'s concerns and develop a plan for academic accommodations and modifications to be implemented in Wallis' classes. There was no discussion of referring Wallis for a disability evaluation. R.II, 1368, ¶12; R.III, 1526-1529; TRIII, p.148, *l*.23 – p.149, *l*.8.

17. Lincoln-Sudbury implemented regular education modifications and supports to assist Wallis in making up the academic work she missed during her absence. R.II, 1368-1371, ¶¶14-17; 1379, ¶3; R.III, 1400-1505 (Answers to Interrogatories 3 and 5), 1414-1415 (Answer to Interrogatory 18), 1419-1424 (Anwers to Interrogatories 24, 25, and 26), and 1428-1431 (Answers to Interrogatories 33 and 34); R.IIII, 1535-1536.

18. Wallis made up all work required by her teachers by the third quarter of the 2012-2013 school year. R.II, 1379, ¶3; R.III, 1615.

19. Wallis accessed the curriculum and made effective progress as evidenced by her grades in the most rigorous classes offered to tenth grade students at LSRHS (RIII, 1577), and the testimony of her teachers. *See e.g.* Kramer, TRIII, p.63, *ll*.13-16; Schultz, TRIII, p.128, *ll*.3-9; Crawford TRIV, p.34, *ll*.19-24; p.55, *ll*.8-16; Gilman, TRIV; p.90, *ll*.18-22; Weiss, TRIV, p.113, *ll*.14-22; Dorey, TRIV, p.167, *ll*.11-23. Even in math, the class she put on the back burner (*see, e.g.,* TRIV, p.182, *l*.8 – p.183, *l*.8), she was able to earn a 91 on a probability test after meeting with Mr. Dorey for a block. Id., p.126, *ll*.11-14. *See also* R.III, 1615 ("parents feel as though [Wallis] has fully accessed the Int Alg curriculum")

20. Wallis maintained good grades in all her challenging academic and non-academic classes and participated in varsity sports, the Model UN program, and other extra-curricular activities. She earned As, Bs, and two Cs and passed all her classes with the exception of Intensive Math. R.III, 1577. Although Wallis received an Incomplete in intensive math, her performance in that class demonstrated that she accessed the curriculum, showed competency in the subject at a level well beyond what an average student would be learning. She received the Incomplete only because she refused to take

one fourth-quarter test and the final, not because she was unable to access and master the content of class. R.II, 1370-1371, ¶17; 1379, ¶¶5, 8; RIII, 1398.

21. Wallis participated fully in her classes and in activities. She did not complain about physical symptoms, her workload, or that she was unable to understand. *See e.g.* Kramer, TRIII, p.65, *l*.21 – p.66, *l*.3; Schultz, TRIII, p.127, *ll*.9-17 (complained about headaches when she first returned to school, but never again); Gilman, TRIV, p.85, *l*.24 – p.86, *l*.6; Dorey, TRIV, p.172, *l*.19 – p.173, *ll*.13-16. She was fully able to do the work. *See e.g.* Kramer, TRIII, p.45, *ll*.1-12; Schultz, TRIII, p.127, *l*.18 – p.128, *l*.20; Gilman, TRIV, p.81, *ll*.3-24; p.83, *ll*.19-22; Dorey, TRIV, p.167. *ll*.3-10; p.166, *l*.21 – p.167, *l*.23; p.176, *ll*.5-16.

22. Wallis's advanced placement United States History teacher, Joshua Gilman, testified that the AP Unites States History class Wallis was taking was college level, used a college level textbook, was very demanding and fast-paced. Gilman, TRIV, p.77, *ll*.10-12. The class was sophisticated and complex and required students to work at an abstract level. Id., p.78, *ll*.1-5. Wallis's performance in the class was in the average to slightly above average range. Id., p.81, *ll*.15-17 and 18-24. She appeared the same after the concussion as before, and she participated as much after as before. Id., p.83, *ll*.19-23. Based upon his observations of Wallis in class every day, Mr. Gilman believed she was following along, understanding the content, and keeping up with the class. TRIV, p.87, *ll*.,11-18. There was nothing about her performance which would have caused him to recommend that she receive specialized instruction in history. Id., p. 91, *ll*.11-24. He also testified that he would not have made a recommendation for her

921576v1
- 6 -

placement in the non-AP History class at any time during the year. Id. *See also* R.III, 1401.

23. Wallis's American Literature teacher, Ann Kramer, testified that the class was the highest level English class at LSRHS (TRII, p.42, *l*.21) and that she had no reason at all to believe Wallis required specialized instruction to make progress in the regular education English curriculum (Kramer,TRIII, p. 66, *ll*.12-17) because she was "sailing right through" the "very difficult" and "challenging curriculum" of the class. Id., p.67, *ll*.2-7; *see also* R.III, 1401.

24. Kim Schultz, who taught Wallis's level one Spanish class (TRIII, p.108, *ll*.14-22), testified that the class was intense and difficult, and there was nothing in Wallis's performance indicating "the presence of a disability that would affect" her performance. Ms. Schultz did not suspect a disability (id., p.130, *l*.21 – p.131, *l*.7) and did not observe anything about Wallis that would have prompted her to refer Wallis for evaluation for an IEP or a Section 504 plan. Id., p.129, *ll*.12-19. *See also* R.III, 1402.

25. Likewise, Brandon Dorey, Wallis's math teacher, testified that Wallis never exhibited any behavior or acted in any way that led him to believe she was suffering from concussion symptoms (TRIV, p.175, *ll*.18-23), nor did she complain to him about any physical symptoms (id., p.172, *ll*.15-18) or about her grades. Id., *ll*.19-23; p.175, *l*.24 – p.176, *l*.2. Wallis never told him she did not understand the material. Id., p..172, *l*.42 – p.173, *l*.2. Mr. Dorey also testified that a C- in Intensive Algebra II demonstrated that Wallis accessed the curriculum and showed competency in algebra. Id,, p.176, *ll*.5-10.

26.     The supports Mr. Dorey put in place to assist Wallis were not special education or Section 504 supports intended for students with disabilities, but were the supports he would have put in place for any student who time for any reason. TRIV, p.185, *l*.12 – p.188, *l*.5. *See also* R.III, 1402.

27.     Wallis also participated effectively in school life, including the Model UN where she took on leadership roles and participated in the in-school conference and three-day trip to New York. TRIII, p.136, *l*.18- p.*l*.7, p.155, *l*.21 – p.156, 12. She participated in winter track practices (R.III, 1530-1534), and participated fully (practices and meets) in spring track. R.III, 1477. *See also* R.III,1395-1433, and R.III, 1396-1397, in particular, for its explanation of the time commitment involved in spring track.

28.     Wallis also scored well, and above average, on the National Spanish Examination, earning a bronze medal; on the United States History Advanced Placement Exam, scoring 4 out of a possible 5; and on the United States History subject SAT, scoring 610. R.II, 1379-1380, ¶8; R.III, 1586, 1591, 1597.

29.     The evidence at hearing was overwhelming that the medical issues Wallis experienced in the fall (being out of school for two weeks, and the doctor's instructions that she not do make-up work and make-up tests for another two weeks) had no effect whatsoever on Wallis's ability to learn and that her ability to learn was not limited at all, much less substantially limited. R.II, 1379, ¶¶2, 6, 8. Even in math, the class she put on the back burner (TRIV, p.182, *l*.8 – p.183, *l*.8), she was able to earn a 91 on a probability test after meeting with Mr. Dorey for a single block (id., p.126, *ll*.11-14) and performed at a level which exceeded that of the average student her age. TRIV, p.165, *l*.21 – p.167, *l*.23.

30.     There were no communications between Mr. and Mrs. W and/or Wallis and Lincoln-Sudbury about Wallis's concussion, concerns over lingering symptoms, make-up work, inability to do any activity or sports, or the need for concussion-related accommodations after November, 2012, until May, 2013, when Brandon Dorey, Wallis' math teacher, declined to recommend her for intensive math in 11th grade.  R.II, 1383; R.III, 1612.  The school nurses, Wallis' guidance counselor, the athletic trainer, and Wallis' teachers all testified to the lack of communication from Wallis' doctor, Wallis, or anyone.  *See e.g.* Cavallo, TRII, p.80, *ll*.18-23; p.85, *ll*.4-8; p.87, *ll*.13-17; p.108, *ll*.8-11; p.125, *ll*.6-17; Park (guidance counselor), TRIII, p.158, *l*.19 - p.159, *l*.1; Ando (athletic trainer), TRIII, p.79, *ll*.6-14; Kramer (English teacher), TRIII, p.116, *ll*.15-21; Schultz (Spanish teacher), TRIII, p.127, *ll*.9-17; p.128, *l*.18 – p.129, *l*.10; Gilman (U.S. History teacher), TRIV, p.83, *l*.19 – p.84, *l*.11; p.87, *l*.22 – p. 88, *l*.11; p.96, *l*.21 – p.97, *l*.4; Dorey, TRIV, p.172, *l*.15 – p.173, *l*.16.  *See also* R.III, 1613.

31.     In May, 2013, Mr. Dorey recommended that Wallis shift from Intensive Math to the next highest honors level class because he concluded that the structure of the Intensive level was not a good fit for her learning style and that Wallis would achieve A grades in the honors class.  R.II, 1371, ¶17; TRIV, p.182, *l*.8 – p.183, *l*.8.

32.     Wallis was upset and angry when the math teacher explained his recommendation to Wallis and that her parents could override his recommendation as they had done with a prior math teacher's recommendation if she preferred to continue at the Intensive level.  R.II, 1371, ¶18; TRIV, p.153, *l*.5 – p.156, *l*.18.

33.     Wallis' guidance counselor met with Wallis and the math teacher and proposed a plan to assist Wallis in raising her fourth quarter grade to at least 70% through

the use of extra help offered by the math teacher, lunch-time math tutoring, online instructional support, and concrete feedback. The math teacher agreed to reconsider his recommendation for placement if she achieved above 70%. R.II, 1371, ¶18; R.III, 1600-1601.

34. On May 19, Mr. and Mrs. W. rejected the plan in a scathing e-mail demanding an emergency meeting to put Wallis on a 504 plan to address deficiencies in math, remove Wallis from Mr. Dorey's classroom and give her an incomplete in math for the year, prohibit Mr. Dorey from conducting any further testing or grading of Wallis' work, schedule an evaluation, and provide summer tutoring. R.II, 1371, ¶18; R.III, 1602-1603.

35. Lincoln-Sudbury responded by e-mail on May 20, offering a meeting to discuss the 504 process, providing a summary of the 504 process, explaining the need for additional medical documentation and consent for cognitive testing, and urging Wallis's prompt return to math class. R.II, 1371, ¶19; R.III, 1604.

36. On May 21, Mr. and Mrs. W. responded with another e-mail which was highly critical of and insulting to Lincoln-Sudbury and its staff, in which they claimed, among other things, that Wallis had been "cognitively disabled for an extended period of time." R.III, 1605-1606.

37. Lincoln-Sudbury met with parents on May 24 for a 504 meeting to discuss, *inter alia*, Wallis's math placement for eleventh grade, parents' questions about math in particular, and, in general, about whether Lincoln-Sudbury appropriately accommodated Wallis after her concussion, whether Wallis had a disability which

required continued accommodations, and the additional steps and documentation required for consideration of a 504 plan.  R.II, 1372, ¶23; R.III, 1610-1615.

38.     At the May 24, 2013, meeting, Mr. and Mrs. W confirmed that they had not taken Wallis back to the doctor because of her concussion, that Wallis had been disabled but was not at that time, that they did not think she had post-concussion symptoms at that point, and even that they felt Wallis had fully accessed the Intensive Algebra curriculum.  R.II, 1373,¶24; R.III, 1613, 1615.

39.     Mr. and Mrs. W were familiar with the parental override process which would permit Wallis to take the Intensive level math class in eleventh grade because they had exercised that option in the past.  R.II, 1373, ¶27.  Lincoln-Sudbury told the Ws it does not deny requests to override teacher recommendations at the May 24 meeting (R.III, 1614) and the Ws exercised the override option to place Wallis in intensive geometry for 9th grade against the recommendation of her eighth grade teacher.  R.III, 1585; TRIV, p.244, *l*.13 – p.246, *l*.24.

40.     Mr. and Mrs. W exercised the override option and Wallis was scheduled for the Intensive level math class in eleventh grade.  R.II, 1373, ¶28; TRIV, p.54, *ll*.5-13.

41.     Mr. and Mrs. W began requesting records from Lincoln-Sudbury in June, 2013.  R.III, 1562, 1563; *see also* R.II, 863-884; 911-917.

42.     On June 14, 2013, Mr. and Mrs. W took Wallis to the doctor for the purpose of obtaining a note asking Lincoln-Sudbury to give Wallis an incomplete and provide tutoring and remediation over the summer.  R.III, 1466; 1510.  The June 14, 2013, note states that Wallis "suffered a concussion in 10/2012 and did not have the

opportunity to learn the work that she had missed."³ R.III, 1514. It does not say she still suffered from concussion symptoms, that she was disabled, or that postponing the tests and math remediation over the summer was medically necessary.

43. Neither the math make-up, nor the math final covered any material from the first quarter when Wallis missed time from school because of the concussion. TRIV, p.51, *ll.*10-19; p.134, *ll.*18-20; p.137, *ll.*1-6; p.189, *ll.*5-13; TRIV,

44. Dr. Gaughan did not examine Wallis during the June 14, 2013, visit; the Procedure Code for the visit was "counseling." R.II, 1373. ¶25; R.III, 1510, 1514.

45. Wallis never made up the math test she missed in May and never took the final. R.II, 1373, ¶26.

46. On July 8, 2013, Mr. and Mrs. W. took Wallis to Boston Children's Hospital for "support to discuss with the school about [alleged] previous lack of accommodations," but the doctor declined because he had not been treating Wallis when parents claim she should have had accommodations. There were no significant findings. R.II, 1373, ¶27; R.III, 1515-1519 and 1506-1509.

47. Lincoln-Sudbury never received a signed consent to evaluate Wallis from Mr. and Mrs. W. R.II, 1373, ¶24; 1379, ¶7.

48. On September 3, 2013, Mr. and Mrs. W. notified Lincoln-Sudbury of their intent to enroll Wallis at Lawrence Academy, a non-special education, college preparatory private high school, claiming that Lincoln-Sudbury had not provided Wallis with a free appropriate public education and requesting public funding for the private high school placement. R.II, 1374, ¶30; R.III, 1537-1539.

---

³ The note asks Lincoln-Sudbury to excuse Wallis from

49. In response, Lincoln-Sudbury sent Mr. and Mrs. W a special education evaluation consent form. R.II, 1374, ¶30; R.III, 1540-1543

50. Wallis began attending Lawrence Academy on September 6, 2013. R.II, 1374, ¶30; R.III, 1540. Her parents called in to Lincoln-Sudbury to report her absent from September 4 through September 24 when they dis-enrolled her from Lincoln-Sudbury Regional High School. R.III, 1559-1560; 1571-1572.

51. By letter dated September 24, 2013, Mr. and Mrs. W formally withdrew Wallis from Lincoln-Sudbury, stating also that they did not consent to an IDEA eligibility evaluation. R. 1374, ¶31; R.III, 1559-1561.

52. Mr. and Mrs. W. requested a hearing before the Bureau of Special Education Appeals (BSEA) on September 22, 2014, almost two full years after the accident (R.I, 4; R.III, 1474) which resulted in Wallis' concussion. R.I, 1-26; R.III, 1512.

53. The case at the BSEA involved extensive discovery requests from Mr. and Mrs. W to Lincoln-Sudbury. *See* R. Index. It also involved numerous motions (*see* R. Index where parents' motions are listed as letters from parents to the hearing officer), including two motions to recuse the hearing officers (R.II, 767-938 and 1042-1058), both of which were denied (R.II, 965-967; 1092) although the case was administratively reassigned to the hearing officer who conducted the hearing and wrote the decision shortly before the hearing was scheduled to begin. R.II, 968.

54. The hearing officer culled thirteen (13) issues from the Ws hearing request. R.126-127; 521-529. Those issues were ultimately pared to eight (8), and after six (6) days of hearing, during which parents called seventeen (17) witnesses, all of whom were either current Lincoln-Sudbury administrators, teachers, and staff or

were former Lincoln-Sudbury administrators, Mr. and Mrs. W. rested their case. TRII – TRVI.

55. The case at the BSEA resulted in a hearing which occurred on six (6) different days over a period of months. R.II,1336.

56. The Ws' witness list identified twenty (20) Lincoln-Sudbury witnesses and eleven (11) non-Lincoln-Sudbury witnesses. SR 44-45.

57. The Ws did not call any of the non-Lincoln-Sudbury witnesses on their witness list (TRII – TRVI; R.II, 1336), including their "key witnesses" whose unavailability was a reason for their requests to postpone the hearing when it was scheduled for February 25-27. R.584.

58. Wallis did not attend any of the hearing or testify. R.II, 1336.

59. Mr. and Mrs. W did not testify. TRIV, p.208, *ll*.3-7.

60. On April 1, 2016, the BSEA issued its decision in Lincoln-Sudbury's favor on all issues. The BSEA issued a corrected decision non April 8, 2016, to correct clerical errors, not make any substantive changes. R.II, R.1333-1360; 1361-1386.

61. Lincoln-Sudbury is the prevailing party because it prevailed at the BSEA on every issue. R.II, 1380-1383.

62. The hearing officer found that Wallis was not disabled within the meaning of the IDEA or Section 504 at any time during the 2012-2013 school year. R.II, 1383.

63. The hearing officer found that Mr. and Mrs. W failed to present any evidence "which could form a reasonable basis for a finding of eligibility for IDEA or Section 504 protections," and found "[t]here was no reasonable support for a 'suspicion'

at any time during the 2012-2013 school year that Wallis might have a disability." R.II, 1383.

64. The hearing office expressly found that the Ws' "claim to special education eligibility is patently frivolous, as is the claim to Section 504 protections." R.II, 1383.

65. The hearing officer also concluded that "Lincoln-Sudbury acted reasonably and responsibly when it followed the physician's instructions concerning Wallis' re-entry to school following her injury" and that "Lincoln-Sudbury teachers extended reasonable regular education supports to Wallis immediately on her return, and for as long as she needed them, and that those supports permitted Wallis to maintain a high level of achievement in rigorous honors level academic classes and in a demanding extracurricular schedule." R.II, 1383.

66. The hearing officer also found that Mr. and Mrs. W.'s behavior toward Lincoln-Sudbury and during the administrative process was characterized by "vitriolic hyperbole." R.II, 1383.

67. The hearing officer found that Mr. and Mrs. W's "vitriolic hyperbole [did] little to disguise the absence of factual and legal support for their position." R.II, 1383.

68. The hearing officer found that "in correspondence to and meeting with Lincoln-Sudbury personnel, and throughout [the BSEA proceeding]" Mr. and Mrs. W offered insults, threats, distortions, misleading and tautological arguments," and that their behavior was apparently designed "to intimidate, shame or coerce Lincoln-Sudbury staff into actions not warranted by a reasonable view of Wallis' educational experience at Lincoln-Sudbury." R.II, 1383.

69. The hearing officer expressly found that "[i]f ever a matter merited a finding that it was brought for an improper purpose it is this." R.II, 1383.

70. The hearing officer found that "[t]he record clearly demonstrates that the Parents' objections to Wallis' 10th grade experience at Lincoln-Sudbury began only after the math department recommended a change from one honors section to another honors section." R.II, 1383.

71. The hearing office expressly found that "the Parents' actions in pursuing IDEA and Section 504 claims at the BSEA were a bad faith effort to punish Lincoln-Sudbury's staff for the perceived 'disrespect' of their daughter's academic prowess and to justify public funding for her private school education." R.II, 1383.

72. Lincoln-Sudbury has paid $109,279.00 in attorneys' fees and $2,006.84 in costs to defend the BSEA proceeding. Affidavit of Counsel in Support of Lincoln-Sudbury Regional School District's Motion for Summary Judgment for Attorneys' Fees, ¶15.

73. Lincoln-Sudbury has also paid an additional $46,327.00 in attorneys' fees through April 30, 2017, and $2,334.90 in costs incurred through March 31, 2017, related to its claim for attorneys' fees and its defense of the Ws' counterclaim appealing from the BSEA decision. Affidavit of Counsel in Support of Lincoln-Sudbury Regional School District's Motion for Summary Judgment for Attorneys' Fees, ¶16.

74. The total fees incurred through April 30, 2017, is $155,606.00. The total expenses through March 31, 2017, is $4,341.74. Affidavit of Counsel in Support of Lincoln-Sudbury Regional School District's Motion for Summary Judgment for Attorneys' Fees, ¶17.

75. Lincoln-Sudbury has continued and will continue to incur fees and costs until this litigation is over. Affidavit of Counsel in Support of Lincoln-Sudbury Regional School District's Motion for Summary Judgment for Attorneys' Fees, ¶18.

76. The number of hours spent on the BSEA case and this litigation is reasonable considering the complex nature of special education litigation in general and the additional complexities involved in this case in light of the parents' pro se status, their rancor toward Lincoln-Sudbury, its teachers and administrators, and the number of issues and Lincoln-Sudbury staff involved. Affidavit of Counsel in Support of Lincoln-Sudbury Regional School District's Motion for Summary Judgment for Attorneys' Fees, ¶19. *See also* Affidavit Of Attorney Mary Ellen Sowyrda in Support of Lincoln-Sudbury Regional School District's Motion for Summary Judgment for Attorneys' Fees, ¶¶5-7.

77. The attorneys' fees, costs, and expenses incurred in defending against Mr. and Mrs. W.'s frivolous claims are reasonable and are within the range of rates prevailing in the community in which the proceeding arose for the kind and quality of services furnished. Affidavit of Jeffrey M. Sankey, ¶6; Affidavit Of Michael J. Joyce, Esq. in Support of Lincoln-Sudbury Regional School District's Motion for Summary Judgment for Attorneys' Fees, ¶¶5, 7; Affidavit Of Attorney Mary Ellen Sowyrda in Support of Lincoln-Sudbury Regional School District's Motion for Summary Judgment for Attorneys' Fees, ¶8.

78. All time spent and fees incurred in defending the Ws' complaints against the school nurses and the athletic trainer, and to respond to Mr. and Mrs. W's repeated and duplicative student records, public records, and open meeting law requests and complaints, totaling $8,505.00 in legal fees and $25.03 in expenses, have been excluded

from the calculation of fees and costs. Affidavit of Counsel in Support of Lincoln-Sudbury Regional School District's Motion for Summary Judgment for Attorneys' Fees, ¶¶7-9 and Exhibits A, p.3, Part III, and B thereto.

79. Any time for other unrelated matters or duplicative time has also been excluded. Affidavit of Counsel in Support of Lincoln-Sudbury Regional School District's Motion for Summary Judgment for Attorneys' Fees, ¶10.

80. Lincoln-Sudbury has reduced the rate for travel time from $225.00 per hour to $175.00 per hour for purposes of this motion. Affidavit of Counsel in Support of Lincoln-Sudbury Regional School District's Motion for Summary Judgment for Attorneys' Fees, ¶14.

DATED at Quincy, Massachusetts, this 6th day of June, 2017.

Lincoln-Sudbury Regional School District
By its attorneys

s/ Doris R. MacKenzie Ehrens
Doris R. MacKenzie Ehrens, Attorney at Law
BBO # 544252
MURPHY, HESSE, TOOMEY & LEHANE, LLP
300 Crown Colony Drive, Suite 410
Quincy, Massachusetts 02269-9126
(617) 479-5000

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 6th day of June, 2017, I served a copy of the foregoing electronically through the CM/ECF system on all counsel of record for the parties.

/s/ Doris R. MacKenzie Ehrens
Doris R. MacKenzie Ehrens