# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| LINCOLN-SUDBURY REGIONAL SCHOOL DISTRICT, | ) ) ) | |
|  | ) | Civil Action No. |
| Plaintiff and Counterclaim-Defendant, | ) ) | 16-10724-FDS |
|  | ) | |
| v. | ) ) | |
| MR. and MRS. W., | ) ) | |
| Defendants and Counterclaim-Plaintiffs, | ) ) ) | |
| and | ) ) | |
| WALLIS W., | ) ) | |
| Counterclaim-Plaintiff, | ) ) | |
| v. | ) ) | |
| BUREAU OF SPECIAL EDUCATION APPEALS, | ) ) ) | |
| Counterclaim-Defendant. | ) ) | |

_____)

## MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND DEFENDANTS' MOTION TO REVERSE THE DECISION OF THE BUREAU OF SPECIAL EDUCATION APPEALS

**SAYLOR, J.**

This lawsuit arises out of an administrative decision by the Massachusetts Bureau of

Special Education Appeals ("BSEA") in a dispute between Lincoln-Sudbury Regional School

District and Mr. and Mrs. W., parents of a minor child, Wallis.[1]

_____

[1] Wallis and Mr. and Mrs. W. are pseudonyms.

In September 2012, Wallis was a sophomore at Lincoln-Sudbury High School. The school is regarded by many as one of the best public high schools in Massachusetts, and serves two relatively affluent towns.

On September 30, 2012, Wallis was injured during a field-hockey practice and suffered a concussion. She was seen by her doctor a few days later, and at a follow-up appointment not long after that. She missed about two weeks of school, and on her doctor's orders, her activities were limited for another two weeks or so after that. The school was aware of the doctor's orders, and complied with them in all respects; she was permitted to make up her schoolwork, and received a variety of other accommodations to help her catch up.

Wallis was, before and after the concussion, a good student. Her grades were largely unchanged after the concussion, and she was almost entirely symptom-free after she returned.

Wallis was taking a rigorous schedule of classes, including the most rigorous and intensive mathematics class offered by the school. In her sophomore year, she struggled somewhat in that class. Eventually—in May 2013, eight months after the concussion—her math teacher recommended that she take an advanced, but less-rigorous, course her junior year.

That recommendation precipitated a lengthy dispute between Lincoln-Sudbury and Wallis's parents, culminating in this lawsuit. Her parents began to claim that Wallis was a disabled child, and accused the school of failing to comply with their legal obligations to provide her with a special education. In September 2013, they removed her from the Lincoln-Sudbury schools and enrolled her at Lawrence Academy, a private school. Wallis is now an honors student at George Washington University.

The parents brought a proceeding before the BSEA seeking, among other things, reimbursement for the costs of Wallis's private education and tutoring. The hearing was

contentious; among other things, the parents accused the school of making false statements and engaging in intimidating and coercive behavior. The BSEA Hearing Officer, however, found that Lincoln-Sudbury had in fact complied with the requirements of the law and that the parents were not entitled to reimbursement. She further found that the parents' claim was "patently frivolous" and brought for "an improper purpose."

After the decision, Lincoln-Sudbury filed suit to recover its attorneys' fees and costs, and the parents counterclaimed to reverse the hearing officer's decision. The parties have cross-moved for summary judgment on the issue of attorneys' fees. In addition, defendants have moved for summary judgment on their counterclaim appealing the BSEA's decision.

For the reasons stated below, plaintiff's motion for summary judgment will be granted, and defendants' motions for summary judgment will be denied.

## I.      Background

### A.      Statutory Background

The Individuals with Disabilities Education Act ("IDEA") conditions the provision of federal funds to public schools on compliance with a requirement to provide all disabled children with a "free appropriate public education" ("FAPE"). *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 987 (1st Cir. 1990) (quoting 20 U.S.C. §§ 1400(c), 1414(b)(2)(A), 1416). "Substantively, the 'free appropriate public education' ordained by the Act requires participating states to provide, at public expense, instruction and support services sufficient 'to permit the child to benefit educationally from that instruction.'" *Id.* (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 203 (1982)).

1.    **"Child with a Disability"**

"All determinations regarding eligibility for special education are . . . governed . . . by the definition of a 'child with a disability.'" *Doe v. Cape Elizabeth Sch. Dist.*, 832 F.3d 69, 73 (1st Cir. 2016) (citing 20 U.S.C. § 1401(3)(A)). A disabled child is one (1) with intellectual, physical, or specific learning disabilities (2) who needs special education services. *See* 20 U.S.C. § 1401(3)(A). Determination of eligibility for special education thus follows a two-step approach. "The first prong determines the existence of a disorder . . . [and t]he second prong identifies whether the child with a qualifying disorder 'needs' special education and related services as a result of that disorder." *Doe*, 832 F.3d at 73. Only after a disability is determined to exist does "the eligibility inquiry ask[ ] whether the child also 'needs special education and related services' 'by reason [of]' her disability." *Id.* at 74 (quoting 20 U.S.C. § 1401(3)(A)(ii)).

Regulations promulgated by the U.S. Department of Education have enumerated certain qualifying disabilities. As relevant here, included among that list of disabilities is "traumatic brain injury," which is defined as follows:

> [A]n acquired injury to the brain caused by an external physical force, resulting in total or partial functional disability or psychosocial impairment, or both, that adversely affects a child's educational performance. Traumatic brain injury applies to open or closed head injuries resulting in impairments in one or more areas, such as cognition; language; memory; attention; reasoning; abstract thinking; judgment; problem-solving; sensory, perceptual, and motor abilities; psychosocial behavior; physical functions; information processing; and speech. Traumatic brain injury does not apply to brain injuries that are congenital or degenerative, or to brain injuries induced by birth trauma.

34 C.F.R. 300.8(c)(12).[2]

---

[2] Mr. and Mrs. W. have submitted a photocopy of an excerpt from the book *Concussions and Our Kids* as an exhibit. (A.R. 1885-1944). The book notes that "[i]n approximately 80 percent of concussion patients, symptoms clear within 7 to 10 days. In 20 percent of cases, the patient feels the effects for a longer period, sometimes much longer." (A.R. 1903). The book further notes that concussions may range in severity from "Mild" (Grade 1) to "Severe" (Grade 3). (A.R. 1894).

### 2.  "Child Find" Provision

Under the IDEA's "Child Find" provision, states are required to "have in effect policies and procedures" to ensure that students with disabilities who need special education services are identified and evaluated.  20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. 300.111.  Once a disabled child needing special education is identified, her school district must "evaluate the child's specific needs and develop an 'individualized educational program.'"  *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 486 (7th Cir. 2012).  The Massachusetts version of the Child Find law is set forth in its special-education statute, Mass. Gen. Laws ch. 71B, and the accompanying regulations.

### 3.  Individualized Education Programs

The individualized education program ("IEP") is the IDEA's primary means for assuring the provision of a FAPE to disabled children.  "Under the IDEA, parents and educators must jointly develop and sign an IEP."  *CBDE Pub. Schools v. Mass. Bureau of Special Educ. Appeals*, 2012 WL 4482296, at *5 (D. Mass. Sept. 27, 2012).  IEPs are written statements detailing an individualized plan for disabled children.  At a minimum, "[e]ach IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide."  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005); *see also Roland M.*, 910 F.2d at 987.

### 4.  Reimbursement for Tuition

If a school fails to provide a FAPE in a timely manner, the parents of a disabled child have the right to seek reimbursement, where appropriate, for private-school tuition.  *See Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985); *C.G. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 284-85 (1st Cir. 2008).  However, parents who unilaterally change their child's

placement without the consent of state or local school officials "do so at their own financial risk." *Id.* at 374. Such parents are entitled to reimbursement "*only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." *Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993) (emphasis in original).

### 5. **IDEA Administrative Procedure**

If a dispute arises between parents and a school district concerning the application of IDEA to a particular child, the statute requires the state to convene an impartial hearing. 20 U.S.C. § 1415(f)(1)(A). In Massachusetts, those hearings are conducted by the BSEA. *See* Mass. Gen. Laws ch. 71B, § 3; 603 C.M.R. 28.08(5); *see also Roland M.*, 910 F.2d at 988. Under Massachusetts law, the BSEA has jurisdiction to hear disputes

> between and among parents, school districts, private schools and state agencies concerning: (i) any matter relating to the identification, evaluation, education program or educational placement of a child with a disability or the provision of a free and appropriate public education to the child arising under this chapter and regulations promulgated hereunder or under the Individuals with Disabilities Act, 20 U.S.C. § 1400 *et seq*., and its regulations; or (ii) a student's rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its regulations.

Mass. Gen. Laws. Ch. 71B, § 2A(a). The BSEA's administrative decision is reviewable in either state or federal court. *See* 20 U.S.C. § 1415(i)(2)(A), (i)(2)(C)(iii); *see also Roland M.*, 910 F.2d at 988. However, before such an action may be brought, the party seeking review must exhaust all administrative procedures under the IDEA. 20 U.S.C. § 1415(l).

### 6. **Rehabilitation Act of 1973**

Section 504 of the Rehabilitation Act requires that "no . . . individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in . . . any program or activity receiving Federal financial assistance." 29 U.S.C. §

794(a); *see also* 34 C.F.R. 104.4.  As applied to public education, Section 504 requires that disabled children have equal access to educational opportunities that non-disabled children enjoy.  *Id.*  In addition, under Section 504, if parents dispute the school district's identification, evaluation, or placement of disabled students, an impartial hearing must be held.  34 C.F.R. 104.36.

Section 504 is not coextensive with the IDEA.  "While the IDEA focuses on the provision of appropriate public education to disabled children, the Rehabilitation Act of 1973 more broadly addresses the provision of state services to disabled individuals."  *Mark H. v. Lemahieu*, 513 F.3d 922, 929 (9th Cir. 2008).  Nevertheless, public schools receiving federal funds must still "provide a free appropriate public education to each qualified handicapped person" under Section 504.  *Id.*  A handicapped person is one with a "physical or mental impairment which substantially limits one or more major life activities."  34 C.F.R. 104.3(j)(1).[3] The phrase "physical or mental impairment" in turn means

> (A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

34 C.F.R. 104.3(j)(2)(i).  "Major life activities" are "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 34 C.F.R. 104.3(j)(2)(ii).  Neither the Rehabilitation Act nor regulations define the phrase "substantially limits," which requires an individualized case-by-case analysis.  *See Schroeder v. Triton Reg'l Sch. Dist.*, 2008 WL 8170074, at *7 (D. Mass. Feb. 21, 2008).

---

[3] Section 504 regulations do not use the term "disability."  Instead, they use the term "handicap."

### 7.    Massachusetts Special-Education Statute

Massachusetts has a special-education law, Mass. Gen. Laws ch. 71B, that works in tandem with the federal IDEA.  The statute charges school districts to "meet [every] child's needs within the regular education program" by modifying the curriculum or teaching strategies or using available support services when necessary.  Mass. Gen. Laws. Ch. 71B, § 2.  However, when that is not possible, the child is to be referred for evaluation to determine whether a disability exists and special education is required.  *Id.* § 3.[4]

A "school age child with a disability" is defined by statute as

> a school age child in a public or non-public school setting who, because of a disability consisting of a developmental delay or any intellectual, sensory, neurological, emotional, communication, physical, specific learning or health impairment or combination thereof, is unable to progress effectively in regular education and requires special education services . . . .

*Id.* § 1.  Under the regulations promulgated by the Massachusetts Department of Elementary and Secondary Education, "disability" includes neurological and physical impairment.  603 C.M.R. 28.02(7).

### B.    Factual Background

### 1.    The Events of September and October 2012

Lincoln-Sudbury Regional School District operates a regional high school that serves the towns of Lincoln and Sudbury, Massachusetts.  As of September 2012, Wallis W. was a sophomore at Lincoln-Sudbury High School.

Wallis was taking some of the most challenging classes available to her.  (A.R. 1366). Her courseload included advanced classes in English, science, mathematics, history, and

---

[4] Similar to the federal "Child Find" provision, school districts are required to "identify the school age children residing therein who have a disability . . . diagnose and evaluate the needs of such children, [and] propose a special education program to meet those needs."  Mass. Gen. Laws ch. 71B, § 3.

Spanish.  (*Id.*).  She also played on the varsity field-hockey team.  (*Id.*).

On September 30, 2012, Wallis was participating in a field-hockey practice overseen by coach Vicky Caburian.  (*Id.*).  During a drill, a teammate accidentally thrust her stick into her mouth, causing a tooth to fall out.  (*Id.*; A.R 1457).  Wallis was given emergency medical care and placed on pain medication and antibiotics.  (A.R. 5).[5]

On October 3, 2012, Wallis was seen by her physician, Dr. Aisling Gaughan, who diagnosed a concussion.  (A.R. 1500-01).  Dr. Gaughan recommended "complete rest; no school or media or reading or physical activity" for two weeks.  (*Id.*).  Subsequently, Mr. and Mrs. W. wrote e-mails to Lincoln-Sudbury staff relating the substance of Dr. Gaughan's orders.  (A.R. 1496-97).  On October 5, 2012, Mrs. W. also wrote an e-mail to Coach Caburian, stating "[Dr. Gaughan] said that [Wallis] will be returning to school part time and should have a step-by-step gradual ramp up to get her caught up on homework projects and tasks she has missed.  She will coordinate further with you to develop a plan [to return to field-hockey] when she returns."  (A.R. 1366).

The following week, on October 12, 2012, Dr. Gaughan saw Wallis again.  She noted that "[Wallis] feels much better, c/o mild fatigue only."  (A.R. 1504).  She recommended excusing Wallis from gym and field-hockey games until October 29.  (A.R. 1504-05).  In addition, she excused her from make-up class work and tests for at least two weeks, with the possibility of excusing her from homework for a week if conditions relapsed.  (*Id.*).  On October 14, 2012, Mrs. W. relayed those instructions to Lincoln-Sudbury.  (A.R. 1523).[6]  Gail Nozik, a school

_____

[5] Although Wallis's medical records are part of the evidence in this case, the Court will not consider what clearly appear to be handwritten comments by Mr. and Mrs. W. in those records challenging physician statements of Wallis's medical history.  *See, e.g.*, A.R. 1463, 1469.

[6] The quoted language from Mrs. W.'s e-mail stated:  "Please allow Wallis to miss gym and games until 29th.  She may run but not yet play.  In class, excuse her from make-up work and tests for two weeks.  If homework cause[s] a relapse of symptoms, please excuse her from homework for a week."  (A.R. 1523).  In addition, Mrs. W.

nurse at Lincoln-Sudbury, acknowledged Dr. Gaughan's orders and entered a medical alert in the school "Ipass" system, which would alert Wallis's teachers to a relevant health concern.  (Tr. III 15).

The prescribed period of inactivity ended in October 2012 without incident.  For the rest of the school year, Wallis did not come to the school nurse's office, except for annual vision and hearing screenings.  (Tr. II 80).  Neither Wallis nor her parents submitted further medical instructions, documents, or requests to the nurse's office concerning her condition.  (Tr. II 125).  The nurse's office was unaware of any symptoms that may have warranted a different protocol.  (Tr. II 87).  In addition, the parents had no contact with Yoshitaka Ando, the Lincoln-Sudbury athletic trainer.  (Tr. III 79).

The record shows that Wallis did not visit Dr. Gaughan at any time between October 12, 2012, and June 14, 2013.  (A.R. 1466).  It appears she had no medical care concerning her concussion from any other provider during that period.

### 2. <u>Wallis's Return to School</u>

After her injury, Wallis returned to school on October 15, 2012, to participate in a field trip with her Advanced Placement U.S. History class.  (A.R. 1368).  She subsequently met with J.K. Park, her guidance counselor, to formulate a plan to help her catch up in her classes.  (*Id.*).  At that meeting, Park saw no observable post-concussion symptoms and believed that Wallis had physically recovered and was emotionally eager to return to class.  (Tr. III 144-45).  Around that time, however, Wallis expressed to Park that she was fatigued.  (Tr. III 147).

Wallis missed two more days of school in early November because of the death of a close family member.  (A.R. 1368).  Because she had missed so many days of school, her parents

---

wrote "Dr. Gaughan offered to speak with any of Wallis's teachers who would like further explanation of the treatment of traumatic head injury and concussion."  (*Id.*).

expressed concerns about her academic performance to Park. (*Id.*; Tr. III 148).

In late November 2012, Park organized a meeting with Wallis, her parents, her teachers, and her housemaster, Sandra Crawford. (Tr. IV 18-19; Tr. III 148). The purpose of the meeting, which took place on November 29, was to discuss and to develop accommodations for Wallis. (Tr. III 148). Handwritten notes taken by Crawford during the meeting indicated that the agreed-upon accommodations included extra tutoring from staff, waiving of certain assignments and tests, extra time for tests, and extension of deadlines for projects. (A.R. 1526-29).

In American Literature, taught by Ann Kramer, Wallis was "the leader of the pack" with "constantly superior" grades. (A.R. 1535). Kramer waived a few quizzes and was prepared to grant Wallis a significant extension on a major paper, but no extension was necessary. (Tr. III 46). Almost no accommodations were needed for the course, as Kramer reported that she appeared to be the same student behaviorally, emotionally, and academically. (A.R. 1369). Overall, she received an "A" for the fall semester. (A.R. 1535).

In Spanish 3, taught by Kim Schultz, Wallis had trouble catching up with her classmates, and Schultz noted that she initially looked "overwhelmed" when she returned to school. (Tr. III 117). However, Schultz testified that she did not complain about physical symptoms beyond "something about headaches and not being able to complete a reading assignment." (Tr. III 127). Schultz did not count the homework assignments she missed and suggested she enlist a tutor, either privately or from the school's peer-tutoring center. (A.R. 1536; Tr. III 129-30).

After the November 2012 meeting, Schultz agreed to reduce Wallis's homework and grant her additional time for tests and quizzes. (A.R. 1536). Her grades dipped between first and second quarter from "B" to "C+," but the following semester she consistently performed at the "B" to "B-" level. (A.R. 2094). According to Schultz, those grades were average in her class

that year and demonstrated that she was accessing the curriculum and making effective progress. (Tr. III 128). She did not seek any accommodations from Schultz in the second semester of the school year. (A.R. 1536; Tr. III 128). Schultz reported to Park on May 14, 2013, that Wallis "seems a bit down" and "needs to ask for help more [often]." (A.R. 2027). Wallis placed in the 78th percentile on the National Spanish Exam in spring 2013. (A.R. 1596).[7]

In Advanced Placement U.S. History, taught by Joshua Gilman, there was almost no change in Wallis's academic performance. She was a consistent "B" student during the academic year, outperforming most of her peers. (A.R. 313). According to Gilman, he granted her an extension for several essays, but she "neither asked nor was given any concussion-related accommodations" after the fall semester. (A.R. 1535). Gilman further testified that she was keeping up with the class and understanding the content. (Tr. IV 87). He stated that he was "all the more impressed given the fact that she had to make up the work for when she was out and simultaneously keep going with the course itself." (*Id.*).

Gilman was also a softball/baseball coach with training in concussion management. (Tr. IV 73). After Wallis's return to school in mid-October 2012, he did not observe any post-concussion symptoms. (Tr. IV 74). Gilman saw no behavioral or academic changes, and she never requested extra help from him. (*Id.*; Tr. IV 83-84). Her parents never contacted him about her injury or voiced any concerns about her health or academic performance. (Tr. IV 87-88). Wallis subsequently scored a 4 out of 5 on the Advanced Placement U.S. History test in May 2013, which indicated that she was "well qualified" for the college-level equivalent course.

---

[7] The record does not indicate when the National Spanish Exam was administered. However, the American Association of Teachers of Spanish and Portuguese, which administers the National Spanish Exam, states that the exam may be administered between March 1 and April 10. *See* TEST DATES AND PROCTORING THE NSE, available at https://www.nationalspanishexam.org/index.php/exam-administration/test-dates-and-proctoring-the-nse/68-when-is-the-national-spanish-examination-administered.

(A.R. 1588). She also scored a 610 out of 800 on the U.S. History SAT Subject Test in June 2013. (A.R. 1591).

In Accelerated Biology, taught by Peter Elenbaas, Wallis's grades were relatively unchanged before and after the injury. (A.R. 312).[8] The class was the most rigorous introductory biology course offered at Lincoln-Sudbury. (*Id.*). She was granted extra time to make up work; such extensions were consistent with what other students received in Elenbaas's class after similarly long absences. (*Id.*). She received grades in the "C" range during the fall semester, although they improved to a "B-" in the spring. (A.R. 2094). Elenbaas did not recall Wallis or her parents ever suggesting that she had a disability. (A.R. 313).

In Intensive Algebra II, taught by Brandon Dorey, Wallis consistently struggled. College-preparatory mathematics at Lincoln-Sudbury is taught at three levels: Level II, which is a typical college-preparation course; Level I, which is a fast-paced course covering more advanced topics; and Intensive, which is the fastest-paced and most-demanding course available. (Tr. IV 119). After each academic year, math teachers make recommendations for each student's placement for the following year. (Tr. IV 153). However, parents may override the teacher's recommendation by filling out an "override" form, which is always honored. (*Id.*).

Upon Wallis's return to class, Dorey waived one test and she elected to not complete an optional homework binder. (A.R. 1535). For the next several months, she did not voice concern to Dorey about any post-concussion symptoms or her grades. (Tr. IV 172). During that period, she never asked for additional help or other accommodations. Dorey recommended that she see him for additional help during the sixth period, when she had free time, but she never took

---

[8] According to Elenbaas, her grades on tests, quizzes, and labs were "+/- 5% before and after her head injury." (A.R. 312).

advantage of that opportunity.  (A.R. 1535).[9]

Dorey modified his grading scheme for Wallis by placing greater weight on her midterm exam, which was administered in January 2013, and which was more than three months after the injury occurred.  (A.R. 1535).  He testified that his normal grading system "didn't make sense for [Wallis] because it would have over- or under-emphasized certain assignments in [the] grading software."  (Tr. IV 145).  She did not seek individual help from Dorey until the fourth quarter (during the spring semester) and did not request additional support for this class from other school staff.  (Tr. IV 126).  She received a "C" for the fall semester.  (A.R. 2094).

Wallis also took the Massachusetts Comprehensive Assessment System ("MCAS") test in June 2013.  (A.R. 2041).  She was provided additional time for that test.  (*Id.*).  She scored "Advanced" in all three categories:  English Language Arts, Mathematics, and Biology.  (A.R. 2043).

### 3. Participation in Athletics

As noted, after evaluating Wallis on October 12, 2012, Dr. Gaughan excused her from sports and gym class through October 29, 2012.  (A.R. 1505).  On approximately November 2, 2012, Mr. and Mrs. W. requested a meeting with the field-hockey coach, Vicky Caburian, to discuss her "return to play."  (A.R. 1524).  The record does not indicate whether she actually returned to play for the field-hockey team.

Wallis expressed interest in participating in winter track, although ultimately she was not able to compete.  (A.R. 1530-31).  She did, however, participate in spring track.  (A.R. 1599).

Lincoln-Sudbury's athletic trainer, Yoshitaka Ando, testified that Wallis never came to

---

[9] In addition, Dorey posted online videos in preparation for each class and there was a math tutoring table available at lunch.  (A.R. 1370).  The tutoring table was offered "every lunch" and "staffed by math teachers."  (Tr. IV 120).

his office following the concussion.  (Tr. III 70).  She also never reported any issues with a particular sport or exercise.  (Tr. III 79).  No one else, including her parents, reported any concerns about her health or well-being to Lincoln-Sudbury athletic staff until May 2013.  (*Id.*).

### 4.    Disputes Between Mr. and Mrs. W. and School Officials

The relationship between the parents and Lincoln-Sudbury staff was relatively cordial until May 2013.  During that time, Wallis continued to struggle in the Intensive Algebra II course, receiving a "C-" for the third quarter.  (A.R. 2094).

In May 2013, Dorey recommended that Wallis drop one level to Level I for her junior year, believing that she would benefit from greater teacher direction and repetition.  (Tr. IV 153-54).[10]  When he spoke with her, another math department teacher, Lisa Weiss, was present.  (Tr. IV 155).  Dorey testified that when he informed Wallis about his recommendation, she became frustrated and shook her finger at Weiss and stated, "you need to go think about what it means to have a concussion."  (Tr. IV 156).

When Wallis was in eighth grade, her Algebra I teacher had similarly recommended that she take Level I Geometry instead of Intensive Geometry.  (A.R. 1373).  Mr. and Mrs. W. had exercised their parental override, and Wallis earned a "B" and "B-" in that course her freshman year.  (*Id.*; A.R. 1585).[11]

Upon learning of Dorey's recommendation, Mr. and Mrs. W. expressed displeasure.

---

[10] Dorey also recommended two other students drop to lower levels for the 2013-14 school year.  (A.R. 1371).

[11] Mr. and Mrs. W. had also previously disputed the science department's recommendation in May 2011 that Wallis be placed in "Earth Science 1" instead of "Accelerated Earth Science" for her freshman year.  (A.R. 1578-83).  In a series of e-mails, they criticized Lincoln-Sudbury staff for its recommendation.  For example, Mrs. W. wrote that Lincoln-Sudbury's "descriptions of the placement process . . . are self-congratulatory on a clearly deficient process," despite the fact that Wallis did not score high enough on a placement test to enter the accelerated class.  (A.R. 1578-79).  Indeed, there were 44 students who scored above her who did not get placed into that class.  (A.R. 1579).  Nevertheless, it appears that the parents overrode the recommendation and Wallis took Accelerated Earth Science.  She received a "B" and a "B-" in that course.  (A.R. 1577).

(A.R. 1373). Park, her guidance counselor, proposed a plan to help Wallis bring her final-quarter grade up to 70% by having her utilize the extra-help tools offered by Dorey several months earlier. (A.R. 1601). Dorey said that he would reconsider his recommendation if Wallis could reach the 70% threshold. (*Id.*). It appears that the parents could have filled out a parental override form, but chose not to do so.

On May 19, 2013, the parents objected to this proposal. They demanded that Wallis be removed from Dorey's class and that she receive an "incomplete" in the course for the year rather than the "C" grade. (A.R. 1603). The parents also requested an emergency meeting, invoking Section 504 of the Rehabilitation Act. (*Id.*).

In response, on May 20, 2013, Crawford (Wallis's housemaster) stated that Lincoln-Sudbury supported Park's plan, but also offered to meet to discuss the Section 504 process. (A.R. 1604). Crawford noted that because the parents were requesting the 504 hearing, they would need to provide medical documentation supporting their claim that Wallis was disabled. (*Id.*). In response, the parents did not assent to testing and stated that she was no longer disabled. (A.R. 1605; Tr. IV 46).

In an e-mail on May 21, 2013, the parents alleged that Dorey and others at Lincoln-Sudbury had failed to comply with their legal obligations to help Wallis succeed. (A.R. 1605-06). They further alleged that Dorey had engaged in "stressful and counterproductive communications" with Wallis and that she had been "cognitively disabled for an extended period of time." (A.R. 1605). A meeting between Wallis, her parents, several math teachers (including Dorey), Park, and Crawford took place on May 25, 2013. (A.R. 1610, 1612). Handwritten notes taken by Crawford and Park indicate that during the meeting, Wallis stated that she wanted to be placed in Intensive Mathematics for her junior year, and her parents expressed frustration at what

they perceived to be a lack of support from her teachers. (A.R. 1612-15). In addition, Wallis stated that she did not seek help earlier because she wanted to be independent and was working hard in her other classes. (*Id.*).

Crawford later e-mailed the parents on June 1, 2013, stating that Lincoln-Sudbury had received "no indications of any concern" about Wallis's health or academic progress between November 2012 and May 2013. (A.R. 1616). Rather, according to Crawford, the parents contacted Lincoln-Sudbury only after Dorey had recommended Wallis be placed in a lower-level math course. (*Id.*). Crawford reiterated, however, that the parents could simply override that recommendation. (*Id.*). She added that Park also offered to arrange a math tutor for Wallis. (A.R. 1617).

Meanwhile, Mrs. W. had Wallis curtail her participation in Dorey's class. For example, she told Wallis to skip a test scheduled for May 20. (A.R. 1618). In response, Crawford urged the parents to help Wallis "agree to access the supports we have provided her to help her succeed in math." (*Id.*).

In a May 21, 2013 e-mail, Dorey suggested to Crawford that "the only reason [the parents] are reacting now is because I am recommending [Wallis] to move down a level." (A.R. 2032). Dorey also stressed that Wallis had never sought out the additional help and resources that he had offered. (*Id.*).[12]

In June 2013, the parents and various members of the Lincoln-Sudbury faculty continued to argue back and forth, mostly over e-mail, concerning a plan for Wallis to complete Intensive Algebra II. The parents criticized Lincoln-Sudbury's attempts to assist and make accommodations for Wallis. (A.R. 1622-26, 1629-31). For example, Mrs. W. described the

---

[12] Dorey later testified that he did not hear from the parents about Wallis or her grades until a few days after he recommended she move down to a lower-level math course. (Tr. IV 173).

school's proposal as "no plan" and "not a math plan." (A.R. 1622). Lincoln-Sudbury faculty consistently asserted that an incomplete grade in her math course would be inappropriate. (A.R. 1616-18, 1633). It appears that Wallis eventually took a probability test in Intensive Algebra II, and scored a 91 percent. (A.R. 1633, 2077). However, she did not take the final exam. (A.R. 2077).

On June 5, 2013, Scott Carpenter, the Superintendent and Principal of Lincoln-Sudbury, voiced his support for proposals by school staff and stated that Wallis's grades suggested progress, even if the progress was not as great as her parents expected. (A.R. 1785).

During this period, Wallis's parents made additional demands. For example, they asked "how grades were calculated in each of her subjects this year by quarter and . . . how test scores, essays, labs, homework, etc. were factored into the calculation of student grades and how specifically [Wallis's] grades were calculated. We need to know what class average scores were for each component of calculating classroom students' grades and what the values were for [Wallis]." (A.R. 1780).

The parents and Dorey eventually worked out another math plan for Wallis in early June 2013. (A.R. 2038). The plan called for Dorey to prepare her for the math assessments still outstanding and to reevaluate his recommendation for her math placement. (*Id.*).

On June 14, 2013, with only a few days left in the school year, Dr. Gaughan wrote a note excusing Wallis from the final exam in Dorey's class. (A.R. 1514). The note did not cover final exams in other subjects, such as Accelerated Biology or Spanish. (*Id.*). Because she did not take the final exam and other tests in Intensive Algebra II, Wallis received a grade of "incomplete" for the semester. (A.R. 1373, 2094).

Eventually, Mr. and Mrs. W. filed an override of Dorey's recommendation that Wallis

take Level I calculus for the 2013-2014 academic year.  (A.R. 1373).  During the summer of 2013, the parents also hired a private math tutor for her.  (A.R. 1363).

### 5. Further Medical Visits

As noted, Wallis had attended medical appointments with Dr. Gaughan on October 3 and 12, 2012, in the aftermath of her concussion.  Her next meeting with Dr. Gaughan was on June 14, 2013.  (A.R. 1466).  At that appointment, Mrs. W. reported that Wallis was having difficulty at school, specifically with math.  (*Id.*).  Dr. Gaughan noted, however, that she was not experiencing headaches, fatigue, or difficulty concentrating.  (*Id.*).  Dr. Gaughan then recommended a "neuropsych eval[uation]," postponement of tests and exams, and "remediation classes in math in the summer."  (*Id.*; A.R. 1514).

On July 8, 2013, after the school year had ended, Wallis was seen at the Boston Children's Hospital sports medical clinic by Dr. Michael Beasley.  (A.R. 1469).  Wallis reported that she was having difficulty in school, particularly her math class.  (*Id.*).  During the visit, Wallis's cognitive efficiency was tested.  She scored a 0.36 on the cognitive efficiency index, which is above the mean and "indicates that the athlete did well in both the speed and memory domains on the symbol match test."  (A.R. 1471).  Dr. Beasley noted that "[o]verall it seems that clinically she is resolved although she does still question if she is having some overall fatigue and endurance concerns that weren't there both athletically and academically prior to this injury."  (A.R. 1508).  He added, "I think [Mr. and Mrs. W. are] looking for some support to discuss with the school about previous lack of accommodations, which is difficult for me to do since [Wallis] wasn't a part of my care at [that] point."  (A.R. 1509).

### 6. Transfer to Lawrence Academy

Mr. and Mrs. W. notified Lincoln-Sudbury on September 3, 2013, that Wallis had been

enrolled for the 2013-2014 academic year at Lawrence Academy, a private institution. (A.R. 1537). The parents requested public funding for that placement. (*Id.*). In response, the school provided a consent form for a special-education evaluation, which the parents needed to sign and return. (A.R. 1540). Lincoln-Sudbury also declined to provide funding for the private school because Wallis began attending Lawrence Academy on September 6, three days after the notice, and the parents had not provided 10 days' notice as required by the IDEA. (*Id.*).

The parents countered that Lincoln-Sudbury was still responsible for payment, regardless of Wallis's start date at Lawrence Academy. (A.R. 1559). They also rejected the consent form and request for a special-education evaluation. (A.R. 1560). In a letter dated October 10, 2013, Lincoln-Sudbury again declined to fund the private-school placement and advised the parents to file for a hearing at the Bureau of Special Education Appeals. (A.R. 1563).

During her junior and senior years at Lawrence Academy, Wallis received "A"s or "B"s in all of her courses. (A.R. 2096-97). Moreover, her final grades in all of her courses ranged from "A-" to "A." (*Id.*). She earned high honors both years. (*Id.*). In June 2014, she also participated in a student summer-visitor program at Stanford University, where she took courses in social psychology and social movements. (A.R. 2100).

After graduating from Lawrence Academy in 2015, Wallis enrolled at George Washington University in Washington, D.C. (A.R. 2103). She earned four "A"s and one "A-" during her first semester. (*Id.*). She was also a member of the University Honors Program. (A.R. 2102).

## C.     Procedural Background

### 1.     The Hearing Request

Mr. and Mrs. W. requested a BSEA hearing on September 22, 2014, to seek public

20

funding for Wallis's private-school placement and reimbursement for privately obtained individual math tutoring during the summer of 2013.  (A.R. 1-26).  The Hearing Officer initially assigned to the case was Rosa Figueroa.  The parents sought review of 13 issues, but Figueroa noted issues 10 through 13 appeared to be "outside the purview of the BSEA."  (A.R. 126-27).[13]

Lincoln-Sudbury filed a motion to dismiss the entire claim, or in the alternative, for summary judgment.  (A.R. 145-65).  The parents conceded that issues 10 and 13 were "not within the jurisdiction of the BSEA," and withdrew issue 9 from consideration.  (A.R. 521).[14] Figueroa then also dismissed issues 11 and 12.  (A.R. 527).  Because the parents' factual allegations raised a "plausible claim to relief," Figueroa allowed issues 1 through 8 to proceed to a hearing.  (A.R. 528).

On March 22, 2015, Mr. and Mrs. W. filed a motion requesting that Figueroa recuse herself.  (A.R. 768-803).  In their motion, the parents alleged a litany of violations, including "not ruling on [their] motions," "prematurely shutting down discovery," and "mandating unbalanced and burdensome constraints on exhibits." (A.R. 782, 786, 790).

In a letter dated March 29, 2015, Mr. and Mrs. W. alleged that Figueroa was biased against them, arguing (among other things) that she "has prejudicially had different standards for [the] parents regarding the scheduling of hearing dates including the necessity of providing reasons and evidence for unavailability."  (A.R. 753).  In that same letter, they reiterated their

---

[13] Issue 10 was "[w]hether parents are entitled to reimbursement for attorneys' fees, professional fees or compensation for their time in pursuing the BSEA hearing request . . . ?"  Issue 11 was "[w]hether parents are entitled to compensation for alleged transgressions by school personnel under 105 C.M.R. 201.000 concerning head injuries and concussions in extracurricular athletic activities . . . ?"  Issue 12 was [w]hether Lincoln-Sudbury failed to follow school policy regarding forwarding 'Warning Notifications' to parents when [the] student was at risk of receiving failing grades?"  Issue 13 was "[w]hether Lincoln-Sudbury must define and implement policies and procedures regarding student records and privacy?"  (A.R. 126-27).

[14] Issue 9 was "[w]hether student is entitled to 300 hours of compensatory instructional services or its financial equivalent for services not rendered [to] student following her concussion?"  (A.R. 126).

demand that Figueroa recuse herself, contending "[t]he tone, descriptions, and substance of [a previous] order make it evident that the Hearing Officer clearly is no longer free from disabling prejudice and is unable to make objective appraisals."  (A.R. 758).

On April 3, 2015, Figueroa denied the motion for recusal, but nevertheless recommended that the matter be reassigned to another hearing officer.  (A.R. 980).  That same day, the matter was reassigned to Hearing Officer Lindsay Byrne.  (*Id.*).

The hearing was scheduled to begin April 7, 2015.  (A.R. 981).  That morning, the parents sent a fax requesting a postponement.  (*Id.*).  They had previously made unsuccessful requests to postpone the hearing to Figueroa.  Byrne found that there "was no rational reason to revisit the previous denial" and denied the request.  (A.R. 983).  In addition, Byrne warned that the parents were engaging in dilatory tactics in an effort to force the BSEA to "reschedule on [the parents'] own terms."  (*Id.*).  Nevertheless, Byrne decided to reschedule the hearing to November 2015.

Mr. and Mrs. W. then filed a motion to recuse Byrne on November 9, 2015.  (A.R. 1041-58).  They argued that Byrne failed "to follow proper process" and was "prejudice[d] against parents."  (A.R. 1043).  That motion was denied on November 16, 2015.  (A.R. 1092).

The hearing ultimately took place across two sessions.  The first was held on November 17-19, 2015.  (A.R. 1365).  The second was held on January 6-7, 2016, to accommodate Wallis's college schedule.  (*Id.*).

## 2.  The Hearing Officer's Decision

Byrne released her decision on April 1, 2016, and a corrected version, with minor edits, on April 8, 2016.  She determined that Wallis had suffered a head injury in September 2012. (A.R. 1379).  That injury caused her to miss school for two weeks, but when she returned, staff

did not notice any post-concussion symptoms.  (*Id.*).  Other than the two notes from Dr. Gaughan

in October 2012 excusing Wallis from make-up work and athletic games for two additional

weeks, neither Wallis nor Mr. and Mrs. W. ever presented Lincoln-Sudbury with any further

physician evaluations or instructions.  (*Id.*).  Wallis maintained good grades and continued to

participate in extra-curricular activities, such as Model UN and varsity sports.  (*Id.*).  Her

teachers implemented various forms of support and Wallis had made up all of her work by the

third quarter of the 2012-2013 academic year.  (*Id.*).

The Hearing Officer found that the dispute between the parties arose at the end of the

2012-13 school year, when Dorey recommended that Wallis switch from Intensive to Advanced

Honors (Level I) math for the following school year.  (*Id.*).  After that recommendation, Wallis

refused to take her fourth-quarter assessment and the final examination in Intensive Algebra II,

and thus received a grade of "Incomplete."  (*Id.*).  Otherwise, Wallis predominately received

average or above-average grades in her classes.  (*Id.*).  The Hearing Officer determined that

"Wallis had access to the regular education academic program, services and/or activities on the

same basis as other 10th grade Lincoln-Sudbury students throughout the 2012-2013 school year.

There is no evidence to the contrary."  (A.R. 1380).

The Hearing Officer further found that Lincoln-Sudbury had complied with Dr.

Gaughan's instructions concerning Wallis's reentry to school in October 2012.  (*Id.*).  She found

that there was "no credible evidence in this record that Wallis had a 'continuing' medical issue or

physical or mental impairment during the 2012-2013 academic year."  (*Id.*).  She also found that

Wallis did not have an impairment that hindered her ability to learn, nor was she denied access to

the curriculum of her classes upon her return.  (A.R. 1381).  Specifically, she found that

Dorsey's recommendation that Wallis take Level I instead of Intensive mathematics did not deny

her access to the curriculum, but rather was consistent with previous recommendations. (A.R. 1381-82). The "incomplete" grade stemmed from her refusal to take tests, and not from a lack of access to the material. (A.R. 1382).

The Hearing Officer concluded that the parents had failed to prove that Wallis was disabled and required special education services; that Lincoln-Sudbury had failed to meet its obligations under the law; or that they were entitled to reimbursement or public funding for her private-school education and math tutoring. (A.R. 1382-83). She concluded that Lincoln-Sudbury acted "reasonably" and had "no reasonable support for a 'suspicion'" that Wallis might have a disability. (*Id.*). Finally, she noted the following:

> If ever a matter merited a finding that it was brought for an improper purpose it is this. The record clearly demonstrates that the Parents' objections to Wallis' 10th grade experience at Lincoln-Sudbury began only after the math department recommended a change from one honors section to another honors section. Their claim to special education eligibility is patently frivolous, as is the claim to Section 504 protections . . . the Parents' actions in pursuing IDEA and Section 504 claims at the BSEA were a bad faith effort to punish Lincoln-Sudbury's staff for the perceived "disrespect" of their daughter's academic prowess and to justify public funding for her private school education.

(*Id.*). The Hearing Officer dismissed the parents' claims with prejudice.

### 3.    Proceedings before this Court

Lincoln-Sudbury initiated this action on April 14, 2016, to recover its attorneys' fees and expenses associated with the administrative proceeding before the BSEA and this litigation. Mr. and Mrs. W. filed a counterclaim on June 30, 2016, requesting reversal of the BSEA's decision. The counterclaim appears to assert claims under the Rehabilitation Act, IDEA, and Massachusetts Child Find statute. On June 6, 2017, the parties both moved for summary judgment on the issue of attorneys' fees and costs, and Mr. and Mrs. W. also moved for summary judgment on their counterclaim.

## II.    <u>Analysis</u>

Because the disposition of defendants' counterclaim will affect the analysis of the issue of attorneys' fees, the Court will address it first.

### A.    <u>Appeal from the BSEA Decision</u>

#### 1.    <u>Legal Standard</u>

Defendants have moved for summary judgment on their counterclaim challenging the BSEA's conclusions.  However, "[i]n a case like this, summary judgment is merely the device for deciding the issue, because the procedure is in substance an appeal from an administrative determination, not a summary judgment."  *North Reading Sch. Dist. v. Bureau of Special Educ. Appeals*, 480 F. Supp. 2d 479, 480 n.1 (D. Mass. 2007) (citations and internal quotation marks omitted).  The burden of proof rests on the party challenging the BSEA hearing officer's decision.  *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 54 (1st Cir. 1992).

Essentially, "judicial review [of administrative decisions on claims brought under the IDEA] falls somewhere between the highly deferential clear-error standard and the non-deferential *de novo* standard."  *Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18 24 (1st Cir. 2008) (citing *Roland M.*, 910 F.2d at 989).  The IDEA provides that courts reviewing agency decisions "(i) shall receive the records of the administrative proceeding; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  The Supreme Court has explained that a district court's review entails both procedural and substantive aspects.  *Rowley*, 458 U.S. at 205 ("When the elaborate and highly specific procedural safeguards embodied in § 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress

attached to these procedural safeguards cannot be gainsaid.").

On matters that implicate educational expertise, heightened deference is due to an agency's administrative findings. *Mr. I v. Maine Sch. Admin. Dist. No. 55*, 416 F. Supp. 2d 147, 156 (D. Me. 2006). However, "when the issue is more a matter of law, the educational expertise of the agency is not implicated, and less deference is required." *Id.* at 157.

As to the evidence, the administrative process is to be accorded "its due weight" such that "judicial review does not become a trial *de novo*, thereby rendering the administrative hearing nugatory." *Roland M.*, 910 F.2d at 996. The First Circuit has directed district courts reviewing appeals of administrative decisions under the IDEA to

> review[ ] the administrative record, which may be supplemented by additional
> evidence from the parties, and make[ ] an independent ruling based on the
> preponderance of the evidence. That independence is tempered by the
> requirement that the court give due weight to the hearing officer's findings. This
> intermediate level of review reflects the concern that courts not substitute their
> own notions of educational policy for that of the state agency, which has greater
> expertise in the educational arena.

*L.T. v. Warwick Sch. Comm.*, 361 F.3d 80, 83-84 (1st Cir. 2004) (citations and internal quotation marks omitted).

### 2. Whether Wallis Was Disabled and Required Special-Education Services

In essence, the BSEA Hearing Officer found that Wallis did not have a continuing disability and did not require special-education services. Those conclusions are overwhelmingly supported by the evidence; indeed, there is almost no evidence to the contrary.

It is undisputed that Wallis suffered a concussion on September 30, 2012. As a general matter, a concussion is a type of traumatic brain injury, although normally a temporary one. *See, e.g.*, *Weeks Marine, Inc. v. Am. Steamship Owners Mut. Protection and Indem. Ass'n, Inc.*, 2011 WL 3796331, at *12 (S.D.N.Y. Aug. 25, 2011) ("Whatever the symptoms of a concussion are, it

is beyond dispute that they are caused by trauma, and that the trauma is to the brain."). Therefore, for the limited purpose of addressing the present motions, the Court will assume without deciding that a concussion is a type of traumatic brain injury, and that Wallis was temporarily disabled as a result.[15]

Wallis was given medical advice from Dr. Gaughan on October 3, 2012, that she should rest, stay home from school, and avoid reading and physical activity for a period of two weeks. The school was made aware of that advice on October 5. On October 12, Dr. Gaughan further advised that she should be excused from make-up work and exams for at least two weeks (that is, through October 26) and from gym and sports activities until October 29. Dr. Gaughan never prescribed any additional limitations, and the prescribed period of inactivity ended on October 29.

Defendants have proffered no medical evidence supporting their claim that Wallis continued to suffer from a disability after October 29. No physician evaluated her again for a period of eight months (that is, between October 12, 2012, and June 14, 2013). Her parents never suggested that their daughter was disabled during that period, and indeed they concede that she was no longer disabled by the following spring.[16] And Wallis was hardly a neglected child; she lived in an affluent community, with supportive parents, and with no apparent barriers to obtaining health-care services. Furthermore, with some minor possible exceptions, Wallis did

---

[15] Lincoln-Sudbury disputes that all concussions are necessarily traumatic brain injuries within the meaning of the relevant statutes and regulations.

[16] As soon as Wallis's parents began to allege that she was (or had been) disabled, Crawford offered to meet with them to discuss the Section 504 process and requested "medical results and/or cognitive testing" to document the disability. (A.R. 1604.) They never provided any such documentation.

not exhibit or complain of any post-concussion symptoms during that eight-month period.[17]
Gilman, who was trained in concussion management, testified that Wallis did not exhibit any
post-concussion symptoms. (Tr. IV 73-74).

Nor is there any evidence that Wallis ever needed any special-education services, or that
the accommodations provided by the school upon her return were inadequate. All of Wallis's
teachers complied with Dr. Gaughan's orders. No further instructions for school staff
concerning Wallis's health were provided by any physician, or anyone else, for another eight
months. *See Loch v. Bd. of Educ.*, 573 F. Supp. 2d 1072, 1084-85 (S.D. Ill. 2008) (holding that
child was not a "child with a disability" where parents failed to offer proof that medical
conditions adversely affected her educational performance).[18]

Every one of Wallis's teachers testified that they believed Wallis had successfully
accessed the curriculum. *See, e.g.*, Kramer (Tr. III 65); Schultz (Tr. III 128); Gilman (Tr. IV 90);
Dorey (Tr. IV 167). Various forms of support were given to facilitate her return to school long
after the time period covered by Dr. Gaughan's instructions. *See, e.g.*, Kramer (A.R. 1525);
Schultz (A.R. 1536; Tr. III 129-30); Gilman (A.R. 1535); Elenbaas (A.R. 312); Dorey (A.R.

---

[17] When she first returned to school in mid-October, Wallis told Park that she was fatigued. (Tr. III 147).
Schultz also testified Wallis at one point said "something about headaches and not being able to complete a reading
assignment." (Tr. III 127).

[18] Dr. Gaughan subsequently wrote a letter on June 14, 2013, excusing Wallis from a "make up test in math
and final test in math" because "[s]he suffered a concussion in 10/2012 and did not have the opportunity to learn the
work that she had missed." (A.R. 1514). The letter includes a medical conclusion (Wallis suffered a concussion)
and an educational conclusion (Wallis did not have the opportunity to make up the work). However, the Court does
not credit the second conclusion. There is no record of Dr. Gaughan seeing Wallis at any point between October
2012 and June 2013. Moreover, Dr. Gaughan was not present at any school meetings, and had no factual knowledge
on which to base that conclusion. Indeed, she noted that the mother was the source of her information ("Mom
reports that [Wallis] has been having difficulty at school . . . because school did not accommodate her and she has
not been supported in math"), and thus the letter almost certainly was the product of the mother's instigation. (A.R.
1510).

The following month, Dr. Beasley of the Boston Children's Hospital wrote, "I think [Mr. and Mrs. W. are]
looking for some support to discuss with the school about previous lack of accommodations, which is difficult for
me to do since [Wallis] wasn't a part of my care at [that] point." (A.R. 1509).

1535).

By the end of the first semester—several months after October 29, 2012—no teacher or administrator believed that accommodations of any kind were needed.  (A.R. 1535-36) (Gilman: "[Wallis] neither asked nor was given any concussion-related accommodations during Q3.  From my perspective, she seemed to have recovered and moved on from the injury."; Dorey:  "[Wallis] did not ask for any concussion-related accommodations quarter 3."; Kramer:  "She was the leader of the pack . . . her grades were constantly superior"; Schultz:  "Second semester [Wallis] never asked me for any accommodations."; Elenbass:  "[Wallis] did not ask for any [accommodations during Q3] and I did not provide any.").[19]  And with the exception of her intensive math class, Wallis continued to receive good grades and perform well on standardized tests.

In short, there is no evidence that Wallis's concussion impaired her ability to learn and master course material during the weeks and months after October 29.   The conclusion of the BSEA Hearing Officer that she did not require special-education services is overwhelmingly supported by the evidence, and will not be overturned on appeal.

### 3.      The Rehabilitation Act Claim

Defendants have also asserted a claim for violation of the Rehabilitation Act.  Proof of such a violation first requires establishing that the child was "handicapped" within the meaning of the Act.  *See generally* 34 C.F.R. 104.3.  The relevant regulation defines a handicapped person as an individual with a "physical or mental impairment which substantially limits one or more major life activities," including learning.  34 C.F.R. 104.3(j)(1) & (2).  As noted, even assuming

---

[19] Schultz did note that Wallis looked "overwhelmed" immediately upon returning to school after missing class for two weeks.  (Tr. III 117).  Of course, any student would feel that way after missing more than two weeks and having to make up work in multiple classes.

that Wallis was temporarily disabled between September 30 and October 29, there is no evidence she was disabled beyond that point within the meaning of the Rehabilitation Act. In particular, there is no evidence that she was suffering from an impairment that "substantially limit[ed]" her ability to learn.

Accordingly, summary judgment will be granted to the school district on the counterclaim under the Rehabilitation Act.

### 4. The "Child Find" Claims

Defendants further contend that Massachusetts Child Find law, Mass. Gen. Laws ch. 71B § 3, "requires an evaluation of children suspected of having a categorical disability regardless of whether there is a belief that the child may require special education services," and that the school improperly failed to perform such an evaluation. (Mem. in Supp. of Counterclaim at 6).[20] In essence, they argue that Lincoln-Sudbury was obligated to perform a full-bore special-education evaluation of Wallis as soon as it found out she had suffered a concussion, and to propose an IEP or Section 504 plan providing her with special-education services.

As noted, under federal law, states are required to "have in effect policies and procedures to ensure that . . . [a]ll children with disabilities . . . regardless of the severity of their disability, and who are in need of special education and related services, are identified, located, and evaluated . . . ." 34 C.F.R. § 300.111(a)(1)(i); *see* 20 U.S.C. § 1412(a)(3). Massachusetts has such policies and procedures in effect by statute and regulation. *See* Mass. Gen. Laws ch. 71B; 603 C.M.R. 28.00.

Under Section 3 of the Massachusetts statute, a school district is required to identify

---

[20] Lincoln-Sudbury contends that defendants failed to raise the Child Find issue in the BSEA hearing and have waived that argument. Because the Court finds that defendants' argument fails on the merits, it need not address that contention.

"school age children . . . who have a disability, as defined in section 2, diagnose and evaluate the needs of such children, propose a special education program to meet those needs, provide or arrange for the provision of such special education program, [and maintain records and make reports]."  Mass. Gen. Laws ch. 71B § 3.

Section 2 charges the Board of Elementary and Secondary Education with promulgating regulations, including a definition of "disability."  Mass. Gen. Laws ch. 71B, § 2.  The relevant regulation, 603 C.M.R. 28.02, defines "disability" broadly; among other things, it includes "neurological impairment," which includes "students who have received a traumatic brain injury," and "physical impairment."[21]

Section 1 defines "school age child with a disability" to mean "a school age child in a public . . . school setting who, *because of a disability* consisting of developmental delay or any intellectual, sensory, neurological, emotional, communication, physical, specific learning or health impairment or combination thereof, *is unable to progress effectively* in regular education and requires special education services . . . ."  Mass. Gen. Laws. Ch. 71B, § 1 (emphasis added).

Reading the statute as a whole, it is clear that schools are required to identify (1) children with disabilities (2) who, because of that disability, require special education.  Once these students have been identified, the schools are then required to evaluate their needs, and propose and implement a special education program, as appropriate.  Defendants, however, argue that the statute requires schools to identify all students with disabilities (whether they have learning issues or not) and then to perform a full-fledged multidisciplinary special-education evaluation for each one of those students (whether they need it or not).

---

[21] Under the IDEA, a "child with a disability" is one with intellectual disabilities, which may include those caused by "traumatic brain injury."  20 U.S.C. § 1401(3)(A)(i).

There are multiple problems with defendants' interpretation, beginning with the fact that it ignores the relevant statutory language. Again, the statute requires schools to identify "school age children who have a disability," and defines "school age child with a disability" as a "school age child . . . who, because of a disability, . . . is unable to progress effectively . . . and requires special education services." Mass. Gen. Laws. Ch. 71B, §§ 1, 3. Defendants' position would read that definition out of the statute entirely. Their position also contradicts available case law, which suggests that a school cannot be held liable for a Child Find violation if the student actually does not need special education. *Cf. D.G. v. Flour Bluff Indep. Sch. Dist.*, 481 Fed. Appx. 887, 891 (5th Cir. 2012) (involving federal Child Find).[22]

Defendants' interpretation would also lead to absurd and unworkable results. The definition of a "disability" is very broad, and makes no distinction between temporary and permanent conditions. Under defendants' view, school districts would have no ability to exercise judgment or common sense in deciding whether to go through the lengthy process of evaluating a student for a potential IEP, no matter how minor or temporary the student's condition, and no matter whether the student's ability to learn is actually impaired.[23] Indeed, under defendants' view, every child with a sprained ankle (a physical impairment) or a touch of the flu (a health impairment) would require a multidisciplinary special-education evaluation. Schools would quickly become mired in unnecessary meetings and paperwork, and teachers and

---

[22] Not surprisingly, the BSEA has interpreted the Massachusetts Child Find statute to require that an evaluation is needed only when the student is suspected of having a disability "and that special education services may have been necessary." *In re: DESE and DYS*, BSEA 10-0669 (July 24, 2012). *See also In re: Student v. Pentucket Reg'l Sch. Dist.*, BSEA 12-8636, Decision II (Oct. 23, 2015) ("The IDEA and the Massachusetts special education law . . . mandate that school districts offer *eligible* students a FAPE . . . . The key in the aforementioned requirements . . . is that the student is first and foremost [ ] found to be eligible.") (emphasis in original).

[23] The relevant regulation, 603 C.M.R. 28.04(2), states that "[u]pon consent of a parent, the school district shall provide or arrange for the evaluation of the student by a multidisciplinary team within 30 school days." 603 C.M.R. 28.05(1) states that "[w]ithin 45 school working days after receipt of a parent's written consent to an initial evaluation or reevaluation, the school district shall . . . determine whether the student requires special education and, if required, develop an IEP in accordance with state and federal laws."

staff would waste their valuable time and resources evaluating students who do not need special-education services.  Of course, that in turn would substantially undercut the ability of teachers and staff to assist those students who do in fact need those services.  The requirements of the law in this area are already sufficiently complex and burdensome without imposing nonsensical obligations upon the schools.

In short, Lincoln-Sudbury had no reason to suspect either a continuing disability or a need for special-educations services.  Defendants' claims under the Child Find law are completely without merit.  *Cf. Rodiriecus L. v. Waukegan Sch. Dist. No. 60*, 90 F.3d 249, 254 (7th Cir. 1996) (stating that parents must reasonably demonstrate that school officials knew of, or should have known of, a student's genuine disability when invoking the IDEA's stay-put provision) ("[I]t is apparent that the school officials had neither knowledge nor reasonable suspicion to base a rational decision that [the child] was in fact disabled.  In fact his academic performance, although not outstanding, did not raise [ ] suspicions and [staff] deemed it 'average.'"); *Doe v. Bd. of Educ. of Elyria City Schs.*, 1998 WL 344061, at *7 (6th Cir. May 27, 1998) (holding that where parents failed to have child independently evaluated and record showed lack of "significant history" of issues at school, student's IDEA rights were not violated when he was expelled despite subsequent finding of disability).[24]

Accordingly, Lincoln-Sudbury did not violate its "Child Find" obligations under federal

---

[24] Defendants' reliance on *N.G. v. District of Columbia*, 556 F. Supp. 2d 11 (D.D.C. 2008) is misplaced.  In *N.G.*, the court granted the parents' motion for summary judgment, finding that the District of Columbia school district should have known that the minor child N.G. was disabled and qualified for special-education services.  *Id.* at 26-27.  However, N.G.'s grades had dropped dramatically during ninth grade, and "her grade point average was 1.4, the equivalent of a D+."  *Id.* at 18-19.  In addition, the school had been notified that N.G. had attempted to commit suicide by ingesting an entire bottle of aspirin and that she was diagnosed with clinical depression.  *Id.* at 18.  There was a multitude of other evidence that the child's "declining grades and poor attendance were caused by her disabilities," including multiple letters from doctors and parents explicitly warning the school district that the depression affected her academic performance.  *Id.* at 28.  Nothing remotely similar occurred here.

or state law, and summary judgment will be granted in its favor as to that portion of the counterclaim.

### 4.     Failure to Consider 105 C.M.R. 201

In their counterclaim, defendants further allege that Lincoln-Sudbury violated Mass. Gen. Laws ch. 111, § 222 and 105 C.M.R. 201 by failing to "assure a gradual return to academic activities and to assess Wallis for concussion symptoms and potential disability." (Ans. at 7; *see also id.* at 22). Defendants contend that the BSEA erred by refusing to consider this claim. (Mem. in Supp. of Counterclaim at 11).[25]

The BSEA correctly excluded from consideration that purported regulatory violation, which was irrelevant to the core issue of whether Wallis was "disabled" within the meaning of applicable federal and state law. Mass. Gen. Laws ch. 111, § 222 directs the Department of Public Health to promulgate regulations to protect student athletes. The Department issued 105 C.M.R. 201 "to provide standardized procedures for persons involved in the prevention, training, management, and return to activity decisions regarding students who incur head injuries while involved in extracurricular athletic activities . . . in order to protect their health and safety." But § 222(f) also specified that "[t]his section shall not create any liability for a course of legal action against a school district, its officers, or employees." Therefore, only the state could bring a proceeding to enforce violations of 105 C.M.R. 201, and the regulation had no relevance in the BSEA proceeding.

---

[25] The hearing officer noted that "BSEA jurisdiction is limited . . . by the statutes and regulations that establish the agency and determine its roles and responsibilities. Pursuant to Massachusetts law, the BSEA [has jurisdiction over matters] concerning: (i) any matter relating to the identification, evaluation, education program, or educational placement of a child with a disability or the provision of a [FAPE] . . . or (ii) a student's rights under Section 504 of the Rehabilitation Act." (A.R. 526).

### 5.    CDC Materials

Defendants seek to supplement the evidentiary record with information from the Centers for Disease Control ("CDC") dated February 16, 2015, concerning the impact of concussions on a child's school performance.  (A.R. 1975-2015).  That information was not offered at the BSEA hearing.  Defendants contend that this Court may take judicial notice of the materials pursuant to Fed. R. Evid. 201(b)(2).

Defendants offered no medical evidence at the BSEA hearing on the subject of whether Wallis's concussion adversely impacted her ability to learn.  They did not call Dr. Gaughan or Dr. Beasley, the only treating physicians, to testify.  (As noted, the parents consulted no physicians between October 2012 and June 2013, by which time they concede Wallis was no longer disabled.)  They did not call, or even attempt to call, any neurologist, special-education professional, or other independent expert witness.  They did not attempt to offer the CDC materials at the hearing.  Accordingly, defendants are essentially seeking to introduce not merely new evidence, but new evidence on a new subject matter.  And they have proffered no reason why they failed even to attempt to offer the evidence at the hearing stage.

Under 20 U.S.C. § 1415(i)(2)(C), a reviewing court may "hear additional evidence at the request of a party."  That is not, however, an open invitation to admit any and all evidence in the district court.  To the contrary, the "First Circuit has outlined a strict approach to the concept of 'additional evidence.'"  *Springer by Springer v. Fairfax Cty. Sch. Bd.*, 134 F.3d 659, 666 (4th Cir. 1998) (citing *Burlington v. Dep't of Educ.*, 736 F.2d 773, 790 (1st Cir. 1984)).  In *Burlington*, the First Circuit stated that the exclusion of "testimony from all who did, or could have, testified before the administrative hearing [is] an appropriate limit in many cases," although district courts have discretion to ensure that *bona fide* new evidence, such as an expert's

update on a child's progress, is admitted. 736 F.2d at 790-91.[26]

Although *Burlington* concerned additional testimony rather than additional exhibits, its core principle is applicable here. The information at issue is not merely supplementary, nor is it genuinely new. Instead, defendants are attempting to raise an entirely new topic, without justification or excuse. Admission of the new evidence is therefore inappropriate. *Id.* at 791 (stating district courts "must be careful not to allow such evidence to change the character of [a court proceeding] from one of review [of an administrative hearing] to a trial *de novo*."). Therefore, the Court will not permit the record to be supplemented with the CDC materials.

### 6.    Alleged Application of a "Passing Grades" Standard

Defendants further argue that the Hearing Officer erroneously applied a "passing grade standard in determining Wallis's disability." (Mem. in Supp. of Counterclaim at 22). In her opinion, the Hearing Officer stated that "Wallis passed all but one of her challenging regular academic and non-academic courses." (A.R. 1379). Defendants contend though that "the question of whether a student is achieving 'good grades' has to be balanced against the student's 'educational and developmental potential.'" (Mem. in Supp. of Counterclaim at 23) (citing 603 C.M.R. 28.02, 28.04).

However, when determining the existence of a disability, the proper reference point is not an individual's potential. Rather, "[i]mpairment is to be measured in relation to normalcy, or, in any event, to what the average person does." *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 156 (1st Cir. 1998) (quoting *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 15-16 (1st Cir. 1997)) (in context of ADA claim). Where even "[t]he most favorable evidence" shows that a student's "grades dipped slightly" but "did not fall below that of the average student [her] age . . . it would

---

[26] The First Circuit declined to adopt a categorical rule disallowing testimony "from all who did, or could have, testified before the administrative hearing." *Burlington*, 736 F.2d at 790.

be error to conclude" that the student "suffered a substantial limitation of a major life activity" such as learning. *Id.*

Accordingly, the hearing officer here did not use an incorrect standard. Furthermore, because Wallis's grades declined only slightly between her freshman and sophomore years and remained average or above-average, her failure to achieve even higher grades does not establish the existence of a disability.

### 7. Entitlement to Reimbursement

As set forth above, the school's purported failure to initiate a special-education evaluation did not violate their legal obligations under federal or state law, and therefore defendants are not entitled to reimbursement for tutoring or tuition for Wallis's attendance at Lawrence Academy. Reimbursement is also inappropriate for at least two other reasons.

First, their request was untimely. As noted above, IDEA requires that the parents provide at least 10 business days' notice to the public school district that they are removing their child to a private school. 20 U.S.C. §1412(a)(10)(C)(iii)(I)(bb). Failure to provide 10 days' notice warrants a reduction or denial of the reimbursement request. *Id.*; *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 240 (2009). As mentioned above, Mr. and Mrs. W. did not notify Lincoln-Sudbury that they were removing Wallis to Lawrence Academy until September 3, 2013. (A.R. 1537). However, Wallis began attending Lawrence Academy on September 6, 2013. (A.R. 1540).

Furthermore, tuition reimbursement under the IDEA is not warranted where the "private school does not offer at least 'some element of special education services in which the public school placement was deficient.'" *Mr. I. ex rel. L.I. v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 24 (1st Cir. 2007) (quoting *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 523 (6th Cir.

2003)). "To hold otherwise would, in essence, embrace the argument we explicitly rejected in [*Rafferty v. Cranston Pub. Sch. Comm.*, 315 F.3d 21, 27 (1st Cir. 2002)]; that the IDEA entitles a parent, at public expense, to seek any alternative school she wishes if the public education is inadequate." *Id.* (quotation marks omitted). Here, defendants have failed to offer any evidence showing that Lawrence Academy offered special-education services that Lincoln-Sudbury failed to provide.[27]

Accordingly, defendants are not entitled to tuition reimbursement under any circumstances.[28] Defendants' motion for summary judgment on their counterclaim will therefore be denied on that basis as well.

**B.     Award of Attorneys' Fees**

**1.     Legal Standard**

Lincoln-Sudbury has moved for summary judgement to recover its attorneys' fees and costs, which amounted to more than $150,000 at the time of the filing of the motion. Under the IDEA, a reviewing court "in its discretion, may award reasonable attorneys' fees as part of the costs" when "the parent's complaint or subsequent cause of action was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation." 20 U.S.C. § 1415(i)(3)(B). In essence, a prevailing school district must make "a showing of both frivolousness and an improper purpose." *Doe ex rel. Doe v. Attleboro Pub. Schs.*, 960 F. Supp. 2d 286, 303 (D. Mass. 2013) (quoting *R.P. v. Prescott Unified Sch. Dist.*, 631

---

[27] In fact, the parents appeared to concede that Wallis was no longer disabled by May 2013, toward the end of her sophomore year. (A.R. 1605) ("[Wallis] is not now brain damaged but was cognitively disabled for an extended period of time."). It is therefore apparent that Wallis did not need special-education services at Lawrence Academy, even if they were available to her.

[28] Even if the parents were entitled to reimbursement, they failed to introduce a single tuition bill from Lawrence Academy in evidence at the hearing. Plaintiffs represent that defendants were precluded from doing so because they failed to comply with BSEA procedures. (Docket No. 70 at 3 n.3).

F.3d 1117, 1126 (9th Cir. 2011)).  The mere fact that the parents bringing suit were unsuccessful "does not make their complaint or subsequent cause of action *per se* frivolous."  *Id.*  Rather, the school district must establish that the action was "unreasonable or without foundation."  *Id.* (quoting *Sagan v. Sumner Cnty. Bd. of Educ.*, 501 Fed. Appx. 537, 541 (6th Cir. 2012)).  "A claim is not frivolous, and therefore not improper if the parent[s] [have] made plausible arguments and 'presented *plausible evidence* that created a *material* fact dispute.'"  *Id.* (quoting *G.M. v. Saddleback Valley Sch. Dist.*, 2012 WL 5947213, at *5 (C.D. Cal. Nov. 26, 2012)) (emphasis in original).

## 2. Lincoln-Sudbury Was a Prevailing Party

"A party has prevailed if there has been 'a material alteration of the legal relationship of the parties' and a 'judicial *imprimatur* on the change.'"  *Doe*, 960 F. Supp. 2d at 299 (quoting *Smith v. Fitchburg Pub. Schs.*, 401 F.3d 16, 22 (1st Cir. 2005)) (emphasis in original).  "The party must have obtained relief on the merits, or in a consent decree, not merely through a favorable private settlement or voluntary change in behavior by the defendant."  *Id.*  "A favorable ruling from an administrative hearing officer serves as the necessary judicial imprimatur to confer prevailing party status.  *Id.* (citing *Schroeder v. Triton Reg'l Sch. Dist.*, 2007 U.S. Dist. LEXIS 100119, at *25-26 (D. Mass. Dec. 18, 2007)).  The ruling "cannot be a 'purely technical or de minimis victory.'"  *Id.* (quoting *Me. Sch. Admin. Dist. No. 35 v. Mr. R.*, 321 F.3d 9, 15 (1st Cir. 2003)).

The hearing officer's ruling satisfies this test.  The opinion stated that "[t]he parents' claims . . . are not supported by the evidence in the record and are dismissed with prejudice." (A.R. 1384).  In addition, the ruling was made on the merits after consideration of approximately 2,500 pages of exhibits and transcripts.  That was not a "technical" or "de minimis" victory for

the district.  Furthermore, and in any event, defendants do not dispute that Lincoln-Sudbury was the "prevailing party" at the BSEA proceeding.

### 3.      Defendants' Arguments Were Frivolous and Unreasonable

The claims brought before the BSEA were patently frivolous and unreasonable.  As set forth at length above, Wallis at most suffered a temporary disability when she received a concussion on September 30.  Her physician prescribed various restrictions through October 29, which the school accepted and followed.  She was allowed to make up assignments and received a variety of other forms of support and accommodation.  She was offered additional assistance in the one class in which she struggled, and declined to take advantage of it.  She received no medical care for post-concussion symptoms for eight months, and with some minor exceptions voiced no complaints.  No one—not her parents, her doctor, or any other form of specialist— ever suggested that she needed special-education services during that period, or needed any restrictions on her studies or physical activities.  No one stated or suggested that she had a continuing disability.  And she earned average or above-average grades in some of the most difficult classes the school offered.

Defendants did not even suggest that Wallis was disabled until the following May, after they discovered that Dorey had recommended that she take a lower-level math course for the following academic year.  Even then, defendants did not claim that she was currently disabled, only that she had been disabled in the past.  They demanded that the school pay for private tutoring services, even though Wallis had not taken advantage of the extra support provided by the school.  They ultimately demanded that the school reimburse them for private tuition, even though Wallis was not disabled, was not failing to access the school curriculum, and did not need special-education services.  And defendants did not send her to a school for the purposes of

40

providing her with special-education services; apparently, she received no such services of any kind at her new private school. Under the circumstances, defendants' claim was clearly frivolous and unreasonable.

### 4. Defendants' Claims Were Brought in Bad Faith

Once the parents became aware of Dorey's recommendation that Wallis take a less-intensive math course, Mr. and Mrs. W. did not engage in a constructive process and debate with the school (or, for that matter, exercise their parental override rights to keep her at the higher-level class). Instead, they became enraged, and began to attack the motives and actions of the Lincoln-Sudbury staff.

For example, in an e-mail dated May 19, 2013, the parents wrote that Park's proposal for helping Wallis catch up "reads like a punishment and mandate" and included "new, unexplained, unreasonable and unjustified quarter grade and final exam ultimatums." (A.R. 1602). In an e-mail dated June 10, they accused Lincoln-Sudbury of having "coercive, baiting, intimidating and unproductive sessions with [Wallis] that not only [fail to] provide any help, [but also] harass and upset her . . . ." (A.R. 1622). In an e-mail dated June 12, Mrs. W. claimed that Crawford doctored Wallis's academic record, adding that she objected to Crawford's "fabrications, sloppiness, and false portrayals." (A.R. 2111). In other e-mails, Mr. and Mrs. W. accused Lincoln-Sudbury staff of making false statements and misrepresentations. *See*, *e.g.*, (A.R. 242, 1605).

During the administrative hearing, Mrs. W. used her opening statement to launch into a tirade against the hearing officer, the attorney for the school district, the teachers, the superintendent, and the athletic staff. (Tr. II 44-68). Among other things, Mrs. W. stated that the district attempted to "limit fact-finding" and "conceal the truth" (Tr. II 44); that the hearing

officers were "prejudicial and unduly burdensome" (Tr. II 49); that the hearing process was "corrupted and biased" (Tr. II 54); that Lincoln-Sudbury put forth "false statements, misrepresentations, [and] fabrications, while stalling, denying, hiding, distracting, sabotaging, twisting, delaying, preventing, undermining, misinterpreting, and acting in bad faith" (Tr. II 55); that the BSEA allowed "hypocrisy and false constraints" (Tr. II 56); that "really unqualified staff" treated defendants in "harsh, aggressive, and dishonest ways" (Tr. II 57); that school staff "portray[ed] [defendants] falsely, and negatively" and "rebuffed and bullied" them (Tr. II 58); and that key decisionmakers were "woefully unaware, excessively ignorant, [and] unsatisfactorily untrained" or "committed nonfeasance, misfeasance, and malfeasance" (Tr. II 66). Such statements are well beyond the bounds of good faith, even taking into account the fact that they were emotionally involved parents, rather than trained professionals.

Furthermore, and as noted, during the hearing itself, the parents failed to offer even a scintilla of medical evidence or testimony in support of their argument that the concussion prevented Wallis from accessing course material after October 29. If their claims had any merit at all, surely they could have found evidence to support them.

The parents' vendetta against school staff, particularly Dorey and Crawford, has continued for five years and cost the district hundreds of thousands of dollars in attorneys' fees, and consumed significant time and attention from school officials. Based on the evidence in the record, it appears that Lincoln-Sudbury staff were patient and accommodating, and complied with Dr. Gaughan's orders in their entirety. By contrast, the parents made unreasonable and unjustified demands, used inflammatory language, and otherwise harassed school officials (and the hearing officers), caused unnecessary delays, and increased the cost of the proceeding.

Accordingly, the Court agrees with the hearing officer that "[i]f ever a matter merited a finding that it was brought for an improper purpose it is this." (A.R. 1383).

**5.      Conclusion**

For the foregoing reasons, and based on the undisputed material facts in the record, the proceeding before the BSEA brought by Mr. and Mrs. W., and this subsequent appeal, were frivolous and brought for an improper purpose, including the purposes of harassment, causing unnecessary delay, and needlessly increasing the cost of litigation. *See* 20 U.S.C. § 1415(i)(3)(B). The Court will therefore award reasonable attorneys' fees as part of the costs to the Lincoln-Sudbury Regional School District. The amount of those fees and costs will be determined at a later stage in this proceeding.

**III.      Conclusion**

For the foregoing reasons, plaintiffs' motion for summary judgment is GRANTED as to defendants' liability for reasonable attorneys' fees and costs, and defendants' motion for summary judgment on the issue of attorneys' fees is DENIED. The amount of those fees and costs will be determined at a later stage in this proceeding. Defendants' motion to reverse the decision of the BSEA is DENIED.

**So Ordered.**


/s/  F. Dennis Saylor
F. Dennis Saylor IV
Dated:  January 25, 2018                          United States District Judge